

Houston Goddard
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Marciano Munoz-De La O

United States District Court
Eastern District of Washington
Hon. Rosanna Malouf Peterson

United States,

Plaintiff,

v.

Marciano Munoz-De La O,

Defendant.

No. 2:20-cr-134-RMP

Reply Supporting Motion to Dismiss Because §1326 Violates the Fifth Amendment

# I. Introduction

In *Arlington Heights*,[1] the Supreme Court set out the two showings necessary to establish a race-based equal protection challenge: (1) the legislature that enacted the law was motivated in part by racial animus, and (2) the law disparately impacts one race. Marciano Muñoz De La O made that showing by setting out the sordid history behind the unlawful reentry statute, which is enforced almost exclusively against Latinxs. The government does not contest that the 1929 Undesirable Aliens Act (which criminalized reentry, and which the government calls the "first version" of 8 U.S.C. §1326) was motivated by racial animus, or that almost all §1326 prosecutions are against Latinxs. Instead, the government attempts to divert the Court's attention from the statute's racist history in three ways:

***First,*** the government argues the Court should not concern itself with the motivations behind criminal immigration laws. In the government's view, so long as the law is facially neutral, the Court should apply a lesser standard of review that would require courts to uphold criminal immigration laws no matter how obvious and odious the racial animus behind the law.

***Second,*** if the Court does look to the motivations behind the unlawful reentry statute, the government argues the Court must start at 1952—when Congress shifted the statute from one section of the criminal code to another (§1326). According to the

[1] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

government, that shift within the code wiped the historical slate clean and the Court therefore cannot consider the racist history of the "first version" of §1326.

***Third,*** if the Court does determine that racial animus was a motivating factor in enacting the statute, the government argues it doesn't matter because later Congresses cured the law by amending it.

Each of these arguments is easily dispatched. First, courts are not forbidden from assessing whether a criminal law is racially motivated; to the contrary, courts' role in our system of government is precisely to determine whether laws enacted by legislatures offend the Constitution. Second, moving a statute from one section of the code to another does not erase its history, and regardless the 1952 Congress recodified the unlawful reentry statute not just in spite of the 1929 Congress's racism but also due to its own racial animus. Third, the Congresses that amended §1326 did not cure the law of racial animus; as set out by Dr. S. Deborah Kang, a professor specializing in immigration history, those Congresses were themselves acting with racial animus.

Because Congress acted with racial animus when it criminalized reentry, and because almost all prosecutions under §1326 are against Latinxs, Mr. Muñoz asks the Court to join the Honorable Miranda M. Du in finding that §1326 violates the Fifth Amendment's equal protection guarantee. *See U.S. v. Carrillo-Lopez*, ___F.Supp.3d___, 2021 WL 3667330 (D. Nev. Aug. 8, 2021).

## II. Unopposed Request for an Evidentiary Hearing

To rebut the government's unfounded claim that the amendments to §1326 were free of racial animus, Mr. Muñoz retained S. Deborah Kang, M.A., Ph. D., a professor at the University of Virginia's Corcoran Department of History, who specializes in immigration history.[2] Dr. Kang prepared an affidavit that shows every amendment to §1326 was "enacted with a discriminatory purpose."[3]

While Dr. Kang's affidavit is thorough and convincing, Mr. Muñoz respectfully asks the Court to set an evidentiary hearing so Dr. Kang could provide oral testimony in support of her affidavit. This would allow Dr. Kang to supplement her affidavit as necessary and to answer any questions from the Court. The government does not oppose this request.

## III. Discussion

### A. Congress cannot shield racist laws from judicial scrutiny.

In its response, the government asks the Court to jettison the traditional equal-protection analysis and instead apply "deferential rational basis review."[4] Why? Because §1326—a criminal statute authorizing up to 20 years of incarceration—"is at its heart an immigration provision" (as opposed to a criminal provision), so "different

[2] *See* Exhibit A (Curriculum vitae of Dr. S. Deborah Kang).

[3] Exhibit B (Affidavit of Dr. S. Deborah Kang, dated December 22, 2021) at 1.

[4] ECF No. 64 (Response) at 10.

rules apply."[5] Those different rules apply because immigration is "terrain left to the political branches," leaving §1326 "largely immune from judicial control."[6]

In effect, the government tries to change the rules because it cannot defend §1326 under the appropriate *Arlington Heights* framework.

**1. Courts assess race- and ethnicity-based equal protection claims under *Arlington Heights*.**

Trial courts routinely apply *Arlington Heights* to race- and ethnicity-based equal protection claims.[7] Just last year, a district court noted that, even in the civil immigration context, "[s]everal recent district court opinions have also applied the *Arlington Heights* framework to evaluate whether the federal government acted with discriminatory purpose despite a facially neutral action." *California v. U.S. Dep't of Homeland Sec.*, 476 F.Supp.3d 994, 1023 (N.D. Cal. 2020).

These district courts are correctly following the lead of the Ninth Circuit and the Supreme Court. Twice in the past three years, the Ninth Circuit has applied *Arlington Heights* in high-profile civil immigration cases. In *Ramos v. Wolf*, the Ninth Circuit applied *Arlington Heights* in an equal-protection challenge to the government's

[5] Response at 12.

[6] Response at 9–10 (citations and quotations omitted).

[7] *See, e.g., California v. U.S. Dep't of Homeland Sec.*, 476 F.Supp.3d 994, 1018–23 (N.D. Cal. 2020); *Cook Cty., Illinois v. Wolf*, 461 F.Supp.3d 779, 789 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 325 (D. Md. 2018); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F.Supp.3d 393,412 (D. Mass. 2018).

termination of the Temporary Protected Status program. 975 F.3d 872, 896 (9th Cir. 2020). And in *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, the Ninth Circuit applied *Arlington Heights* in an equal-protection challenge to the government's rescission of the Deferred Action for Childhood Arrivals (DACA) program. 908 F.3d 476, 518–20 (9th Cir. 2018). The Supreme Court then heard the DACA case, and at least five Justices agreed *Arlington Heights* applied, although they rejected the plaintiffs' claim on the facts. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1915–16 (2020); *id.* at 1917–18 (Sotomayor, J.).

If *Arlington Heights* applies to civil claims of race- and ethnicity-based discrimination, it certainly applies in the criminal context. This is consistent with basic separation of powers principles: Congress makes the laws, and courts determine whether those laws pass constitutional muster. There is no reason the rules should be any different just because a criminal law touches on immigration. As the Ninth Circuit put it: "A challenged law does not receive minimal scrutiny merely because it is related to immigration." *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018).

