FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 18, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO: 2:20-CR-134-RMP-1 |
| Plaintiff, | |
| v. | ORDER DENYING DEFENDANT'S MOTION TO DISMISS |
| MARCIANO MUÑOZ-DE LA O, | |
| Defendant. | |

BEFORE THE COURT is Defendant Marciano Muñoz-De La O's Motion to Dismiss, ECF No. 61. The Court heard oral argument on the motion on January 28, 2022. Defendant, pursuant to the CARES Act § 15002(b)(2), Pub. L. No. 116-136 (H.R. 748) (eff. March 27, 2020); General Order No. 20-101-3 Extended (E.D. Wash. Jan. 14, 2022); and General Order No. 2021-5 (E.D. Wash. March 19, 2021), expressly waived his right to be physically present, *see* Fed. R. Crim. P. 43(a), and consented to appear by video conference for this hearing.

Defendant, who is not in custody, was represented by Assistant Federal Defenders J. Houston Goddard and Payton B. Martinez. Defendant was assisted

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 1

by court-certified interpreters Natalia Rivera and Susan Evans.  Assistant United States Attorney Michael J. A. Ellis appeared on behalf of the Government. Counsel, the Court, and court personnel also appeared via video conference.

The Court heard testimony from Defendant's expert witness, Professor Deborah S. Kang, an Associate Professor of History at the University of Virginia.[1] Having reviewed the parties' filings, heard the argument and testimony presented at the evidentiary hearing, and reviewed the relevant law, the Court is fully informed.

## I.    BACKGROUND

Defendant Marciano Muñoz-De La O is a citizen and national of Mexico. ECF No. 23.  On October 21, 2020, Defendant was indicted for violating 8 U.S.C. § 1326 by unlawfully reentering the United States after having been previously denied admission, excluded, deported, and removed.  *Id.*  Defendant moves to dismiss the Indictment, ECF No. 23, on the basis that § 1326 violates the Fifth Amendment's guarantee of equal protection.  ECF No. 61.  Defendant argues that "racism motivated Congress to criminalize reentry" and that § 1326 "disparately impacts Latinx."  *Id.* at 4 (citing *Village of Arlington Heights v. Metropolitan*

---

[1] Counsel for Defendant orally moved for Professor Kang to be certified as an expert in the history and legislative history of United States immigration law. Professor Kang has a doctorate degree in United States History, Late Modern European History, and Law and Social Theory.  The Government had no objection, and the Court granted the request.

*Housing Development Corp.*, 429 U.S. 252, 265–68, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)).

A.    Overview of United States Immigration History Prior to § 1326[2]

A review of the decades leading to the enactment of § 1326 reveals this country's checkered past in immigration policies.  The federal government first forayed into the realm of immigration legislation during the 1870s.  ECF No. 64 at 5.  One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years.  Pub. L. No. 47-126, 22 Stat. 58. Despite constitutional challenges to the law, the United States Supreme Court twice upheld the law's validity in what are now commonly referred to as the Chinese Exclusion cases.  *See Chae Chan Ping v. United States*, 130 U.S. 581, 609, 9 S. Ct. 623, 32 L. Ed. 1068 (1889) (disregarding the law's violation of existing treaties because "[w]hatever license . . . Chinese laborers may have obtained . . . is held at the will of the government, revocable at any time, at its pleasure"); *Fong Yue Ting v. United States*, 149 U.S. 698, 724, 13 S. Ct. 1016, 37 L. Ed. 905 (1893) (describing Chinese laborers as "aliens, having taken no steps towards becoming citizens, and incapable of becoming such under the

---

[2] The Court synthesizes the following background information in Parts I.A – I.C based on the parties' briefing and the testimony presented at the evidentiary hearing in this matter.

naturalization laws" who "therefore remain subject to the power of Congress to expel them . . . from the country, whenever, in its judgment, their removal is necessary or expedient for the public interest").

At the turn of the twentieth century, Professor Kang asserts that a "different form of xenophobia emerged in response to the migration of 1.5 million Mexicans [to the United States] between 1910 and 1920." ECF No. 78-2 at 3. Specifically, she asserts that leaders and lobbyists for southwestern agribusiness "created and perpetuated a negative stereotype of [Mexican nationals] as a cheap, exploitable, and deportable labor force" who were "mentally and morally inferior to European immigrants." *Id.* at 4. Around this same time, Congress passed multiple reforms to the country's immigration policies.

First, the National Origins Act of 1924 set the number of European immigrants permitted to enter the U.S. to two percent of the total population of each foreign-born nationality in the country as reported in the 1890 census. *See* Immigration Act of 1924, Pub. L. No. 68-139, ch. 190, 43 Stat. 153.[3]  Professor

---

[3] Immigrants from the following nations were excluded from the quota system: Canada, Newfoundland, Mexico, Cuba, Haiti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America.  Immigration Act of 1924 §4(c).  Moreover, the law prohibited the admission of aliens "ineligible to citizenship," which excluded Asian immigrants based on prior laws such as the 1882 Chinese Exclusion Act. *Id.* at §§ 2(a), 5.  Immigration quotas were not

Kang describes the quota system as racist and discriminatory, in part, because the law exempted immigrants from the Western hemisphere to guarantee that southwestern growers had an easy and regular supply of exploitable Mexican national workers.

In the ensuing years, Congress held hearings on the "eugenical aspects of deportation"[4] that described deportation as "the last line of defense against contamination of American family stocks by alien hereditary degeneracy."  ECF No. 61-4 at 6.  During a separate congressional hearing, Congressman Box stated that "[t]he admission of a large and increasing number of Mexican peons to engage

"allotted to any African countries under the Act because immigrant visas were allocated solely based on the nation's white population."  *Unfit for the Constitution: Nativism and the Constitution, from the Founding Fathers to Donald Trump*, Jared A. Goldstein, 20 U. Pa. J. Const. L. 489, 525 n.219 (2018).

[4] As one academic has observed, "Eugenicists argued that intelligence was genetically determined, and consequently, transmittable from parent to child."  Khiara M. Bridges, *White Privilege and White Disadvantage*, 105 Virginia L. Rev. 449, 462 (2019).  In order to further the goal of creating "an American society in which the population had nothing but advantageous genes running through its veins[,]" Eugenicists utilized several tactics, including encouraging "the right immigrants to enter the country" from Scandinavian countries while "preventing the same from the wrong immigrants" who hailed from non-white countries.  *Id.* at 463.

in all kinds of work is at variance with the American purpose to protect the wages of its working people." ECF No. 61-6 at 2. Congressman Box argued that the presence of Mexican immigrants destroyed "schools, churches, and all good community life" for white Americans. *Id.*

It is with this historical backdrop that Congress passed the 1929 Undesirable Aliens Act ("UAA"), "which established the first criminal penalties for the acts of illegal entry and reentry" into the United States. ECF No. 78-2 at 5. Professor Kang testified that the UAA was a compromise between Nativists seeking to restrict immigration from non-white countries and southwestern agribusiness seeking a cheap and exploitable labor supply during the growing season. In the Great Depression Era of the 1930s, when jobs were scarce, racial animus towards Mexican Nationals grew, resulting in forced repatriation drives in places such as Los Angeles, California. The repatriation drives sought to remove ethnic Mexicans from the country, based on the false viewpoint that Mexicans were responsible for the nation's economic crisis. *Id.* at 5–6. An estimated 500,000 ethnic Mexicans, including Mexican Americans, were forced to leave the United States during this time period. *Id.* at 6.