**2. The government's attempts to push the Court away from *Arlington Heights*'s higher level of scrutiny fall short.**

In arguing for "deferential rational basis review," the government cites to a number of civil cases that are easily distinguishable. For example, the government cites to *Trump v. Hawaii*, 138 S.Ct. 2392 (2018), for the proposition that rational basis

review "applies equally to constitutional questions."[8] The government fails to appreciate that President Trump's "Muslim ban" (at issue in that case) was a civil matter addressing the entry of individuals from outside the country.

That is not this case. Mr. Muñoz's challenge is to a criminal statute employed to incarcerate members of our community for up to two decades. When one's liberty is on the line, the full panoply of constitutional protections applies. As the Supreme Court has held, constitutional protections are afforded to noncitizens even under civil immigration laws where the government seeks to "punish[] by deprivation of liberty and property." *Wong Wing v. U.S.*, 163 U.S. 228, 237 (1896).[9] When Congress imposes criminal sanctions, we have departed the "terrain left to political branches" and any hands-off review of legislation necessarily ends.

While the government correctly notes that some district courts have bought its argument for rational-basis review,[10] courts that have engaged with the issue have rightly been unpersuaded. *See, e.g., U.S. v. Carrillo-Lopez*, 2021 WL 3667330 at *1–3 (applying *Arlington Heights* after being "unpersuaded that a criminal law enacted by

---

[8] Response at 10.

[9] *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent") (citations omitted).

[10] Response at 13. The government also cites to *U.S. v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), Response at 12–13, but that case simply established Congress has the authority to criminalize reentry—a proposition Muñoz does not contest.

Congress is free from constitutional equal protection constraints, even if the offense relates to immigration"); *U.S. v. Machic-Xiap*, ___F.Supp.3d___, 2021 WL 3362738 at *9–10 (D. Or. Aug. 3, 2021) at *9–10 ("Freedom from imprisonment … lies at the heart of the liberty that the Fifth Amendment's Due Process Clause protects. The Government's assertion that the Court has little role in policing the Fifth Amendment's boundaries in a case where the defendant faces risk of imprisonment is without merit."); *see also U.S. v. Rios-Montano*, 2020 WL 7226441 at *2 (S.D. Cal. 2020) (applying *Arlington Heights* to a constitutional challenge to 8 U.S.C. §1325).

**3. It cannot be that racist laws must stand so long as they touch on immigration.**

The government's argument for rational-basis review is wrong on the law, and it fundamentally misunderstands Mr. Muñoz's situation as a defendant facing criminal charges. This is a routine criminal case. When the government sought to prosecute Mr. Muñoz, it took the case before a grand jury.[11] The magistrate arraigned Mr. Muñoz and informed him of his rights—to remain silent, to be represented by counsel, to trial by a jury of his peers.[12] Mr. Muñoz was granted pretrial release, and he has resided in the community without incident for well over a year.[13] At no point

[11] *See* ECF No. 23 (Indictment).

[12] *See* ECF No. 28 (Minute Entry of Arraignment).

[13] *See* ECF No. 18 (Order Following Detention Hearing, and Striking Preliminary Hearing).

has there been any indication Mr. Muñoz's criminal proceedings differ because his alleged crime has some connection to this country's immigration laws.

Just like any other individual facing criminal charges, Mr. Muñoz has the right to challenge the law he is alleged to have violated—and to have a court assess whether the law impermissibly discriminates on the basis of race. This is especially the case when that law is employed almost exclusively against one race. If Mr. Muñoz and others in his situation were barred from challenging such a law, Congress would have carte blanche to pass any law it wanted—no matter how obviously racist—so long as the law itself was couched in neutral terms and somehow touched on immigration.

The government disagrees and insists it is permitted to prosecute Mr. Muñoz (and potentially send him to prison for years) without the Court so much as considering whether §1326 was passed specifically to target Latinxs.

This cannot be. It cannot be that courts are barred from analyzing whether a law violates the Constitution on the basis of race—the most suspect category, *see Loving v. Virginia*, 388 U.S. 1, 11 (1967) ("the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the most rigid scrutiny")—simply because the law has some connection to immigration. The "sensitive inquiry" demanded by *Arlington Heights* provides a necessary bulwark against precisely such unconstitutional discrimination. 429 U.S. at 266.

**B. The government concedes Congress acted with discriminatory intent when it criminalized reentry.**

In its response, the government does not contest the overwhelming evidence showing the 1929 Congress acted with a discriminatory purpose when it criminalized reentry under the Undesirable Aliens Act.[14] The government explicitly conceded this point in separate proceedings. *See Carrillo-Lopez*, 2021 WL 3667330 at *7.

There is no question that anti-Latinx animus motivated Congress's passage of the Undesirable Aliens Act and its criminalization of reentry. As such, Mr. Muñoz has established discriminatory intent.

**1. By shifting the statute to a new location in the criminal code, Congress did not erase its discriminatory intent.**

Despite characterizing the Undesirable Aliens Act's unlawful reentry provision as the "first version" of §1326,[15] the government now insists this concededly racist "first version" has no bearing on the almost-identical law recodified at §1326 in 1952. The government argues legislative intent does not "carr[y] over from one law to the next."[16] This is contrary to the Supreme Court's instruction that "in construing [a statute] we may refer to the ***purpose*** and scope of the act from which it was derived."

---

[14] *See* ECF No. 61 (Motion) at 6–16. The Court noted that some documents filed in *Carrillo-Lopez* had not been filed in this case. *See* ECF No. 76. With the filing of this reply, all pertinent documents before Judge Du in *Carrillo-Lopez* are before this Court. A chart listing each document is attached as Exhibit C.

[15] Exhibit D (United States Attorneys' Bulletin, dated July 2017) at 1.

[16] Response at 19.

*U.S. v. Mason*, 218 U.S. 517, 525 (1910) (emphasis added); *see also U.S. v. Ryder*, 110 U.S. 729, 740 (1884) ("[i]t will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed"); *U.S. v. Nishiie*, 996 F.3d 1013, 1026 (9th Cir. 2021) ("codification does not alter congressional meaning evident from prior history").

The government relies heavily on *Abbott v. Perez*, 138 S. Ct. 2305 (2018), without acknowledging that *Abbott* itself confirms that the original legislature's intent is relevant to determining the reenacting legislature's intent, "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding" such intent. *Id.* at 2327. In *Abbott*, the Supreme Court made clear that the law in question withstood an *Arlington Heights* challenge only because the reenacting legislature had not "carried forward the effects of any discriminatory intent on the part of the" legislature that had initially enacted a racist law. *Id.* at 2325. The Court distinguished *Hunter v. Underwood*, 471 U.S. 222 (1985), where "amendments [to a racist law] did not alter the intent" of the law—and the law was therefore unconstitutional. 138 S. Ct. at 2325. And the Court upheld the law in question only because the reenacting legislature had engaged with the racism behind the original law and passed a new law explicitly created to "fix the problems identified." 138 S. Ct. at 2329.