Despite the UAA's passage and the repatriation drives of the 1930s, undocumented immigration rose during the 1940s, coinciding with the 1942

Bracero Program.[5]  ECF No. 78-2 at 7.  The Bracero Program created bilateral agreements between the United States and Mexico for temporary Mexican laborers, many of whom would be "exploited" and "racialized[,]" to work temporarily on farms in the United States.  *See id.* at 4 (stating that agricultural growers "claimed that 'braceros were a unique[,] docile group of people, denuded of ambition and complacent with their status in life as a result of centuries of servitude and brutal exploitation on the haciendas.'" (quoting Lawrence A. Cardoso, <u>Mexican Emigration to the United States 1897–1931</u> 124 (1980)).[6]

As Professor Kang testified, the mid-twentieth century also is linked to the popularization of the racially derogatory term, "wetback," to describe the Mexican immigrants who were forced to cross the Rio Grande River to enter the United States.  Use of this racial slur carried into the 1950s, when Senate Bill 1851,

---

[5] The Bracero Program "led to the admission of approximately 4.5 million temporary workers from Mexico between 1942 and 1964."  ECF No. 78-2 at 7.  "[O]ver the twenty-two-year-course of the Program, approximately five million undocumented immigrants would cross the U.S.-Mexico border."  *Id.* at 10.

[6] Professor Kang states that the screening process for braceros was "dehumanizing" and notes that photographer Leonard Nadal "documented the fumigation of braceros with DDT at the [U.S.-Mexico border] processing centers in the United States."  ECF No. 78-2 at 10.  At the evidentiary hearing, Professor Kang testified that braceros often were denied the wages and other benefits their contracts promised them.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 7

referred to by some congressmen as the "Wetback Bill," sought to bar "aliens from entering or remaining in the United States illegally" while simultaneously protecting employers from prosecution for "harboring" undocumented employees. Pub. L. No. 82-283, 66 Stat. 26 (1952).[7]    Numerous congressmen continued to use the racial slur when discussing potential amendments to Senate Bill 1851.[8]

---

[7] Senate Bill 1851 amended the 1917 Immigration Act and is not directly related to the recodification of § 1326.

[8] *See* 82 Cong. Rec. 8115 (June 26, 1952) (Senator Magnuson offered an amendment to "the enforcement and administration of what is called the wetback bill passed by the Congress several weeks ago").  During these same hearings, Senator Humphrey offered a further amendment to increase the Immigration and Naturalization Service budget by $2,500,000 to support an "airlift operation" for transporting undocumented immigrants back to Mexico.  *Id.* at 8121.  Throughout the discussion of the different appropriations amendments, multiple senators used the racial slur "wetback."  *See, e.g.*, *id.* ("Soon we shall vote on the question of whether the Senate wishes to do something about the wetbacks, or whether again the Senate will fail to act in accordance with its responsibilities to stop this invasion . . . by illegal entrants, who drive down our standard of living . . . and jeopardize the health and security of our Nation."); *see also id.* at 8122 ("It suggests to me that . . . instead of being called the wetback amendment, perhaps [it] should be called the catback amendment, having in mind the time-honored custom of taking a cat as far away from home as possible and then turning it loose, in the hope that it could not get back.").  However, Senator Humphrey's amendment was voted down by a count of 11 'yeas' to 65 'nays.'"  *Id.* at 8123.  The other proposed amendments also were overwhelming rejected.  *Id.* at 8123–24.

B.     Relevant History and Legislative Record Regarding § 1326

In 1952, Congress recodified the unlawful reentry provision of the 1929

UAA at 8 U.S.C. § 1326.  The new statute provided the following:

> Any alien who– (1) has been arrested and deported or
> excluded and deported, and thereafter (2) enters, attempts
> to enter, or is at any time found in, the United States,
> unless (A) prior to his reembarkation at a place outside the
> United States or his application for admission from foreign
> contiguous territory, the Attorney General has expressly
> consented to such alien's reapplying for admission; or (B)
> with respect to an alien previously excluded and deported,
> unless such alien shall establish that he was not required
> to obtain such advance consent under this or any prior Act,
> shall be guilty of a felony, and upon conviction thereof, be
> punished by imprisonment of not more than two years, or
> by a fine of not more than $1,000, or both.

Pub. L. No. 82-414, Title II, § 276, 66 Stat. 229.  Professor Kang argues that

Senator Pat McCarran, co-author of the 1952 Immigration Nationality Act ("1952

INA") [9] "worked to remove obstacles to the undocumented crossings of Mexican

workers" to defend "a widespread system of labor exploitation premised upon

racist notions of Mexican migrants as expendable farmworkers."  ECF No. 78-2 at

18.

In the buildup to Congress's enactment of the 1952 INA, Professor Kang

describes Senator McCarran as regularly wielding "his authority to delay and block

---

[9] The 1952 INA also is referred to as the McCarran-Walter Act after its
congressional sponsors, Senator Pat McCarran and Representative Francis Walter.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 9

the passage of any liberal reforms." *Id.* at 20.[10]  As for § 1326, specifically,

"Congress remained largely silent with respect to the recodification of the criminal

entry and re-entry provisions of the immigration laws in the 1952 Act" and "made

no effort to examine or cleanse the anti-Mexican racism that infected the [1929

UAA]." ECF No. 78-2 at 22.  Instead, the changes made to the recodification of

unlawful reentry at 8 U.S.C. § 1326 supposedly made the crime "easier to

prosecute." *Id.*; *see also* ECF No. 61-16 at 7 (noting that the recodified unlawful

reentry provision's inclusion of noncitizens who are "subsequently found" in the

---

[10] Professor Kang also points to comments made by Senator McCarran during two appropriations hearings that occurred one year before and after the 1952 INA became law.  ECF No. 78-2 at 19.  In 1951, Senator McCarran described the "flood of people" who come across the border, legally or illegally, as "wet-backs" who engage in "come-and go drifting" between Mexico and the United States during various harvest seasons.  ECF No. 78-7 at 4 (Hearing on Deportation of Mexicans Before the Subcomm. on Appropriations, 82nd Cong. 124 (1951)).  During a 1953 appropriations hearing, Senator McCarran stated that southwestern growers could not "get along without" Mexican farm labor, noting that "on this side of the border there is a desire for these wetbacks."  ECF No. 78-6 at 31–32 (Hearing on H.R. 4974 Before the Subcomm. on Appropriations, 83rd Cong. 245–46 (1953)).  When responding to concerns that the Bracero Program required bracero workers to be fed, paid minimum wages, and given health insurance, Senator McCarran responded that "[t]he wetback is little interested in that sort of thing.  In other words, a farmer can get a wetback and he does not have to go through that red tape."  *Id.* at 32.