Here, the 1952 Congress didn't engage with the 1929 law's racist history at all. It simply shifted the unlawful reentry statute to a different section of the U.S. Code as

part of the McCarran-Walter Act's consolidation of immigration laws, tweaking the language to make it easier to prosecute that crime.

Recognizing Congress did not "fix the problems identified," the government offers a curious explanation: the law is too simple to fix.[17] But if it's so simple, why has Congress amended it five separate times? The 1952 Congress's decision to tweak the statute only to make it easier to prosecute the offense—by expanding it to cover those "found in" the U.S., while continuing to protect employers and ensure border enforcement remained lax—is a clear sign Congress did not engage with the law's racist origins and made no effort to "fix the problems identified."

Recent Ninth Circuit case law demonstrates the error of the government's view. In *U.S. v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021), the Ninth Circuit looked to the Undesirable Aliens Act of 1929 when assessing 8 U.S.C. §1325, which criminalizes entry (as opposed to reentry). The Ninth Circuit found it important that "the precursor statutes to both §1325(a) and §1326(a), which bear substantially similar language to the modern statutes, were enacted together in 1929 as part of" the Undesirable Aliens Act. *Id.* at 1298. Why? Because "when statutes are enacted shortly after one another and address the same subject and use similar language, that demonstrates Congress's intent that they have the same meaning." *Id.* That is, the

[17] Reponse at 18 ("[C]riminalizing illegal reentry is rather simple; one of the least complex laws in the United States Code. How could the [1929 and 1952] laws not be similar?").

Ninth Circuit explicitly tied §1326 to its "precursor statute," the Undesirable Aliens Act, finding it was "Congress's intent that they have the same meaning." *Id*. It is therefore appropriate for this Court to construe §1326 by referring to its precursor statute, the Undesirable Aliens Act's unlawful reentry provision, and to find discriminatory intent.

In short, Judge Du was correct to find that "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Carrillo-Lopez*, 2021 WL 3667330 at *10.

**2. Dr. Kang's evidence confirms the 1952 Congress acted with a discriminatory purpose when it recodified the unlawful reentry statute.**

Because racial animus motivated the 1929 Congress to criminalize reentry under the Undesirable Aliens Act, and because the 1952 Congress simply recodified that law at §1326 without engaging with its discriminatory intent, there is no need for the Court to assess the McCarran-Walter Act under *Arlington Heights*. The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry statute—without debate on (and with full knowledge of) the statute's discriminatory intent and disparate impact—establishes the discriminatory intent needed under *Arlington Heights*.

However, should the Court assess the McCarran-Walter Act, the record (particularly as buttressed by Dr. Kang's evidence) demonstrates, by at least a

preponderance of the evidence, that racial animus was a motivating factor in the 1952 Congress's recodification of the unlawful reentry statute at §1326. Such an assessment would require "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including (1) the "historical background of the decision," (2) the "specific sequence of events leading to the challenged decision," (3) the "legislative or administrative history," and (4) any "[d]epartures from normal procedural sequence." *Arlington Heights*, 429 U.S. at 265–68.

Out of an abundance of caution, Mr. Muñoz walked through that analysis for the McCarren-Walter Act.[18] Here, he adds Dr. Kang's evidence:

**a. The first factor (the law's historical background) shows a discriminatory purpose.**

Mr. Muñoz highlighted three particular areas of §1326's historical background. First, the racial animus underpinning the Undesirable Aliens Act of 1929, which informed the 1952 Congress's recodification of the unlawful reentry provision.[19] Second, the anti-Latinx racism that continued from 1929 to 1952, most notably the "repatriation drives" of the Great Depression and the subsequent "Bracero Program."[20] Third, the 1952 Congress's debate and passage of the "Wetback Bill,"

---

[18] Motion at 21–32.

[19] Motion at 21.

[20] Motion at 22–25. Dr. Kang provided substantial additional evidence on the "Bracero Program," a particularly dark chapter in this country's history. Exhibit B at 6–12. Dr. Kang concludes that "the immigration enforcement policies of the Bracero era powerfully reinforced

which included regular use of the racial slur "wetback," just two months before its passage of the McCarran-Walter Act.[21]

The government does not contest the racial animus underpinning the Undesirable Aliens Act, the anti-Latinx racism that continued through 1952, or the repeated use of the racial slur "wetback" by members of Congress just two months before they recodified the unlawful reentry statute at §1326. The government's only response is to note the "Wetback Bill" did not address unlawful reentry.[22] It is not surprising the government has little to say in the face of such overwhelming evidence of racial animus. While the government's one point (that the "Wetback Bill" did not address unlawful reentry) is correct, Congress's regular use of that epithet is certainly "historical background" evidence of racial animus from the body that would pass the McCarran-Walter Act just two months later.

To the extent the Court questions whether the historical background leading up to Congress's passage of the McCarran-Walter Act demonstrates racial animus, Dr. Kang addresses that issue thoroughly. As Dr. Kang explains, Senator McCarran was a racist and anti-Semite who drafted provisions barring European Jews' admission

longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable force." Exhibit B at 11.

[21] Motion at 25–26.

[22] Response at 18.

to the U.S. in the 1940s.[23] He described the threat of immigration as one of the United States being "overrun, perverted, contaminated, or destroyed."[24] He also worked to ensure the continued vitality of the compromise struck in the Undesirable Aliens Act: granting Anglo business owners access to cheap Latinx labor (by weakening border protection and continuing the exemption of Latin America from the national quota system) while ensuring Latinxs could not become permanent members of the community (through various means, including the expanded criminalization of reentry).[25] Even the State Department agrees Senator McCarran was motivated to secure passage of the McCarran-Walter Act by concern "that unassimilated aliens could threaten the foundations of American life."[26] As Dr. Kang summarizes it:

> [A]nti-Mexican animus informed the passage of the 1929 Undesirable Aliens Act and its 1952 revision. Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness. In times of prosperity, agricultural labor programs, such as the Bracero Program, welcomed Mexicans to the United States; in moments of economic crisis, however, laws such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 [§1325 and §1326, the unlawful entry and reentry statutes]

---

[23] *See* Exhibit B at 18–19 n.54. *See also* Exhibit E (Letter from Senators Jacky Rosen and Catherine Cortez Masto and Representatives Steven Horsford, Dina Titus, and Susie Lee, dated June 19, 2020), describing Senator McCarran's "dark legacy of virulent racism, anti-Semitism, and xenophobia," describing him as "a man who advocated bigotry," and requesting that his statue be removed from the National Statuary Hall Collection.