United States would "overcome the inadequacies in existing law" that required the Immigration and Naturalization Service ("INS") "to establish the place of reentry, and hence the proper venue, arising in prosecutions" against deported noncitizens).

In a memo to Senator McCarran on behalf of the Department of Justice, Deputy Attorney General Peyton Ford wrote approvingly of numerous provisions in the 1952 INA, including what would become § 1326. However, Deputy Attorney General Ford noted that certain language in § 1326 was "somewhat obscure" and suggested clarifying language to limit the penalty exceptions for noncitizens who unlawfully reenter the United States. *See* ECF No. 61-16 at 7. Turning to a separate provision, Deputy Attorney General Ford noted that the law as written failed to give "authority to immigration officers to go upon private property for the purpose of interrogating aliens." *Id.* at 9. To support the expansion of INS's authority to enter private property, he cited a 1951 report of the President's Commission on Migratory Labor, which provided that such a clarification "will aid in taking action against the conveyors and receivers of the wetback." *Id.*

In summarizing the history surrounding § 1326 as well as the entirety of the 1952 INA, Professor Kang argues that "both congressional conservatives and liberals played an active and deliberate role in extending the racism that inhered in the nation's immigration laws via the passage of the [1952 INA]." *Id.* at 24. On June 25, 1952, President Truman vetoed the Congressional bill, citing a number of

concerns with the proposed law. Chief among them was that "[t]he bill would continue, practically without change, the national origins quota system." ECF No. 61-15 at 4. President Truman noted that the quota system "discriminates deliberately and intentionally, against many of the peoples of the world." *Id.*[11] He observed that "[s]eldom has a bill exhibited the distrust evidenced here for citizens and aliens alike—at a time when we need unity at home, and the confidence of our friends abroad." ECF No. 61-15 at 7.

President Truman also compared the bill to the "infamous Alien Act of 1798, passed in a time of national fear and distrust of foreigners, which gave the President the power to deport any alien deemed 'dangerous to the peace and safety of the United States.'" *Id.* at 8–9. Despite these misgivings, Congress overrode the presidential veto, and the law went into effect on June 27, 1952.

C.    Subsequent Amendments to § 1326

Since 1952, Congress has amended §1326 five times. First, the 1988 Anti-Drug Abuse Act created the concept of an "aggravated felon[y]." ECF No. 78-2 at 51; *cf.* ECF No. 78 at 26. The amendment also enhanced penalties for "criminal

---

[11] President Truman's remarks about the bill's deliberate and intentional discrimination mostly center on the President's qualms with the historical treatment of Asian, not Hispanic, individuals in United States immigration policy. *See* ECF No. 61-15 at 11 (urging Congress "to enact legislation removing the racial barriers against Asians from our laws").

aliens" by up to five years' imprisonment and up to 15 years for those with a prior "aggravated felony" conviction. Pub. L. 100-690, Title VII, § 7345(a), 102 Stat. 4471 (Nov. 18, 1988). Next, the Immigration Act of 1990 authorized greater fines for § 1326 prosecutions, although the legislative history for the amendment "is very thin." ECF No. 78-2 at 52; *cf.* ECF No. 78 at 28.

The 1994 Violent Crime Control and Law Enforcement Act, "the largest crime bill passed by Congress" increased mass incarceration "of citizens and immigrants alike." ECF No. 78-2 at 81. The law amended § 1326 by increasing the maximum imprisonment time both for those with a prior felony conviction (from five to 10 years) and for those with a prior aggravated felony conviction (from 15 to 20 years). ECF No. 78 at 28–29 n.64 (citing Pub. L. 103-322, Title XIII, § 130001(b), 108 Stat. 2023 (1994)). Professor Kang asserts that the 1994 amendment to § 1326 also occurred during a time that saw "the highest level of hostility towards immigrants 'since the heyday of the nativism in the 1920s.'" ECF No. 78-2 at 68 (quoting Joseph Nevins, Operation Gatekeeper: The Rise of the "Illegal Alien" and the Making of the U.S.-Mexico Boundary 90 (2002)).

The fourth amendment to § 1326 occurred with the passage of the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), which "limited collateral attacks on deportation orders" and "mandated incarceration for individuals who reentered after being deported." ECF No. 78-2 at 85–86. No congressman raised objections to the new additions to § 1326. *Id.* at 86. When

later speaking about immigration reform, Congressman Bill McCollum stated that the new provisions in AEDPA "went too far[,]" and he introduced a measure to waive deportation for permanent residents convicted of minor crimes, although the measure applied only to permanent residents and not "foreigners."  *Id.* at 90.

Later that year, the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996 further amended § 1326 "by broadening its scope to include individuals who previously were removed (along with those who previously were deported), and authorizing up to 10 years' imprisonment for noncitizens who reenter after being removed while on parole, supervised release or probation for a nonviolent offense."  ECF No. 78 at 36 (citing Pub. L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618–20, 3009-629 (1996)).  Between 1996 and 2013, "immigration prosecutions, primarily under § 1325 and § 1326, increased by a factor of ten."  ECF No. 78-2 at 97.

Professor Kang asserts that the five subsequent amendments to § 1326 "failed to extinguish the racial animus of the 1929 and 1952 laws" and, instead, "reproduced the anti-Mexican sentiments that first inspired the criminalization of undocumented immigration."  *Id.* at 100–101.  In 2019 and again in 2021, lawmakers "authored bills that would repeal these provisions of the immigration code."  *Id.* at 103 (citing A New Way Forward Act, H.R. 5383, 116th Cong., Title

VI, § 601(b) ( 2019); A New Way Forward Act, H.R. 536, 117th Cong., Title VI, § 601(b) (2021)).

## II.    LEGAL STANDARD

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  Although the Fifth Amendment does not contain an equal protection clause similar to the Fourteenth Amendment, "the concepts of equal protection and due process, stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693, 98 L. Ed. 884 (1964).  Accordingly, the equal protection analysis implicit in the Fifth Amendment "is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).  Challenges to official action or facially neutral laws for violation of the Equal Protection Clause require proof that a "racially discriminatory intent or purpose" served as "a motivating factor in the decision" or law being challenged. *Arlington Heights*, 429 U.S. at 265–66.

Courts will not "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).  Recognition that "legislators and administrators are properly concerned with balancing numerous competing considerations" encourages courts to "refrain from reviewing the merits of

[congressional or administrative] decisions, absent a showing of arbitrariness or irrationality." *Arlington Heights*, 429 U.S. at 265.  Racial discrimination, however, "is not just another competing consideration" and "proof that a discriminatory purpose has been a motivating factor" in the challenged government action eliminates the justification for "judicial deference." *Id.* at 265–66.

In *Arlington Heights*, the Supreme Court established certain non-exhaustive factors to guide the "sensitive inquiry" into whether a challenged government action was motivated by an "invidious discriminatory purpose." *Id.* at 266.  These factors include (1) the disparate "impact of the official action"; (2) the "historical background of the decision"; (3) the "sequence of events leading up to the challenged decision"; (4) any procedural or substantive departures; and (5) the relevant "legislative or administrative history." *Id.* at 266–68.