[24] *See* Exhibit E.

[25] *See* Exhibit B at 18–19.

[26] U.S. Dep't of State, Office of the Historian, *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)*, https://bit.ly/32d4Y6B.

> could be used to deter prospective arrivals. In short, the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship.[27]

Dr. Kang's evidence is consistent with—and builds on—the historical background set out in Mr. Muñoz's motion. It establishes beyond any doubt that the historical background of the McCarran-Walter Act supports a finding that racial animus motivated the 1952 Congress to recodify the unlawful reentry statute at §1326.

**b. The second factor (events leading up to the law) shows a discriminatory purpose.**

Mr. Muñoz highlighted two events leading up to the recodification of the unlawful reentry statute at §1326: Congress's passage of the "Wetback Bill" two months earlier and Deputy Attorney General Peyton Ford's use of the racial slur "wetback" in a letter to the Judiciary Committee regarding the unlawful reentry statute.[28] The government does not dispute that "wetback" is a racial slur and was understood as such in 1952, but argues Ford's use of the epithet "cannot be indicative of the motivations of Congress" in enacting §1326 because Ford was not a member of Congress.[29]

---

[27] Exhibit B at 99.

[28] Motion at 26–27.

[29] Response at 18. While government counsel in this case does not argue "wetback" was ever an appropriate way to refer to Mexicans, his colleagues at the Department of Justice have taken a different tack. In the Opening Brief of its appeal in *Carrillo-Lopez*, the government argues that this highly offensive term was, in the early 1950s, "often used to refer to an undocumented

Mr. Muñoz maintains the open racism of the man speaking for the Department of Justice is significant. Regardless, Dr. Kang has pointed to instances of Senator McCarran (the man behind the 1952 recodification of the unlawful reentry statute) using the racial slur "wetback." He did so repeatedly, including in Senate committee hearings in 1951 and 1953.[30]

Even were the Court to agree with the government that Ford's use of the term "wetback" is limited evidence of racial animus because Ford was not a member of Congress, that argument does not carry over to Senator McCarran. Not only was Senator McCarran a member of Congress, he was the driving force behind the McCarran-Walter Act. His open anti-Latinx racism is significant evidence of the racial animus that motivated the codification of the unlawful reentry statute at §1326.

---

worker from Mexico" and the term has come to be "understood as a 'racial epithet'" only as a result of "linguistic norms chang[ing] over time." *U.S. v. Carrillo-Lopez*, Ninth Circuit Case No. 21-10233, Dkt. Ent. 5 at 48. The government offers no support for this argument other than its assertion that many people used the term "wetback" in the early 1950s. *Id.* at 48–49. It is not difficult to think of other racial slurs that were once common in this country that were offensive then and remain so now. Common usage in no way suggests the term "wetback" was anything but a racial slur in the early 1950s. As Professor Gonzalez-O'Brien testified in *Carrillo-Lopez*, the "term 'wetback' is one that is racially derogatory [and] was recognized as being racially derogatory at the time." ECF No. 61-5 at 90.

[30] *See* Exhibit B at 17–18; Exhibit F (Hearings before the Subcommittee of the Committee on Appropriations, U.S. Senate, March 25, 1953) at 245–46; Exhibit G (Hearings before the Subcommittee of the Committee on Appropriations, U.S. Senate, March 8, 1951) at 124.

**c. The third factor (legislative history) shows a discriminatory purpose.**

The government argues the scarcity of legislative history regarding §1326 disqualifies Mr. Muñoz's argument.[31] However, Dr. Kang shows that Congress's relative silence around the recodification of the unlawful reentry statute cannot be read as suggesting an absence of racial animus. To the contrary, opponents of §1326 knew that arguing against the racism underlying that provision would be ineffective because Senator McCarran "regularly wielded his authority to delay and block the passage of any liberal immigration reforms."[32]

As Dr. Kang establishes, "Those congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists."[33] Or, as Representative Emanuel Celler of New York put it, "I knew that a really liberal immigration bill … had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[34]

[31] Response at 25–26.

[32] Exhibit B at 19.

[33] Exhibit B at 23.

[34] *See* Exhibit B at 20.

While there was little discussion of the 1952 recodification of the unlawful reentry statute at §1326, Congress's one change to the law was telling.[35] That one change was to expand the law to cover those "found in" the United States, thereby massively extending the scope of the 1929 law.[36] This change served no purpose other than to make it easier to prosecute the Latinxs that Congress knew were disparately impacted by the racially motivated law. This legislative history demonstrates that racial animus was a motivating factor in Congress's recodification of the unlawful reentry statute at §1326.

**d. The fourth factor (deviations from procedural norms) shows a discriminatory purpose.**

Mr. Muñoz highlighted three relevant deviations from procedural norms: Congress passed the Wetback Bill just two months before enacting §1326, Congress expanded the unlawful reentry statute based on a letter using a racial slur, and Congress passed §1326 with little debate despite knowing of its disparate impact on Latinxs.[37] Dr. Kang identified two additional deviations:

[35] In addition to this change to the unlawful reentry statute, Congress lessened the penalty for unlawful entry (recodified at 8 U.S.C. §1325) from a felony to a misdemeanor, specifically to avoid the need to present the case to a grand jury and to deprive defendants of a jury trial. INS pursued this revision because grand juries "typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers and, as a result, often refused to indict." *See* Exhibit B at 22. Over 90% of immigration crimes were "no-billed" in El Paso, TX, in the late 1940s. *See* Exhibit B at 22, n.69.

[36] *See* Exhibit B at 21.

[37] Motion at 29–31. The government did not engage with these arguments and instead simply

First, Congress obstructed efforts at effective border enforcement. As Dr. Kang sets out, "congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills."[38] While leaders of the Immigration and Naturalization Service (INS) repeatedly asked the Appropriations Committee (of which Senator McCarran was a member) for funds to hire more Border Patrol agents and to construct more processing facilities to control the number of unlawful entries, Senator McCarran "worked to remove obstacles to the undocumented crossings of Mexican workers" and "routinely supported reductions in funding for border enforcement operations."[39] Senator McCarran's support of INS budget cuts "defended a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers."[40] Senator McCarran justified a denial of an INS appropriations request by explaining southwestern growers' "desire for these wetbacks" took precedence over the agency's enforcement needs.[41]

Second, Congress rejected INS's proposal for employer penalties to deter unlawful immigration. As Dr. Kang establishes, INS proposed such sanctions, and the

---

stated (incorrectly) that Muñoz "had failed to reveal procedural or substantive irregularities underlying the [McCarran-Walter Act]." Response at 26.

[38] Exhibit B at 15.