No single *Arlington Heights* factor is individually dispositive. *Id.* at 268.  The party asserting that a "law was enacted with discriminatory intent" carries the burden of proof. *Abbott v. Perez*, ___ U.S. ___, 138 S. Ct. 2305, 2324, 201 L. Ed. 2d 714 (2018).  Satisfaction of that burden shifts the burden to the Government to establish "that the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21.[12]  "The

_____

[12] The *Arlington Heights* decision does not explicitly address the standard for satisfying each party's burden of proof.  It appears that both the party challenging a

allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324.

## III.    DISCUSSION

### A.    Overview of Related Cases

Based on the Court's own research and the parties' briefing, it appears that approximately fourteen district court cases, thus far, have considered equal protection challenges to § 1326 that are nearly identical to Defendant's instant motion.[13] Of those fourteen cases, only one ruled that § 1326 was enacted with a

---

law for discriminatory intent and the Government are required to satisfy their respective burdens of proof by a preponderance of the evidence. *See Hunter v. Underwood*, 471 U.S. 222, 225, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985). In *Hunter*, the Court affirmed a ruling from the Eleventh Circuit, which applied the preponderance of the evidence standard to both the plaintiffs and the defendants. *See id.*; *see also Underwood v. Hunter*, 730 F.2d 614, 617 (11th Cir. 1984) (citing *Arlington Heights*, 429 U.S. at 270 & n.21; *and Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)). The *Mt. Healthy* case directly states that if the burden shifts to the Government, the Government must satisfy its burden by a preponderance of the evidence, although the Court does not discuss the standard for the plaintiff. *See* 429 U.S. at 287.

[13] *See United States v. Hernandez-Lopez*, ___ F. Supp. 3d ___, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United States v. Rivera-Sereno*, No. 2:21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United*

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 17

discriminatory motivation in violation of the Equal Protection Clause of the Fifth Amendment. *See United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, No. 3:20-cr-26-MMD-WGC, 2021 WL 3667330, at *25 (D. Nev. Aug. 18, 2021).[14]

Applying heightened scrutiny to review § 1326, the *Carrillo-Lopez* court determined that the defendant met his burden under the *Arlington Heights*

_____

*States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Suquilanda*, No. 21 CR 63 (VM), 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Orozco-Orozco*, No. 21-CR-023459-TWR, 2021 U.S. Dist. LEXIS 178951 (S.D. Cal. Sept. 20, 2021); *United States v. Novondo-Ceballos*, ___ F. Supp. 3d ___, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021); *United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, No. 3:20-cr-26-MMD-WGC, 2021 WL 3667330 (D. Nev. Aug. 18, 2021); *United States v. Machic-Xiap*, ___ F. Supp. 3d ___, No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021); *United States v. Palacios-Arias*, No. 3:20-CR-62-JAG (E.D. Va. Oct. 13, 2020).

[14] The Government appealed the decision in *Carrillo-Lopez* to the Ninth Circuit. The briefing on appeal is still being filed and a decision from the Ninth Circuit has not issued as of the filing of this Order.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 18

framework and ruled that the "Government failed to establish that a nondiscriminatory motivation existed in 1952 for reenacting Section 1326." *Id.*

Nine other district courts, including two in this circuit, subjected § 1326 to the deferential rational basis review standard and determined that the law was rationally related to the Government's immigration interests in preventing unlawful reentry. *See, e.g.*, *Gutierrez Barba*, 2021 WL 2138801, at *5; *see also United States v. Orozco-Orozco*, 2021 U.S. Dist. LEXIS 178951, at *1.

In all cases where district courts applied rational basis review to § 1326, the courts either determined that the *Arlington Heights* framework did not apply to the defendant's equal protection challenge or that the defendant failed to present a sufficient challenge under *Arlington Heights*. *See Novondo-Ceballos*, 2021 WL 3570229, at *4 (ruling that the *Arlington Heights* standard is inapplicable to § 1326 "because as an immigration law, it is subject to rational basis review" and, regardless, finding no discriminatory intent because "subsequent reenactments of § 1326 have cleansed the law of its original taint"); *see also Samuels-Baldayaquez*, 2021 WL 5166488, at *3 (declining to apply *Arlington Heights* to an immigration law and noting that, "even if *Arlington Heights* applied, the Defendant has not made an adequate case to invalidate 8 U.S.C. § 1326" where the defendant focused

only on the legislative history of the 1929 UAA and provided "no evidence of discriminatory motivation in the 1952 enactment of § 1326").[15]

A handful of courts have applied the *Arlington Heights* framework to review equal protection challenges to § 1326, although none ruled the law unconstitutional other than *Carrillo-Lopez*. *See Machic-Xiap*, 2021 WL 3362738, at *10 (D. Or. Aug. 3, 2021) (applying *Arlington Heights* but noting that the defendant's strongest evidence, *i.e.*, "§ 1326's historical background and its disparate impact on people from Latin America. . . . is the least valuable" to the court's constitutional analysis); *see also Wence*, 2021 WL 2463567, at *9–10 (reviewing § 1326 under the *Arlington Heights* framework but concluding that "the legislative history for the 1952 and 1990 legislation does not reveal any discriminatory motive" and the law's disparate impact "is not pronounced enough to give rise to an inference of discriminatory motive").

B.    Standard of Review

Preliminarily, the parties dispute the applicable standard of review for

---

[15] At least two courts analyzed the equal protection challenge to § 1326 under *Arlington Heights* and then, after determining that the defendant failed to meet the standard under *Arlington Heights*, the courts applied rational basis review to uphold the constitutionality of § 1326. *See Wence*, 2021 WL 2463567, at *10; *Hernandez-Lopez*, 2022 WL 313774, at *7.

Defendant's constitutional challenge.  The Government maintains that the Court's review of § 1326 is "subject to deferential rational basis review, not the strict scrutiny as urged by the Defendant."  ECF No. 64 at 4.  For support, the Government argues that § 1326 was "passed as part of the comprehensive Immigration and Nationality Act of 1952," making "it 'well within the ambit of Congress's sweeping power over immigration matters.'"  *Id.* (quoting *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998)).  Defendant counters that the Ninth Circuit has applied the heightened scrutiny standard inherent to *Arlington Heights* "in high-profile civil immigration cases[,]" demonstrating that "'[a] challenged law does not receive minimal scrutiny merely because it is related to immigration.'"  ECF No. 78 at 5–6 (quoting *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018)).

For over a century, courts have acknowledged "that Congress possesses authority over immigration policy as 'an incident of sovereignty.'"  *Hernandez-Guerrero*, 147 F.3d at 1076 (quoting *Ping v. United States*, 130 U.S. at 609).  Congress's broad power over immigration "underscore[s] the limited scope of judicial inquiry into immigration legislation."  *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S. Ct. 1473, 52 L. Ed. 2d 50 (1977).  Accordingly, the Ninth Circuit has reviewed "equal protection challenges to federal immigration laws under the [deferential] rational basis standard."  *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011).  However, two reasons suggest that the holding in

*Hernandez-Mancilla* does not automatically dictate the applicable standard of review in this case.