[39] Exhibit B at 17.

[40] Exhibit B at 17.

[41] *See* Exhibit B at 18; Exhibit F at 245.

Truman administration published that recommendation in a 1951 report explaining that (as Dr. Kang summarizes it) "American growers created the conditions that drew undocumented works to the United States in the first place"—and that it was those American growers "rather than the migrants themselves, [who] bear the principal responsibility for the so-called crisis on the border."[42] But, "[a]s in the 1920s, racist conceptions of Mexican migrants as the ideal agricultural workforce led congressional conservatives to ... reject efficacious employer penalty proposals."[43]

These irregularities demonstrate that it was racial animus—not a race-neutral desire to prevent unlawful immigration—that motivated Congress's recodification of the unlawful reentry statute at §1326. If Congress's true aim was preventing unlawful immigration, it was illogical and counter-intuitive for it to cut the border enforcement budget and to refuse to sanction employers who hired undocumented immigrants.

* * *

Based on the record before the Court in *Carrillo-Lopez*, Judge Du was correct to find "the totality of the evidence shows that the same factors motivating the passage of [the unlawful reentry statute] in 1929 were present in 1952"—meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326."

---

[42] Exhibit B at 14.

[43] Exhibit B at 13. These efforts were led by Senator Allen Ellender of Louisiana, the son of Louisiana plantation owners, a lifelong segregationist and civil rights opponent, and an ally of agribusiness. *See* Exhibit B at 15–16.

2021 WL 3667330 at *10, 16. Dr. Kang's additional evidence only underscores that point.

**C. Congress's later amendments to §1326 did not cleanse that law of racial animus.**

In its response, the government argues Congress's amendments to §1326 "provide incontrovertible evidence that Congress would have criminalized unlawful reentry regardless of any racially discriminatory motivation from the 1920's."[44] (Once a challenger has established discriminatory intent, "the burden shifts to the law's defenders to demonstrate that the law would have been ***enacted*** without" the motivating factor of racial discrimination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).) But those amendments have no bearing on the one relevant question: whether the Congress that ***enacted*** (not amended) the unlawful reentry statute would have done so absent racial animus.

The government's argument misses the distinction between enacting a bill and amending a bill already on the books, and the government does not argue the 1929 Congress or 1952 Congress would have criminalized reentry without the motivating factor of racial discrimination.

Even were the Court to determine that actions of an amending Congress could theoretically demonstrate the intent behind a law it did not enact, there is no such

[44] Response at 26–27.

evidence here. None of the amendments to §1326 involved Congress reconsidering the decision to criminalize reentry. Quite the opposite. The amendments expanded the pool of individuals who could be punished, stiffened penalties, and limited collateral attacks on removal orders—all ensuring more Latinxs would be incarcerated for more time. As Judge Du found, the amendments "do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23. The Supreme Court has agreed, noting (with respect to the 1988 amendment) the legislative history "speaks about, and only about, the creation of new penalties." *Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998). At no point since 1929 has Congress debated unlawful reentry or given any indication it would have criminalized reentry had that law not already been on the books.

Finally, even were the Court to determine one or more of the amending Congresses would have criminalized reentry, none would have done so without the motivating factor of racial discrimination. While the government argues "no evidence of racial animus exists" with respect to the amending Congresses,[45] Dr. Kang thoroughly refutes that claim by developing the record for each of the five amendments, which are contained in:

1) the Anti-Drug Abuse Act of 1988;

[45] Response at 21.

2) the Immigration Act of 1990;

3) the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA);

4) the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA); and

5) the Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).

As Dr. Kang details, these amendments were authored by elected officials from Florida (Senator Lawton Chiles, Senator Bob Graham, and Representative Bill McCollum) working in close conjunction with the Federation for American Immigration Reform (FAIR)—an anti-immigrant hate group, as designated by the Southern Poverty Law Center—in response to a perceived crisis that the nation had lost control of its borders.[46] While shifting societal norms made the overt racism of earlier decades unacceptable and the legislative history is therefore less rife with racial slurs, Dr. Kang demonstrates that each amendment to §1326 was "enacted with a discriminatory purpose."[47]

**1. Anti-Drug Abuse Act of 1988**

The Anti-Drug Abuse Act was a legislative centerpiece of President Reagan's War on Drugs.[48] The Act took an extraordinarily punitive approach to drug crimes by establishing severe mandatory minimum sentences for drug offenses, expanding the

[46] Exhibit B at 25; Southern Poverty Law Center, *Federation for American Immigration Reform*, https://bit.ly/3qgZike.

[47] Exhibit B at 1.

[48] *See* Exhibit B at 44 n.155.

death penalty for drug crimes, permitting public housing authorities to evict tenants, and revoking public benefits such as student loans.[49]

Senator Chiles of Florida, who coordinated with FAIR, was responsible for drafting the immigration provisions of the Anti-Drug Abuse Act.[50] Those provisions introduced the concept of an "aggravated felony," curtailed the procedural rights of noncitizens, and amended §1326 to add subsection (b), which enhanced penalties for "criminal aliens"—up to five years' imprisonment for those with a prior felony conviction, and up to 15 years for those with a prior "aggravated felony" conviction.[51]

Senator Chiles previously expressed concern that "[i]f we do not regain control of our borders ... I think that within ten years, we will not recognize the United States as the United States we see today."[52] He criticized the Supreme Court for "allowing the alien to have all the constitutional rights of a citizen."[53] And he co-sponsored legislation that aimed to reduce the admissions of refugees, rescind "special rights" afforded to undocumented immigrants, and allow the U.S. military to enforce immigration laws "beyond the territorial limits of the United States."[54] With the Anti-Drug Abuse Act, Senator Chiles drew immigrants into the ambit of the War on

---

[49] *See* Exhibit B at 44 n.155.

[50] Exhibit B at 38.

[51] *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988).

[52] *See* Exhibit B at 43.

[53] *See* Exhibit B at 43.

[54] *See* Exhibit B at 39–41.

Drugs by establishing new criminal penalties for noncitizens convicted of drug offenses and engaging the INS in the work of drug control.[55]

Senator Chiles's focus on the threat of "criminal aliens" came despite the fact that, per the General Accounting Office, there was no objective basis for the belief that "alien involvement in crime is a serious problem."[56]

An ACLU Associate Director testified before the Senate that Senator Chiles's proposals "misperceive the problem" and "may be counterproductive in terms of our immigration policy objectives," noting in particular that "the problem presented by the failure to deport 'illegal alien felons'" was down to "INS' inability to adequately identify and apprehend persons subject to deportation"—and would not be helped by amending §1326.[57] Representative Shirley Chisholm of New York, the chair of the Congressional Black Caucus's task force on refugees, argued: "We cannot hope to retain the respect and admiration of the world if our immigration and refugee policies are discriminatory on the basis of … skin color."[58]

---

[55] *See* Exhibit B at 44 n.155.
[56] *See* Exhibit B at 46–47.
[57] *See* Exhibit B at 46–47; Exhibit H (Hearing before the Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, U.S. Senate, Statement of Wade J. Henderson, April 14, 1988) at 38–40, 43.
[58] Exhibit B at 41–42.