First, Congress's "plenary power to create immigration law. . . . is subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695, 121 S. Ct. 2491, 150 L. Ed. 653 (2001). In the instant case, relevant constitutional limitations apply regardless of Defendant's citizenship status "because 'all persons within the territory of the United States are entitled to protection' of the Constitution." *Id.* at 694 (quoting *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S. Ct. 977, 41 L. Ed. 140 (1896)); *see also Mathews v. Diaz*, 426 U.S. 67, 77, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976) (recognizing that the Fifth Amendment protects all individuals "within the jurisdiction of the United States[,]" even those "whose presence in this country is unlawful").[16]

Second, both the Supreme Court and the Ninth Circuit recently recognized, albeit in the context of a citizenship distinction, that an "exacting standard of review" may apply to immigration-related equal protection challenges. *Sessions v.*

---

[16] Relevant precedent provides that there are stronger justifications for applying heightened scrutiny to constitutional challenges by non-citizens who are already residing in the United States, as opposed to non-citizens who are seeking admission. *See, e.g.*, *Zadvydas*, 533 U.S. at 693 (collecting cases and noting the distinction, for constitutional purposes, "between an alien who has effected an entry into the United States and one who has never entered").

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 22

*Morales-Santana*, ___ U.S. ___, 137 S. Ct. 1678 1694, 198 L. Ed. 2d 150, (2017); *see also Dent*, 900 F.3d at 1081 (holding that petitioner's equal protection claims "are treated the same as they would be in a non-immigration case").

The Government contends that, unlike the particular "carve-outs to rational basis review of Congress's immigration legislation," an equal protection challenge to a criminal statute previously has been "reviewed for a rational basis." ECF No. 81 at 3 (citing *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091–92 (9th Cir. 2007) *and United States v. Lopez-Flores*, 63 F.3d 1468, 1471–75 (9th Cir. 1995)). The Government's cited cases are distinguishable from the instant case, namely because both *Ruiz-Chairez* and *Lopez-Flores* involved challenges to an alienage classification, not discrimination based on race or national origin. *See* 493 F.3d at 1091; 63 F.3d at 1475.

Absent direct guidance from binding authority as to the applicable standard of review for an equal protection challenge to § 1326, the Court first considers Defendant's challenge under the heightened standard of review as set forth in *Arlington Heights*. *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *9 ("The Government's assertion that the Court has little role in policing the Fifth Amendment's boundaries in a case where the defendant faces risk of imprisonment is without merit"); *Wence*, 2021 WL 2463567, at *3 ("[T]he Court can find no support for the proposition that criminal laws enacted by Congress, even when they are enacted in furtherance of Congress's broad immigration power, are otherwise

immune from . . . upholding a right so fundamental as the equal protection of this nation's laws."); *Carrillo-Lopez*, 2021 WL 3667330, at \*3 (finding that § 1326 "must be reviewed under the *Arlington Heights* equal protection framework").[17]

C.    Equal Protection Challenge to § 1326 Under *Arlington Heights*

To guide the evidentiary inquiry into a challenged law's discriminatory purposes, the Supreme Court established several non-exhaustive factors for a court to consider.  *Arlington Heights*, 429 U.S. at 266–68.  First, "[t]he impact of the official action[,]" in burdening a particular race more than another, "may provide an important starting point." *Id.* at 266.  Next, the "historical background of the decision" provides a second "evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.  Similarly, the "specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.*  Courts also consider "departures from the normal procedural sequence" as well as substantive departures where "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*  Lastly, the legislative history "may be highly

[17] *But see Gutierrez-Barba* 2021 WL 2138801, at \*5 (applying rational basis review after finding that *Arlington Heights* did not "govern the Court's analysis"); *see also Orozco-Orozco*, 2021 U.S. Dist. LEXIS 178951, at \*1 (applying rational basis review to the defendant's challenge to § 1326 based on the language from the Ninth Circuit in *Hernandez-Mancilla*).

relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268. Given that Defendant is charged with violating § 1326, not the unlawful reentry provision contained in the 1929 UAA, the Court considers each of the *Arlington Heights* factors in relation to Defendant's constitutional challenge to the validity of § 1326, specifically.

### 1. *Disparate Impact*

Defendant argues that § 1326 disparately impacts Latinxs and cites two recent district court cases holding the same. ECF No. 61 at 8 (citing *Carrillo-Lopez*, 2021 WL 3667330, at *6–7; *Machic-Xiap*, 2021 WL 3362738, at *10). The Supreme Court has rejected the notion that "a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). However, the Court recognized exceptions where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960)).

In *Yick Wo*, the Court considered a San Francisco ordinance that made it illegal to operate a laundry facility in a wooden building without a permit. 6 S. Ct.

at 1065.  Although racially neutral on its face, the Court held that the law was

unconstitutional because "[t]he necessary tendency, if not the specific purpose, of

this ordinance . . . is to drive out of business all the numerous small laundries,

especially those owned by Chinese [individuals]."  *Id.* at 1068.  In *Gomillion*,

petitioners challenged the validity of an Alabama law that redefined the boundaries

of the City of Tuskegee.  364 U.S. at 340.  The Court reversed the lower courts,

thereby allowing the equal protection claim to proceed to trial, given that the

"inevitable effect of this redefinition of Tuskegee's boundaries is to remove from

the city all save four or five of its 400 Negro voters while not removing a single

white voter or resident."  *Id.* at 341.  "Absent a pattern as stark as that in *Gomillion*

or *Yick Wo*, [disparate] impact alone is not determinative."  *Arlington Heights*,

429 U.S. at 266.

        The Supreme Court recently considered a disparate impact argument as part

of a constitutional challenge to the recission of the Deferred Action for Childhood

Arrivals ("DACA") program.  *See Department of Homeland Security v. Regents of

the University of California*, ___ U.S. ___, 140 S. Ct. 1891, 1915, 207 L. Ed. 2d

353 (2020) (ruling that the respondents' argument that the rescission of DACA

disparately impacted "Latinos from Mexico, who represent 78% of DACA

recipients" was insufficient, to establish an equal protection violation).  There, the

Court noted that alleged disparate impact alone did not demonstrate an invidious

discriminatory purpose because otherwise, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916.

In the instant case, Defendant cites evidence from the Department of Justice and the United States Sentencing Commission, showing that about 98% "of those charged with illegal reentry in 2010 were from Latin America, and over 99% of those convicted of illegal reentry in 2020 were Hispanic." ECF No. 61 at 8; *see also* ECF No. 78-2 at 7 (discussing the "disparate prosecution of Mexicans under the [1929 UAA]"). The Government does not dispute the accuracy of Defendant's statistics but counters that such numbers "are a feature of geography and geopolitics—Latin America's proximity to the United States and related socioeconomic and political conditions—not discrimination." ECF No. 64 at 23. The Government's argument misunderstands the crux of prior Supreme Court holdings regarding disparate impact.