Despite this criticism, the Act passed, "creat[ing] the foundation for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws."[59]

**2. Immigration Act of 1990**

The Immigration Act of 1990 amended §1326 by authorizing greater fines,[60] and the legislative history for this amendment is "very thin."[61] Senator Bob Graham of Florida sponsored the amendment, and Dr. Kang notes that Senator Graham "like the drafters of the [Anti-Drug Abuse Act], worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted migrants in the war on drugs."[62]

**3. Violent Crime Control and Law Enforcement Act of 1994**

In 1994, Congress passed the VCCLEA, a bill recognized as a "major driver of mass incarceration" of both citizens and noncitizens.[63] The VCCLEA included an amendment to §1326 increasing penalties and including those with misdemeanor convictions in the heightened penalty category.[64]

---

[59] Exhibit B at 50.

[60] *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).

[61] Exhibit B at 51.

[62] Exhibit B at 52.

[63] *See* Exhibit B at 80.

[64] Specifically, the VCCLEA increased the imprisonment time for those with a prior felony conviction from up to five years to up to 10 years and for those with a prior aggravated felony

As Dr. Kang sets out, Congress passed the VCCLEA at a time when this country was experiencing the "the virulent xenophobia that emerged as a result of an economic recession … and increases in both the legal and undocumented immigrant population."[65] Opinion polls showed the highest level of hostility toward immigrants "since the heyday of nativism in the 1920s."[66] As *The New York Times* put it, "Americans have felt freer to voice a rude inhospitality that at other times they might have considered racist or at least xenophobic."[67] Right-wing intellectuals published best-sellers promoting white supremacism and nativism, while arguing Mexican immigrants—unlike European immigrants—were incapable of assimilation.[68] Patrick Buchanan (the presidential candidate and political commentator) revived the eugenicist notion of "race suicide," warning that white Americans would become a minority given Mexican birth rates.[69] Capturing the popular mood, the headline on an

---

conviction from up to 15 years to up to 20 years; included persons with "three or more misdemeanors involving drugs, crimes against the person, or both" in the group with the penalty of up to 10 years imprisonment; and broadened the definition of 'deportation' to include "any agreement in which an alien stipulates to deportation during a criminal trial under either Federal or State law." *See* Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994).

[65] Exhibit B at 66.

[66] *See* Exhibit B at 67.

[67] *See* Exhibit B at 67.

[68] *See* Exhibit B at 67–68.

[69] *See* Exhibit B at 68. The idea of "race suicide" has more recently been cast as the "Great Replacement Theory." According to the Anti-Defamation League, over half of the extremist murders committed in the U.S. over the past decade were carried out by people espousing such white supremacist ideologies. *See* John Eligon, *The El Paso Screed, and the Racist Doctrine Behind It*, N.Y. TIMES (Aug. 7, 2019), https://nyti.ms/3p49FZ9.

April 1990 cover of *Time* magazine depicted an image of an American flag composed of black, brown, and yellow stripes—and asked, "What will the U.S. be like when whites are no longer the majority?"[70]

It was against this backdrop that Senator Harry Reid of Nevada proposed an amendment to §1326 that would have barred any noncitizen from "challeng[ing] the validity of the deportation order."[71] (Senator Reid's proposed amendment would have also revoked birthright citizenship for children born to undocumented immigrants.[72]) Senator Reid later apologized for his proposed amendment, calling it "the biggest mistake I ever made," and blaming interest groups that had "convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States."[73]

Senator Reid's proposed bar on challenging the validity of removal orders in §1326 prosecutions did not become part of the VCCLEA, although a later amendment—discussed below—would restrict such challenges. The amendment to §1326 that did pass was authored by Representative Bill McCollum of Florida.

---

[70] *See* Exhibit B at 66–67.

[71] *See* Exhibit B at 78–79. This was six years after the Supreme Court had held that, if §1326 "envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process." *U.S. v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987).

[72] *See* Exhibit B at 79.

[73] *See* Exhibit B at 79.

Representing a deeply conservative and predominantly white district in central Florida, Representative McCollum dedicated his career to the reconfiguration of this country's criminal and immigration laws.[74] His legislative agenda "reflected an aversion towards Latin American migrants," and his "sustained attack on Latin American migration led many observers to criticize his immigration policy proposals for their racially discriminatory impacts and the racist ideas that informed them."[75] He co-sponsored and endorsed measures drafted by FAIR, and he spoke at a FAIR-sponsored congressional briefing.[76] He sought to end challenges to deportation orders, to curtail the rights of asylum seekers (he claimed up to half of the entire population of Mexico would come to the United States if allowed), and to enhance penalties for unlawful entry and reentry.[77] He co-sponsored resolutions to amend the Constitution to deny birthright citizenship to the children of undocumented immigrants and to make English the official language of the United States.[78]

---

[74] Exhibit B at 54. In criminal law, Representative McCollum sought to limit habeas appeals in capital cases, end the exclusionary rule, abolish parole, pass three-strikes laws with mandatory life sentences, and increase the incarceration of children. *Id.* at 55. As Representative McCollum said on the House floor, "[T]hese violent youthful offenders, young people 12, 13, 14, 15 years of age. We need to take those very violent criminals, whatever age they are off the streets, lock them up and throw away the key." *Id.*

[75] Exhibit B at 56.

[76] *See* Exhibit B at 57–58.

[77] *See* Exhibit B at 55–56, 58.

[78] *See* Exhibit B at 58, 60.