In *Arlington Heights*, the Court described disparate impact as an action that "'bears more heavily on one race than another.'" 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242). Defendant's statistical evidence, which the Government does not refute, easily demonstrates that Latinxs are more heavily burdened by the enforcement and prosecution of § 1326 violations. Accordingly, the Court finds that Defendant has satisfactorily demonstrated disparate impact regardless of extenuating factors that contribute to the disparity. Although the Government's proffered "geography" explanation does not undermine this finding, the Court

recognizes that such reasoning distinguishes this case from *Yick Wo* and *Gomillion*, where no legitimate reason other than race explained the respective law's racial impact. Accordingly, § 1326's disparate impact on the Latinx population is relevant but, as in *Arlington Heights*, "the Court must look to other evidence" that an invidious discriminatory purpose was a motivating factor in enacting the challenged law. *Id.*

### 2.    *Historical Background*

Setting aside disparate impact, *Arlington Heights* provides for the consideration of "[t]he historical background of the decision" being challenged. *Id.* at 267. Defendant argues that § 1326 is rooted in the historical background of the 1929 unlawful reentry provision that was itself motivated by racist theories of eugenics. ECF No. 78-2 at 4–5; *cf.* ECF No. 61 at 9. Additionally, Defendant cites the rise of anti-Latinx racism from 1920 onwards, most notably evidenced by the "repatriation drives" during the Great Depression and the treatment of workers in the Bracero Program. ECF No. 78-2 at 5–13; *cf.* ECF No. 78 at 14. Lastly, Defendant points to the use of the racial slur "wetback" by Congressmen, both leading up to and following the passage of the 1952 INA. ECF Nos. 78-6 at 32, 78-7 at 4; *cf.* ECF No. 78 at 14–15.

The Government disputes Defendant's view that "the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry." ECF No. 64 at 19. The *Carrillo-Lopez* decision extensively drew on the "racial animus"

in the period preceding the passage of the 1929 unlawful reentry provision and held that the law's "reenactment did not cleanse Section 1326 of its racist origins." 2021 WL 3667330, at *9.  In response, the Government argues that *Carrillo-Lopez* erroneously interpreted the Supreme Court's holding in *Abbott*, which rejected the argument that a State must show that a former Legislature "somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature" two years earlier.  138 S. Ct. at 2324.  *Abbott* distinguished the Court's earlier decision in *Hunter v. Underwood* which "involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a constitutional convention avowedly dedicated to the establishment of white supremacy."  *Id.* at 2325 (citing *Hunter*, 471 U.S. at 228–30).

Defendant's instant challenge appears closer to the challenge raised in *Hunter* than *Abbott*, suggesting Congress's prior racial animus could be imputed to § 1326.  *But see Machic-Xiap*, 2021 WL 336278, at *15 (distinguishing the law at issue in *Hunter* from § 1326 because "unlike Alabama's moral turpitude provision, the 1929 Act does not remain on the books").  Ultimately, though, the Supreme Court in *Hunter* declined to decide whether the Alabama law "would be valid if enacted today without any impermissible motivation."  471 U.S. at 233.  A review of the applicable precedent shows that past discrimination from a prior law, although relevant, does not directly control the *Arlington Heights* analysis of a different law.  *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S. Ct. 1490,

64 L. Ed. 2d 47 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.").

Defendant further argues that the Court may rely on evidence of prior discriminatory intent, as exhibited by the 1929 Congress, based on the Ninth Circuit's recent holding in *United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021). There, the court observed that "the precursor statutes to both § 1325(a) and § 1326(a), which bear substantially similar language to the modern statutes, were enacted together in 1929 as part of the same bill to regulate unlawful immigration." *Id.* at 1298. Accordingly, the court noted that "when statutes are enacted shortly after one another and address the same subject and use similar language, that demonstrates Congress's intent that they have the same meaning." *Id.* (citing *United States v. Nishiie*, 996 F.3d 1013, 1026 (9th Cir. 2021)). The Government counters that this language concerned only the court's statutory interpretation of § 1325(a) as a regulatory offense and "is not a directive to compare the 1929 and 1952 statutes with one another." ECF No. 81 at 4.

The Court finds that the Government persuasively argues that past discrimination from the 1929 UAA is not directly imputed onto a recodified law, such as § 1326, decades later. Nevertheless, Defendant presents strong evidence

concerning the racist historical background in the years and months leading up to the recodification of the unlawful reentry provision in 1952, not just in 1929. The 1942 Bracero Program, which continued for a decade after the 1952 INA, provided a pathway for Mexican migrants to work in America while also causing the same migrants to suffer cruel treatment at the border and exploitation of their labor. *See* ECF No. 78-2 at 4, 10. Congress, led by Senator McCarran, allegedly removed obstacles so migrant farmworkers could easily cross the border to appease agricultural growers while simultaneously undermining pathways to citizenship, access to healthcare, and minimum wage for those same migrant workers. *Id.* at 18–19; *see also* ECF No. 78-6 at 32. Such a hostile viewpoint for undocumented Mexican farmworkers, while simultaneously refusing to sanction the employers who harbored the farmworkers for cheap labor, is further evidenced by the passage of Senate Bill 1851, derogatively referred to as the "Wetback Bill," two months prior to the enactment of the 1952 INA. *See* 82 Cong. Rec. 8115 (June 26, 1952).

Together, the historical background leading up to 1952, as well as § 1326's disparate impact on Latinx individuals, provide relevant evidence of potential discriminatory motivation. However, such evidence, on its own, is insufficient to demonstrate that the law violates the Equal Protection Clause and, accordingly, the Court must consider other factors under the *Arlington Heights* framework.

/ / /

/ / /

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 31

3.    *Sequence of Events Preceding the Law's Enactment*

Turning to the events preceding § 1326's enactment, Defendant first focuses on the 1929 unlawful reentry provision, which Professor Kang alleges was led by "negative stereotype[s]" of Mexican workers "as a cheap, exploitable, and deportable labor force" both by southwestern agribusiness and Eugenicists.  ECF No. 78-2 at 3–5; *cf.* ECF No. 61 at 11 (describing the 1929 UAA as "a compromise between nativists and industry").  In the months leading up to the recodification of § 1326 in the 1952 INA, Defendant again highlights the usage of racial slurs in congressional hearings when referring to Mexican immigrants.  ECF No. 78-7 at 4 (Senator McCarran, co-sponsor of the 1952 INA, refers to the "flood of people" coming into the United States as "wet-backs"); *cf.* ECF No. 78 at 17 (discussing the passage of the "Wetback Bill" as well as "Deputy Attorney General Peyton Ford's use of the racial slur 'wetback' in a letter to the Judiciary Committee regarding the unlawful reentry statute").

The Government counters that "the primary discriminatory intent cited by the Defendant [regarding the 1929 UAA] is neither recent . . . nor proven in the 'given case,'—*i.e.* the 1952 statute or any of its subsequent versions."  ECF No. 64 at 16.  In *Regents*, the case reviewing President Trump's rescission of the DACA program, the Supreme Court deemed that prior statements made by President Trump in relation to Latinos were "remote in time and made in unrelated contexts" and, therefore, "do not qualify as 'contemporary statements' probative of the

decision at issue." 140 S. Ct. at 1916 (quoting *Arlington Heights*, 429 U.S. at 268). This Court previously distinguished *Regents* in a case challenging the Public Charge rule, where "the States' allegations regarding statements by President Trump," and "by a high-level White House official and a [Department of Homeland Security] decision-maker" occurred between January 2018 and August 2019, when the rule being challenged was published. *Washington v. United States Department of Homeland Security*, No. 4:19-cv-5210-RMP, 2020 WL 12834440, at *16 (E.D. Wash. Sept. 14, 2020).