**4. Antiterrorism and Effective Death Penalty Act of 1996**

Because Representative McCollum believed the VCCLEA had "not gone far enough," he introduced a bill to limit collateral attacks on removal orders in §1326 prosecutions.[79] (While the government argues this provision, §1326(d), "stands solely to the benefit of the accused alien,"[80] that is incorrect. The Supreme Court had previously held that noncitizens have a constitutional right to collaterally attack their predicate removal order in a §1326 prosecution. *U.S. v. Mendoza-Lopez*, 481 U.S. 828 (1987). Section 1326(d) cabined that right by adding requirements of judicial and administrative exhaustion found nowhere in the Supreme Court's decision.) Two other amendments to §1326 were authored by Representative Mark Foley of North Carolina, who had previously introduced a constitutional amendment to deny birthright citizenship to the children of undocumented immigrants.[81] All of those amendments became part of AEDPA, which was passed into law in 1996.[82]

It's important to understand AEDPA in its historical context. In October 1994—one month before the midterm elections—President Clinton faced pressure to

---

[79] *See* Exhibit B at 83.
[80] Response at 21.
[81] Exhibit B at 60, 84. These amendments established penalties for individuals who reenter after being excluded under §1225(c) and mandated incarceration for individuals who reenter after being deported by judicial order. *See* 8 U.S.C. §1326(b)(3), (c).
[82] *See* Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996).

take further action against border crossings and launched Operation Gatekeeper.[83] This operation placed hundreds of federal officers on the border as a "visible show of force," with the predictable result that migrants altered their routes and attempted dangerous journeys through the inhospitable desert, transforming the Arizona borderlands into a "killing field."[84]

Despite President Clinton's efforts, the Republicans took control of the House in January 1995. FAIR was elated and began promoting its immigration agenda aggressively.[85] As the head of FAIR put it, "We expected to see the tightening up of the whole deportation process, eliminating needless appeals, presumption in favor of detention, curtailing of asylum, and summary exclusion at the border."[86]

FAIR got what it expected. In June 1995, Speaker Newt Gingrich's Task Force on Immigration Reform proposed dramatic increases in "resources to prosecute deported felons who illegally re-enter"—along with streamlined deportation proceedings, mandatory prosecution of certain noncitizens, an end to birthright citizenship for the children of undocumented immigrants, and the denial of public benefits (including public education) to undocumented immigrants.[87]

---

[83] Exhibit B at 81.

[84] *See* Exhibit B at 81.

[85] Exhibit B at 90.

[86] *See* Exhibit B at 90.

[87] Exhibit B at 82 n.312.

When Congress took up debate on AEDPA, "both Democrats and Republicans strove to win the votes of [the] anti-immigrant electorate in anticipation of the 1996 elections."[88] Representative Gerald Solomon of New York made racist complaints about the number of children born to undocumented immigrants.[89] Representative Lamar Smith of Texas urged passage of the bill by stressing that it would cut down on challenges to deportation orders.[90] And Representative McCollum explained the amendment to §1326 would limit challenges to predicate removal orders.[91]

Congress passed AEDPA, and President Clinton signed it into law. Along with the aforementioned amendments to §1326, AEDPA expanded the offenses considered aggravated felonies, eliminated long-term residency as a defense to deportation, expanded the pool of undocumented immigrants who could be deported expeditiously, and authorized wiretap authority for immigrant-smuggling investigations.[92]

Three years later, even Representative McCollum would concede AEDPA "went too far."[93] As he put it, "We are a just and fair nation and must strike a just

---

[88] Exhibit B at 87.

[89] *See* Exhibit B at 87.

[90] *See* Exhibit B at 84.

[91] *See* Exhibit B at 84.

[92] Exhibit B at 83–84.

[93] *See* Exhibit B at 89.

and fair balance in our immigration laws."[94] Representative McCollum gave two examples of noncitizens treated unfairly by the law. Tellingly, neither were Latinx: one was Bob, a Scotsman deported for a dated crime; the other was Robert A. Broley, the son of the Republican Party treasurer in Orange County, Florida, who was convicted on felony fraud charges and deported to Canada.[95]

**5. Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

Later in 1996, Representative Lamar Smith of Texas (a member of FAIR's National Advisory Board) introduced IIRIRA, also known as "The Mexican Exclusionary Act."[96] Representative Smith argued "there exists an inchoate sense among the American people that our culture is changed by immigration"—and promised IIRIRA would correct laws that viewed "immigration as a form of 'civil right' that is owed to an unspecified portion of the world's population without regard to objective criteria of selection based in the national interest."[97] It was widely understood that Cordelia Strom, formerly of the Immigration Reform Law Institute (FAIR's litigation arm), drafted the bill for Representative Smith.[98] In fact, many

[94] *See* Exhibit B at 89.
[95] *See* Exhibit B at 90, n. 338.
[96] *See* Exhibit B at 82 n.310, 91.
[97] *See* Exhibit B at 91.
[98] Exhibit B at 90–91.

considered that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR."[99]

IIRIRA amended §1326 by broadening its scope to include those removed (as opposed to deported), and authorizing up to 10 years' imprisonment for noncitizens who reenter after being removed while on parole, supervised release, or probation for a nonviolent offense.[100] In addition to these amendments, IIRIRA eliminated family reunification visas for siblings and adult children, capped humanitarian admissions, limited asylum claims, expanded the definition of an aggravated felony, and expedited the removal of so-called "criminal aliens."[101]

Opponents of IIRIRA drew attention to the racial animus underlying the bill. Representative Xavier Becerra of California (now the Secretary of Health and Human Services) wondered why the bill targeted border-crossers, considering the majority of undocumented persons in the United States were visa overstays.[102] Representative Jerrold Nadler of New York argued the bill's "mindless cruelty" and its "good old-fashioned Xenophobia" had "nothing to do with legitimate protection of our borders."[103] But, as Dr. Kang notes, "the pressure to appear tough on undocumented

---

[99] *See* Exhibit B at 91.
[100] *See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).
[101] Exhibit B at 92.
[102] *See* Exhibit B at 93.
[103] *See* Exhibit B at 92.

immigration was particularly acute given that 1996 was an election year," and the bill was passed into law.[104]

IIRIRA had its intended effect. Following its passage, deportations from the United States jumped precipitously—massively increasing the pool of individuals who could be charged with violations of §1326 should they return.[105] It is no coincidence that criminal immigration proceedings then jumped tenfold.[106]

* * *

Judge Du was correct to hold that §1326's amendments "never substantively altered the original provision," "did not change the operation of Section 1326," and "do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23. These amendments are irrelevant to the analysis of whether the unlawful reentry statute violates equal protection.

Regardless, it's clear §1326's amendments "demonstrate that lawmakers made no effort to examine and acknowledge the legacy of racism that informed the passage of" the Undesirable Aliens Act of 1929 and its recodification as §1326—and that they

---

[104] Exhibit B at 94–95.

[105] In 1994, there were just over 50,000 removals. In just two years, that number had more than doubled. By 2019 (the latest year with records), there were nearly 360,000 removals. Dep't of Homeland Sec., Aliens Removed or Returned: Fiscal Years 1892 to 2019 (2009), https://bit.ly/3Eb0Sci.

[106] *See* Exhibit B at 96.

in fact perpetuated the "racism that informed the passage of these earlier laws ."[107] As Dr. Kang concludes, each amendment was "enacted with a discriminatory purpose."[108]

These amendments in no way cleansed §1326 of its racial animus.