Returning to the instant motion, the evidence that Defendant provides for events leading up to § 1326, namely Deputy Attorney General Ford's memo and President Truman's veto, are less compelling. Although the statements are relatively contemporary with the time period during which § 1326 was drafted, the statements give no direct insight into the motivations of the 1952 Congress that passed the law. *See Machic-Xiap*, 2021 WL 3362738, at *13 (placing little weight on President Truman's veto as an opponent of the law and noting that President Truman's full statements reveal that he was most concerned with how the quota system "disfavored immigrants from Asia and southern and eastern Europe," not Latin America); *see also id.* (agreeing that Deputy Attorney General Ford's use of the word "wetback" is "evidence of racial animus[,] although the use of the racial slur in the congressional record "is limited evidence of Congress's purpose in enacting § 1326" because "Ford was not a member of Congress"). Given the

limited congressional record regarding § 1326 specifically, both when it was recodified in 1952 and amended in later years, the Court finds that there is insufficient evidence to show that the sequence of events preceding the law provides adequate evidence of a discriminatory motivation.

The use of racial slurs by one of the sponsors of the 1952 INA, both before and after the recodification of § 1326, is troubling.[18] However, both Defendant and Professor Kang rely heavily on the assumption that isolated remarks by individual congressmembers provide evidence that the entire congressional sequence of events is replete with discriminatory intent, a proposition that this Court rejects. Absent more direct evidence about § 1326, specifically, the Court makes no such assumption.

### 4. *Procedural and Substantive Departures*

Defendant contends that the time period surrounding the passage of the 1929 UAA was "the first and only era in which Congress openly relied on eugenics when passing legislation." ECF No. 61 at 17. Professor Kang highlights Senator McCarran's efforts to obstruct "effective border enforcement" to further the "labor

---

[18] Defendant highlights the use of the racial slur "wetback" by Senator McCarran, a co-sponsor of the 1952 INA, during appropriations hearings in 1951 and 1953. ECF Nos. 78-6, 78-7. The Court also recognizes that a select number of Congressmen using the racial slur "wetback" during a hearing in June 1952, around the same time that the 1952 INA became law. *See supra* at 8 n.8.

exploitation" of Mexican migrants.  ECF No. 78-2 at 15–17.  Professor Kang imputes Senator McCarran's supposed tactics to all of Congress based on Congress's rejection of a proposal for employer penalties to deter unlawful immigration.  *Id.* at 14; *cf.* ECF No. 78 at 20 (arguing that "Congress expanded the unlawful reentry statute based on a letter using a racial slur" and "passed § 1326 with little debate despite knowing of its disparate impact on Latinxs").

The Court concludes that Professor Kang's evidence provides a potential explanation for the discriminatory motivations of certain congressmen, such as Senator McCarran.  However, at its core, this evidence is speculative and fails to sufficiently establish any procedural or substantive departures in the enactment of § 1326 that would suggest a discriminatory motivation by Congress as a whole.  Additionally, the fact that the law passed over President Truman's veto shows that Congress widely agreed to the provisions established in the INA, including § 1326, which was recodified without much debate.

### 5.    *Legislative History*

For the final *Arlington Heights* factor, Defendant's evidence continues to fall short of the standard necessary to demonstrate that § 1326 was enacted with an invidious discriminatory purpose.  Defendant first argues that the legislative history of the 1929 provision included overtly racist remarks during congressional hearings and debate.  ECF No. 61 at 16.  Although the legislative history for

§ 1326 is undoubtedly sparser, Defendant argues that Professor Kang's research "shows that Congress's relative silence around the recodification of the unlawful reentry statute cannot be read as suggesting an absence of racial animus." ECF No. 78 at 19. The main support for this argument comes again in the form of President Truman's veto and Deputy Attorney General Ford's memo, both of which the Court deems to have little probative value to the motivations of the 1952 Congress. Defendant and Professor Kang also dedicate a great deal of briefing to the xenophobic backgrounds of certain legislators and other individuals involved with the passage of § 1326, the subsequent amendments to § 1326, and other immigration law. *See generally* ECF No. 78-2 at 16–21, 26–28, 34–47, 53–55, 57–66, 79–81, 91–93.

The Government counters that Defendant highlights only "a small number of legislators per [the] enactment of § 1326" rather than properly focusing on the intent of the entire 1952 Congress or the subsequent Congresses that amended § 1326. ECF No. 81 at 5. Moreover, the viewpoints of those who opposed the law, such as President Truman, provide little insight given that the Supreme Court has cautioned "against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents." *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964).

Applying the *Arlington Heights* framework, the Court concludes that Defendant fails to meet the burden of demonstrating § 1326 was passed with an invidious discriminatory motivation by Congress as a whole.

### D.    Relevancy of Subsequent Amendments to § 1326

The Court next considers whether subsequent amendments to § 1326 provide evidence of a discriminatory purpose for the unlawful reentry provision. At the outset, the Court notes that the evidence presented to suggest discriminatory intent for the subsequent amendments is far weaker than the evidence presented for the 1929 and 1952 laws.[19]

Perhaps recognizing the minimal congressional record for the subsequent amendments to § 1326, Defendant relies on the argument that "[t]hese revisions . . . failed to acknowledge and expunge the racial animus of the 1929 [UAA]."  ECF

---

[19] Similar to the reliance on Senator McCarran's background in profiling the passage of the 1952 INA, Professor Kang also relies on the racist remarks of several legislators who supported and/or drafted subsequent amendments to § 1326.  However, the Government persuasively counters that the legislators "profiled by [Professor] Kang may have drafted and advocated for the various reenactments, but it took a majority of their fellow congressmen—hundreds on each occasion—to ratify those measures into law."  ECF No. 81 at 7.  Moreover, the legislative history for the subsequent amendments is relatively sparse, the amendments "were often enacted by wide margins[,]" and they "'stirred no debate in Congress.'"  *Id.* at 5–6 (citing and quoting ECF No. 78-2 at 50, 87, 92).

1    No. 78-2 at 103.  The *Carrillo-Lopez* decision accepted a similar argument based,

2    in part, on the court's distinction of *Johnson v. Governor of State of Florida*,

3    405 F.3d 1214 (11th Cir. 2005).  *See* 2021 WL 3667330, at *23.

4        *Johnson* involved an equal protection challenge to a felon

5    disenfranchisement law, first codified in the Florida Constitution in 1868.

6    405 F.3d at 1216–18.  In rejecting the plaintiffs' equal protection challenge, the

7    court noted that "[o]ne hundred years after the adoption of the 1868 Constitution,

8    Florida comprehensively revised its Constitution" and chose again "to maintain a

9    criminal disenfranchisement law."  *Id.* at 1220.  In doing so, the 1968 Florida

10   Legislature made substantive changes to the law (limiting disenfranchisement to

11   those convicted of felonies) that were sufficient to "eliminate the taint from a law

12   that was originally enacted with discriminatory intent."  *Id.* at 1223.