**D. Section 1326 disparately impacts Latinxs.**

Having established discriminatory intent, Mr. Muñoz must show disparate impact to make out an equal protection violation. The government misunderstands what such a disparate-impact showing entails.

Under *Arlington Heights*, the disparate-impact inquiry is separate and distinct from that of discriminatory intent. For the disparate-impact inquiry, the question is simply a matter of numbers: whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up).[109]

This distinction matters because it shapes the inquiry. While the assessment of discriminatory intent involves parsing legislative history, the disparate-impact inquiry is purely mathematical. Courts look to the numbers without any need to search for an explanation behind disparities.

---

[107] Exhibit B at 50.

[108] Exhibit B at 1.

[109] That question concerns the law's impact in the current day. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding disparate impact because the law "continues to this day" to have such an effect).

The sole question here is: does §1326 disparately impact Latinxs? The answer is clear: yes, it does. The government does not dispute that, from the enactment of the Undesirable Aliens Act up to today, 85 to 99 percent of unlawful reentry prosecutions have been brought against Latinxs.[110] The *Machic-Xiap* court described this as "strong evidence" of disparate impact. 2021 WL 3362738 at *10. And, as Judge Du noted, "[t]hese numbers are in line with other successful *Arlington Heights* challenges." *Carrillo-Lopez*, 2021 WL 3667330 at *6. Mr. Muñoz has made the necessary showing.

The government's response is confused. While the government appreciates that disparate impact and discriminatory intent are separate inquiries,[111] it conflates them. For example, the government characterizes Mr. Muñoz's motion as "cit[ing] the higher percentage of illegal reentry prosecutions of Latinx defendants as proof of disparate impact ***and discrimination***," and argues he "cannot show a true disparate

[110] *See* Motion at 6. Oddly, the government takes issues with Muñoz for noting that it had, in prior cases, "not disputed the statute bears more heavily on Latinxs." The government calls this a "mischaracterization"—and then, in the very next sentence, agrees that "most prosecutions for illegal reentry are against persons from Latin America." Response at 22 n.2 (quotations and citations omitted). To say that a statute "bears more heavily on Latinxs" is precisely to say that "most prosecutions are against persons from Latin America."

[111] Response at 25 (recognizing "disparate impact either exists or it doesn't and is independent from whether there is also evidence of discriminatory intent").

impact ***caused by racial animus***."[112] To be clear, Mr. Muñoz's arguments concerning disparate impact have nothing to do with discrimination or racial animus.

The government's confusion carries over to its misreading of *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). There, the Supreme Court found that a showing of disparate impact alone (i.e., without a separate showing of discriminatory intent) does not make out an equal protection claim. Judge Du correctly summarized this finding and followed it. *Carrillo-Lopez*, 2021 WL 3667330 at *6. This is uncontroversial, yet the government describes Judge Du's reasoning as "highly questionable" and "illogical."[113]

To support its claim, the government selectively quotes the relevant portion of the Supreme Court's opinion—and adds words of its own that twist the Court's meaning. Here's how the government sets out what it describes as the Court's "unambiguous" holding: "[W]hen referencing the fact that 'Latinos make up a large share of the unauthorized alien population,' the Court expressly held that '[w]ere this fact sufficient to state a claim' ***of disparate impact***, 'virtually any generally applicable immigration policy could be challenged on equal protection grounds.'"[114]

[112] Response at 23 (emphasis added).

[113] Response at 25.

[114] Response at 24 (emphasis added).

This is a misreading of what the Supreme Court actually said in *Regents*. The Court was discussing whether the respondents had made out "a plausible equal protection claim"—and said nothing about a claim "of disparate impact."[115] By inserting the words "of disparate impact," the government distorts the Court's clear meaning. As the *Machic-Xiap* court put it when addressing the same argument from the government, "The quoted text does not state that the DACA recipients had not presented evidence of disparate impact. Indeed, the Supreme Court itself characterized the DACA recipient's statistical evidence as evidence of 'the *disparate impact* of the recission [of DACA] on Latinos.'" 2021 WL 3362738 at *11 n.64 (quoting *Regents*, 140 S. Ct. at 1915) (emphasis in original).

Having confused the issue, the government attempts to explain away the overwhelming evidence of disparate impact as "a feature of geography and geopolitics – Latin America's proximity to the United States and related socioeconomic and political conditions."[116] But the disparate-impact analysis is not concerned with the

---

[115] The relevant portion of *Regents* reads: "[R]espondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. None of these points, either singly or in concert, establishes a plausible ***equal protection claim***. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S.Ct. at 1915–16 (citations omitted) (emphasis added).

[116] Response at 23.

reason for the disparity. The *Machic-Xiap* court correctly summarized the government's error in rejecting the same argument: "The Government misdescribes disparate impact. That an innocent explanation may exist for the disparity does not eliminate the disparity." 2021 WL 3362738 at *11.

To make a showing of disparate impact, Mr. Muñoz only needs to show that §1326 "bears more heavily" on Latinxs. He has done that.

## IV. Conclusion

Nationwide, one-third of the federal docket is §1326 prosecutions. Each year, there are thousands and thousands of initial appearances, arraignments, detention hearings, changes of plea, and sentencings for impoverished Latinxs encouraged to come work this country's fields, only to be locked up for daring to cross the border. Meanwhile, Anglo employers cast cursory glances at undocumented Latinx laborers' papers, knowing there's no realistic threat of the government cracking down on their unlawful hiring practices. Doing so would disturb the nearly century-old compromise: a steady supply of cheap Latinx labor for Anglo businesses, but with criminal laws on the books to punish and drive out the "rat men" when needed.

The government's attempts to shield the unlawful reentry statute from scrutiny are unavailing. Congress enacted that law to uphold this nation's unconscionable compromise. Section 1326 serves as a reminder that xenophobia and racism have always been a part of our history and our laws. "Racist conceptions of

Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness," and "the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship."[117]

With this history, it's unsurprising the government asks the Court not to look behind the curtain. But the Constitution demands that courts examine criminal statutes for discriminatory intent and disparate impact in order to ensure equal protection under the law.

One cannot uncouple §1326's history from the history of anti-Latinx racism in the United States. But joining Judge Du in recognizing that §1326 offends the Constitution would acknowledge that sordid history and allow the country to begin to address it.

Dated: December 22, 2021

Federal Defenders of Eastern Washington & Idaho
Attorneys for Marciano Munoz-De La O

s/ J. Houston Goddard
J. Houston Goddard, NY #4545851

## Service Certificate

[117] Exhibit B at 99.

I certify that on December 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorney Michael Ellis.

s/ J. Houston Goddard
J. Houston Goddard, NY #4545851