13       *Carrillo-Lopez* contrasted the changes to § 1326 with the situation in

14   *Johnson* given that the five amendments to § 1326 "did not change" the law's

15   operation, "but instead served to increase financial and carceral penalties" to

16   strengthen the law's deterrent value.  2021 WL 3667330, at *23.  Neither *Johnson*

17   nor *Carrillo-Lopez* are binding on this Court, although both provide persuasive

18   contrasting viewpoints to consider.

19       Upon review, the Court declines to embrace the "forever tainted" argument

20   at the heart of both the *Carrillo-Lopez* decision and Defendant's instant motion for

21   two reasons.  First, *Carrillo-Lopez*, and by extension Defendant, rely on the

premise that § 1326 is inextricably linked to the 1929 UAA, but the laws, although similar, are not one and the same. *Compare* ECF No. 61-14 (1929 Public Law 1018 making it a felony punishable up to two years for an "alien" who is "arrested and deported" to "enter or attempt to enter the United States") *to* Pub. L. No. 82-414, § 276, 66 Stat. 229 (1952 INA § 1326 making it a felony for any "alien who . . . has been arrested and deported or excluded and deported" to enter, attempt to enter, or be found in the United States). This Court has recognized that the similarities between the laws is probative, but not dispositive, of an illicit motivation for § 1326. However, the Court rejects the notion that similarities between two laws enacted decades apart forever taints the later legislation, particularly where the members of Congress have completely changed in the ensuing years.

Second, and relatedly, the Supreme Court holding in *Hunter*, imputing discriminatory intent to a racially neutral law based on the existence of a prior discriminatory law does not mean that the ill motivations of prior laws are automatically imputed to a legislative recodification. *See, e.g.*, *City of Mobile*, 446 U.S. at 74 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) ("Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent.").

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 39

1    This Court has found that Defendant failed to meet his burden under

2    *Arlington Heights* to establish that § 1326 was enacted with an invidious

3    discriminatory purpose.  The five subsequent amendments to § 1326 do not

4    change, much less undermine, this finding.  Having found that Defendant fails to

5    demonstrate that § 1326 or its five subsequent amendments were enacted with a

6    discriminatory purpose, the Court proceeds to consider the law's constitutionality

7    under the rational basis review standard.

8        E.    Equal Protection Challenge to § 1326 Under Rational Basis Review

9        Laws reviewed under the rational basis standard are upheld "if they are

10    'rationally related to a legitimate government purpose.'"  *Hernandez-Mancilla*,

11    633 F.3d at 1185 (quoting *Masnauskas v. Gonzales*, 432 F.3d 1067, 1071 (9th Cir.

12    2005)).  "Using such rational basis review, a statute is presumed constitutional"

13    and the party challenging the law bears the burden of proving no legitimate

14    government purpose exists.  *Masnauskas*, 432 F.3d at 1071.

15        In this case, the Government contends that the Ninth Circuit "already

16    determined that § 1326, with the statute's clear focus on deterring aliens from

17    unlawfully reentering the United States, satisfies rational basis review."  ECF

18    No. 64 at 14 (citing *Hernandez-Guerrero*, 147 F.3d at 1078).  The Government's

19    argument is in line with the nine other district courts who held that § 1326 is

20    rationally related to legitimate immigration policy.  *See, e.g.*, *Wence*, 2021 WL

21    2463567, at *10 ("The United States undeniably has a legitimate interest in

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 40

regulating its borders and preventing the entry of those who have committed violent and drug-related crimes, as well as the reentry of those who have violated immigration laws in the past.").  Moreover, Professor Kang conceded on cross examination that subsequent amendments to § 1326, such as the 1988 Anti-Drug Abuse Act, are justified by public safety considerations for criminal aliens with aggravated felony convictions.

Professor Kang suggests that a healthy skepticism should be applied to drafters of legislation who likely were not thinking about actual crime, but rather their underlying racist motivations to enact such laws.  Applying the deferential standard of rational basis review, such "healthy skepticism" is unwarranted, particularly where the congressional record is sparse enough to support only speculations about the internal workings of an individual congressman's mind.[20] Accordingly, the Court agrees that evidence about one or more congressman's

---

[20] The Court also is reluctant to rely on Professor Kang's subjective quantification of her belief that the subsequent amendments to § 1326 were motivated by racial animus.  On direct examination, Professor Kang repeatedly stated that she had over 90% confidence in her assertion that both § 1326 and its subsequent amendments were motivated, in part, by racial animus.  However, Professor Kang was unable to support these assertions with any sort of scientific method or basis, and, on cross examination, she was unable to clarify what evidence would provide 100% confidence in the belief that racial animus motivated the passage of such laws.

racist motivations is insufficient to attribute racial motivation to the entire Congress.

The Court next considers whether Defendant has shown that no legitimate government purpose exists for enacting § 1326. *Masnauskas*, 432 F.3d at 1071. Defendant makes no such showing. The Government argues that the purpose of § 1326 is to deter unlawful reentry by giving teeth to civil immigration statutes regarding deportation orders. ECF No. 64 at 13 (citing *Gutierrez-Barba*, 2021 WL 2138801, at \*5). As for the subsequent amendments to § 1326, the Government notes the same goal of deterrence is evidenced by the "heightened penalties for more serious offenders." ECF No. 81 at 8. The Court deems the Government's arguments persuasive and finds that § 1326 is rationally related to the legitimate government interests of border enforcement, criminal deterrence, and public safety.

## IV.    CONCLUSION

Overall, Defendant presents evidence of § 1326's disparate impact as well its troublesome historical background. However, the remaining *Arlington Heights* factors, such as § 1326's legislative history, fail to sufficiently demonstrate that Congress was motivated, in part, by an invidious discriminatory motivation in recodifying the unlawful reentry provision. Defendant has submitted little more than circumstantial inferences as to the motivations of several congressman regarding broad immigration policy, as opposed to the 1952 Congress's intentions in enacting § 1326, specifically. Although the Court is cognizant that Defendant

has presented evidence of explicit discrimination against the Latinx population in relation to the 1929 law, the Court will not impute such motivations onto a recodified provision passed over twenty years later without supporting evidence of the same discriminatory motivations or intentions.

The Court reiterates the viewpoint of its sister court: "[N]othing restrains a future Congress from explicitly disavowing earlier expressions of racism when passing future immigration legislation, especially comprehensive immigration legislation." *Machic-Xiap*, 2021 WL 3362738, at *15.  Absent stronger evidence of discriminatory intent on behalf of the 1952 Congress that enacted § 1326 or the later Congresses who amended the law, the Court rejects Defendant's instant equal protection challenge.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, **ECF No. 61**, is **DENIED**.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** February 18, 2022.

_s/ Rosanna Malouf Peterson_
ROSANNA MALOUF PETERSON
Senior United States District Judge

ORDER DENYING DEFENDANT'S MOTION TO DISMISS ~ 43