# ORIGINAL

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 2:20-CR-00134-RMP-1
3                                 )
                   Plaintiff,     ) January 28, 2022; 9:01 am
4                                 )
v.                                ) By Videoconference
5                                 )
MARCIANO MUNOZ-DE LA O,           ) Motion to Dismiss Hearing
6                                 )
                   Defendant.     ) Pages 1 to 166
7   _____

8

9        BEFORE THE HONORABLE ROSANNA MALOUF PETERSON
         SENIOR UNITED STATES DISTRICT COURT JUDGE
10

11                    APPEARANCES:

12  For the Plaintiff:        MR. MICHAEL J. A. ELLIS
                              USAWAE.MEllisECF@usdoj.gov
13                            US Attorney's Office
                              920 W. Riverside Avenue, Suite 300
14                            Spokane, Washington 99210-1494
                              509-353-2767
15

    For the Defendant:        MR. J. HOUSTON GODDARD
16                            houston_goddard@fd.org
                              MS. PAYTON B. MARTINEZ
17                            payton_martinez@fd.org
                              Federal Defenders
18                            10 North Post, Suite 700
                              Spokane, Washington 99201
19                            509-624-7606

20  Court-Certified Interpreters:  Ms. Natalia Rivera
                                   Ms. Susan Evans
21

    Official Court Reporter:  Marilynn S. McMartin, CCR #2515
22                            United States District Courthouse
                              P.O. Box 2706
23                            Yakima, Washington 98907
                              509-573-6613
24

25  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.

2

**INDEX**

**Proceedings**:                                                      **Page**

        Motion to Dismiss Hearing - January 28, 2022        3
        Argument by Mr. Goddard                           135
        Argument by Mr. Ellis                             150
        Rebuttal by Mr. Goddard                           161
        Court's Oral Comments                             164

**WITNESS INDEX**

**Plaintiff Witnesses**:                                              **Page**


            (None)

* * * * *

**Defense Witnesses**:                                                **Page**

    S. DEBORAH KANG, PhD
            Direct Examination by Mr. Goddard               5
            Cross-Examination by Mr. Ellis                 78
            Redirect Examination by Mr. Goddard           128

**EXHIBITS ADMITTED**

**Plaintiff**
  **Number**        **Description**                                  **Page**

            (None)


**Defense**
  **Number**        **Description**                                  **Page**

            (None)

**GENERAL INDEX**

                                                                     **Page**

Reporter's Certificate.................................. 166

1    (January 28, 2022; 9:01 am)

2        (Call to order of the court)

3        THE COURTROOM DEPUTY:  The matter now before the court

4    is *United States of America v. Marciano Munoz-De La O*, Case

09:02:05    5    No. 2:20-CR-134-RMP-1, time set for motion hearing.  Appearing

6    for the government is Michael J. A. Ellis, and appearing for the

7    defendant is J. Houston Goddard.

8        THE COURT:  Mr. Munoz, you do have the right to have

9    this hearing in open court, but to avoid cross-contamination

09:02:32    10    during COVID, we've arranged for this video hearing.  Do you

11    agree to proceed by video today?  And you can speak --

12        THE DEFENDANT:  Yes, yes.

13        THE COURT:  All right.  Now we are going to mute your

14    microphone and -- there we go.

09:02:52    15        Okay.  Mr. Goddard, I want to make sure there's no other

16    echoing, so if you'll just speak for a second.

17        MR. GODDARD:  Certainly, Your Honor.  I hope this is

18    coming through okay.

19        THE COURT:  Yes.

09:03:03    20        Okay.  Mr. Ellis, your sound's okay?

21        MR. ELLIS:  Yes, Your Honor.  I can hear everybody, and

22    is there any echo on my end or anything?

23        THE COURT:  No.  I think we're good.

24        So, Counsel, I've read your briefs.  I've looked over

09:03:16    25    Dr. Kang's affidavit.  I don't know if you want to make opening

1    statements of any sort or if you want to proceed directly to

2    your examination of Dr. Kang.

3            The other thing is -- I don't know if Ms. Lamb has

4    reached out to you yet, Mr. Goddard and Mr. Ellis.  We're

09:03:42    5    curious as to whether the parties anticipate if this hearing

6    will extend to 3:00 o'clock just because we have an interpreter

7    issue.  What do you think, Mr. Goddard?

8            MR. GODDARD:  I would not anticipate we would still be

9    going at 3:00 pm, Your Honor.

09:03:57   10            THE COURT:  Okay.  Mr. Ellis?

11            MR. ELLIS:  I agree.  That would be very surprising.

12            THE COURT:  Okay.  I don't want to rush you, though.  If

13    you need more time, we'll take more time.  We'll figure out

14    something else.  But that helps Ms. Lamb plan a little bit.

09:04:14   15            So, Mr. Goddard, this is your motion, so do you want to

16    make an opening statement or call your witness?

17            MR. GODDARD:  Thank you, Your Honor.  I would like to

18    proceed directly to the examination of Dr. Kang.

19            THE COURT:  Okay.  Can you -- is Dr. Kang admitted into

09:04:31   20    the Zoom room?

21            MR. GODDARD:  I spoke with her just a moment ago, Your

22    Honor.  My understanding is she is in the waiting room, and it

23    looks like -- here she comes.

24            THE COURT:  Okay.  Good.  Dr. Kang, the first thing

09:04:44   25    we're going to do is place you under oath.

1    THE COURTROOM DEPUTY:  Please raise your right hand.

2

3                    **S. DEBORAH KANG, PhD**,

4    called as a witness on behalf of the defendant, having first

5    been duly sworn or affirmed, testified under oath as follows:

6

7            THE WITNESS:  Yes.

8            THE COURTROOM DEPUTY:  Thank you.

9            THE COURT:  You may lower your hand.  Thank you.

10           Would you please state your full name and spell your

11   last name.

12           THE WITNESS:  Yes.  My full name is Shulamith Deborah

13   Kang.  My last name is spelled K-a-n-g.

14           THE COURT:  Okay.  Good.  Are you being able to hear and

15   see us okay, Dr. Kang?

16           THE WITNESS:  Yes.

17           THE COURT:  All right.  Mr. Goddard, please proceed.

18           MR. GODDARD:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20   BY MR. GODDARD:

21   Q    Good morning, Dr. Kang.  Thank you for being here.  I'd

22   like to begin by setting out your experience.

23           Dr. Kang, how are you currently employed?

24   A    I'm currently an associate professor in the Department of

25   History at the University of Virginia.  I'm also a member of the

1  faculty advisory committee of the Democracy Initiative also at

2  the University of Virginia.

3  Q    How long have you been in that position?

4  A    Since August 2021.

09:05:56  5  Q    And prior to that position, have you held positions at

6  other academic universities?

7  A    Yes, the University of Texas at Dallas and California State

8  University San Marcos.

9         THE COURT:  I'm gonna stop you just for a second.  I'm

09:06:11  10  just getting a message.  Are the interpreters doing okay with

11  this?

12         You selected English, is that correct, Dr. Kang, on the

13  choice?

14         THE WITNESS:  Yes.

09:06:23  15         THE COURT:  Okay.  And, Natalia, is everything flowing

16  okay?

17         THE INTERPRETER:  (No response heard)

18         THE COURT:  Okay.  If you need your cameras reactivated,

19  Natalia, you can do that.  It was -- you and Susan, Ms. Evans,

09:07:02  20  can go ahead and activate your cameras if that makes it easier

21  for you.

22         THE INTERPRETER:  (No response heard)

23      (Interruption by court reporter for IT assistance)

24         INTERPRETER RIVERA:  Interpreter Rivera speaking.

09:08:27  25         Your Honor, yes, everything seems to be working well.

1    Thank you.  However, if it is possible, we would need our

2    cameras to be turned on.  We need a little bit more practice.

3    We usually use the camera to be able to more effectively do

4    interpreter changes.  For now, it seems to be working well.  If

09:08:48  5    we run into any issue, we will let Your Honor know.  Thank you.

6              THE COURT:  Okay.  Thank you.

7              Marilynn, are you ready to proceed now?

8           (Court reporter replied)

9              THE COURT:  Okay.  Mr. Goddard, I apologize again.  And

09:09:06  10   Mr. Way is just concerned that Dr. Kang may not have the English

11   channel on, but I'm not sure if that will matter, because I

12   don't think your client is going to be speaking today.  Is he,

13   Mr. Goddard?

14             MR. GODDARD:  I would not anticipate so, Your Honor.

09:09:22  15             THE COURT:  Okay.  So I think we're okay with that.

16             Mr. Goddard, I was following you going through the

17   credentials.  And I did read the CV, but please go ahead.

18             MR. GODDARD:  Understood.  Thank you, Your Honor.

19   Q    (By Mr. Goddard)  Dr. Kang, what is your academic

09:09:40  20   background?

21   A    I earned my PhD in United States history from the

22   University of California at Berkeley.  I earned my master's

23   degree in jurisprudence and social policy also from the

24   University of California at Berkeley.  I earned my

09:09:55  25   undergraduate degree in European literature and history from

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

8

1    Cornell University.

2    Q    When did you receive your PhD?

3    A    In 2005.

4    Q    And what was your PhD dissertation on?

09:10:08    5    A    My PhD dissertation was a history of the Immigration and

6    Naturalization Service on the US-Mexico border.

7    Q    As a historian, do you have a particular area of expertise?

8    A    Yes, the history of US -- of immigration to the United

9    States.

09:10:25    10    Q    Does that expertise extend to legislative history of US

11    immigration law?

12    A    Yes.

13    Q    And would that encompass assessing legislative intent?

14    A    Yes.

09:10:38    15    Q    How did you learn to assess legislative intent?

16    A    I learned how to do legislative histories as a master's

17    student in the jurisprudence and social policy program at the

18    University of California at Berkeley.

19         While there in that program, I was required to take

09:10:55    20    principally law school classes, and in my first year in that

21    program, I was required to take legal research and writing.

22    This is a class that was also required of all 1L students at

23    Berkeley Law.

24         In that class we were taught how to do legislative

09:11:14    25    histories using a textbook called *Finding the Law* by law

1    professor Bob Berring, who was affiliated with the University of

2    California at Berkeley Law School.

3         In addition to that, I served as an associate editor of the

4    *Asian Law Journal* and a member of the *Berkeley Women's Law*

09:11:32   5    *Journal*, both which are published out of the University of

6    California Berkeley Law School, although their titles today may

7    be slightly different.

8         And then in preparing my dissertation as well as my book

9    manuscript, I prepared extensive legislative histories that were

09:11:49  10    relevant to my own research.  And then as a scholar and teacher

11    of immigration law and policy, I continued to hone and develop

12    my skills with respect to legislative history by reading such

13    books as Victoria Nourse's *Misreading the Law, Misreading*

14    *Democracy*.  Victoria Nourse is a law professor at Georgetown,

09:12:13  15    and her book is used in law schools today to teach students how

16    to do legislative history.

17    Q    Thank you.

18         Could you summarize just briefly what you learned from

19    those various textbooks and courses.

09:12:26  20    A    So I learned how to do a legislative history, and I learned

21    about the various databases that were relevant to the

22    preparation of a legislative history, the very-detail-oriented

23    work involved in tracing the story of how a bill becomes a law.

24    This requires the extensive reading of the *Congressional Record*,

09:12:49  25    congressional committee reports, as well as conference reports.

10

1       I also learned how -- I also learned about standards of

2   evidence, and this was particularly the case with the *Asian Law*

3   *Journal*.  My first year on that journal, the journal subjected

4   all new members to a kind of hazing where you were asked to

09:13:09   5   memorize *The Blue Book*.

6       You were also taught how to cite check, and in the law

7   school context, cite checking first to not only making sure that

8   the format of the footnotes were correct, but also making sure

9   that if there were any cite, any direct quotes or paraphrases in

09:13:28   10   a manuscript that the journal might have received, it was our

11   job as first-year members to literally go to the library, find a

12   paper copy of the source, Xerox it, and ensure that the

13   references to the source, the paraphrases and the quotes were

14   accurate.

09:13:50   15       And then I also learned how to edit manuscripts, and that

16   training was invaluable because that training emphasized

17   evidence, providing adequate evidence for an argument.  And to

18   this day, I draw upon that training in writing my own historical

19   monographs, journal articles, and even this affidavit.

09:14:15   20       And I think that sometimes I get a backhanded compliment

21   from other historians who like to tell me that I footnote like a

22   law student and so that applies to, again, my historical

23   scholarship as well as the work I did for this affidavit.

24   Q   Thank you, Dr. Kang.

09:14:36   25       Have you published academic work in your area of expertise?

1    A    Yes.

2    Q    Were those works peer-reviewed?

3    A    Yes.

4    Q    And did you receive awards for those academic works?

09:14:49    5    A    Yes, for the publication of my first, first solo-authored

6    monograph.

7    Q    And have you lectured on your area of expertise?

8    A    Yes.

9    Q    Have you taught university-level courses in your area of

09:15:03    10    expertise?

11    A    Yes.

12        MR. GODDARD:  Thank you, Dr. Kang.

13        Your Honor, at this point I'd ask for Dr. Kang to be

14    certified as an expert in the history and legislative history of

09:15:14    15    US immigration law.

16        THE COURT:  Mr. Ellis, any objection?

17        MR. ELLIS:  No, Your Honor.

18        THE COURT:  Okay.  You may inquire, Mr. Goddard.

19        MR. GODDARD:  Thank you, Your Honor.

09:15:25    20    Q    (By Mr. Goddard)  Dr. Kang, I'd like to walk through the

21    work you've done with regard to this case.  What were you asked

22    to do in this case?

23    A    I was asked to research and write about the legislative

24    history of the 1952 McCarran-Walter Act which recodified the

09:15:45    25    reentry statute under Section 1326.  I was also asked to do a

1    legislative history of the amendments to 1326 in the late

2    twentieth century.  And, in general, I was asked to research and

3    write about the legislative intent underlying those bills.

4    Q    Dr. Kang, when you were first asked to undertake these

09:16:07  5    tasks, what did you expect to find?

6    A    So when I began this work, I didn't expect to find much.  I

7    was very doubtful that I would find anything of interest for

8    that particular Federal Defender at the time, and this is

9    because 1326 is a small clause in each one of these bills.  And

09:16:31 10    each one of these bills from '52 onwards are massive pieces of

11    legislation, and they're also very complex pieces of

12    legislation.

13    Q    All right.  So when you began this task, not thinking you

14    would find much, what was your process?

09:16:50 15    A    So my process was to conduct extensive legislative

16    histories using the now pervasive online databases that are

17    available for doing those legislative histories.  They include

18    HeinOnline, LexisNexis, ProQuest Congressional, and more.

19         In addition to that, I read the relevant secondary sources.

09:17:14 20    This includes books, journal articles, and newspaper articles.

21    I also conducted archival research in Washington, DC, at the

22    Library of Congress and the George Washington University

23    library.

24         And at the Library of Congress I looked at some of the

09:17:31 25    records of House Speaker Newt Gingrich so as to discern the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

13

1    speaker's stance on immigration law reform, and then I also

2    looked at the archival records of the Federation for American

3    Immigration Reform at the George Washington University library

4    and archives.

09:17:54  5    Q    This in-person archival work that you conducted, how long

6    did that take?

7    A    So I spent two weeks in Washington conducting that archival

8    research.

9    Q    And after conducting all of this research, you produced a

09:18:08  10   report; is that right?

11   A    Yes.

12   Q    Did that report include conclusions on the congressional

13   intent behind the bills that you studied?

14   A    Yes.

09:18:17  15   Q    And as a professional historian, how do you assess

16   legislative intent?

17   A    So historians assess legislative intent by looking at the

18   historical context underlying a piece of legislation and also by

19   considering the motivations of the drafters and sponsors of a

09:18:39  20   bill or a particular section of a bill.

21   Q    Thank you.

22        So let's start with historical context.  Why is that

23   important to understanding legislative intent?

24   A    So for historians, historical context is critical in

09:18:57  25   understanding the legislative intent of a bill.  Historians

1    consider historical context to be inseparable from legislative

2    intent, and that's because you can't understand the intent or

3    meaning underlying a single word or a phrase in a piece of

4    legislation without knowing the historical context.

09:19:28    5        So without that historical context, the meaning of a single

6    word or a phrase in a bill or a statute is arbitrary, so you

7    really need to look at the historical context to understand

8    legislative intent.

9    Q    So it would be impossible to assess legislative intent of a

09:19:50    10    bill in a vacuum?

11    A    Yes.  And here Victoria Nourse's work is very, very

12    helpful.  She points out that without understanding historical

13    context, a specific phrase, a phrase such as "fundamental

14    rights," the meaning of that very phrase would be arbitrary.  It

09:20:09    15    would be simply up to the whims or prejudices of the reader at

16    any particular moment.  And so you really need to look at the

17    historical context to understand what was meant by that phrase

18    "fundamental rights" at a particular time.

19    Q    And when you're assessing laws that have to do with

09:20:32    20    immigration in the United States, is there any particular

21    historical context that is particularly important?

22    A    Yes.  So there is broad agreement among immigration

23    historians that when it comes to the history of immigration law

24    and policy, it's essential to understand the contemporaneous

09:20:51    25    attitudes about immigration, immigrants, race, racism, as well

1    as nativism.

2        And this is because, once again, there's broad consensus

3    among immigration historians that the history of American

4    immigration law and policy is entangled with the history of

09:21:12  5    American xenophobia.  The pattern is very clear that from the

6    nation's founding to the present, American immigration laws and

7    policies are often formed in response to xenophobia.

8    Q    Thank you.

9        You mentioned that in addition to historical context, it's

09:21:31  10   important to understand the motivations of the drafters or

11   sponsors of legislation or certain provisions in bills; is that

12   right?

13   A    Yes.  That's right.  So it's essential.  The motivations of

14   the drafters or sponsors are just as essential as understanding

09:21:52  15   the historical context because, again, that eliminates some of

16   the arbitrariness in discerning the intent and the meaning of

17   single words and phrases in a bill or a statute.

18   Q    Is it ever the case that the drafter or sponsor of a bill

19   does not explicitly state his or her motivations --

09:22:14  20   A    Yes.

21   Q    -- of the bill?

22   A    Yeah.  That's quite common.

23   Q    And does that prevent you from assessing legislative

24   intent?

09:22:23  25   A    No, not at all, because you can discern the stands of the

1   particular legislator who's involved in the drafting or

2   sponsoring of a measure by looking at his or her stands on

3   analogous policy proposals or analogous bills.

4        You can also discern their thoughts on a particular section

09:22:46   5   of a bill or a bill in its entirety by looking at the things

6   that they might say on the floor of Congress or any documents

7   that they might have submitted and added to the *Congressional*

8   *Record*.  You can also look at their contributions to various

9   congressional committee hearings, conference reports.

09:23:07   10        You should also take into consideration statements that

11   they might have made outside of Congress to the media or through

12   the preparation of law review articles or op-eds.

13        And you should also take into consideration their

14   relationships with various kinds of organizations, whether

09:23:26   15   private sector, public sector, lobbying organizations, and so

16   on.

17        So there are a lot of ways.  There are a lot of tools at

18   our disposal to discern the motivations of a particular

19   legislator even if they've been silent on a specific part of a

09:23:47   20   bill within Congress itself.

21   Q   Thank you, Dr. Kang.

22        So there are other tools you could use to --

23   A   Yes.

24   Q   -- assess the motivations, and you said one of those is if

09:23:57   25   you don't have a direct statement on one particular topic, you

17

1   could look to that legislator's views on analogous topics.

2   Could you speak a little bit more about that particularly in the

3   immigration context.

4   A    So in the immigration context, if -- you know, if we take

09:24:12   5   the example of 1326, a legislator has been silent on that

6   specific provision or proposed amendments to that provision, you

7   can understand that particular legislator's thoughts on

8   immigration law enforcement as well as the assignment of

9   criminal penalties to undocumented immigration by looking at

09:24:38   10  other statements they might have made within Congress or outside

11  of Congress as well as any publications they may have issued or

12  interviews they might have given to the media.  So, once again,

13  there are a lot of tools.

14  Q    Thank you.

09:24:57   15       And that's -- we've been speaking about divining the intent

16  behind the drafters or sponsors of legislation.  Of course,

17  there are other legislators who have to vote for these bills to

18  get them passed.

19  A    Yes.

09:25:09   20  Q    Do you expect to have insights into what's going on in the

21  minds of each legislator who votes for a bill?

22  A    No.  In preparing a legislative history, that's not the

23  expectation.  And, again, this comes from Victoria Nourse's

24  work.  When historians prepare a legislative history, our goal,

09:25:28   25  our aim is to tell a story of the winners.

1    As Victoria Nourse explains, legislative history is, at

2    bottom, a history of winners.  And it's our job as historians to

3    explain how it is that these so-called winners in Congress

4    managed to transform a bill into a law.

09:25:52    5    And as Nourse explains, and as many of us know, getting a

6    bill to become a law is an extremely lengthy and difficult

7    process, and so our job as historians telling legislative

8    histories is to really answer the question of how is it that

9    this member of Congress or this group of members of Congress

09:26:19    10    managed this very difficult process of transforming a bill into

11    a law, getting a bill enacted into law.  So the legislative

12    history is, again, at bottom, a history of the winners.

13    Q    Is it ever the case that a legislature passes a bill

14    without much discussion of the bill itself or of a certain

09:26:45    15    provision within the bill?

16    A    Yes.

17    Q    And does that prevent you from assessing the legislative

18    intent?

19    A    No, it doesn't, and that -- again, there are several

09:26:59    20    reasons for this.  First, it's because there are other tools

21    that one can draw upon to assess the legislative intent and also

22    because historians understand that frequently legislators are

23    silent with respect to a bill or Congress might be silent with

24    respect to specific provisions of a bill because those

09:27:24    25    provisions are uncontroversial.

1    And because it is so challenging to make a bill into a law,

2  legislators know that it's in their interest to be as efficient

3  as possible, and so during congressional debates or in a

4  conference hearing, a conference committee hearing, they're

09:27:52    5  gonna spend their time debating about the most contested aspects

6  of a bill, the most controversial features of the bill.  They're

7  not gonna waste their time on features of the bill that they

8  consider to be uncontroversial.

9    Q    Understood.  Thank you, Dr. Kang.

09:28:08   10    So you've explained to us the variety of tools you have as

11  a historian to assess legislative intent.  Did you use those

12  tools that you've discussed in assessing congressional intent in

13  the report you prepared?

14    A    Yes.

09:28:22   15    Q    And in your research for that report, were you able to

16  gather enough information to make informed and comprehensive

17  findings regarding congressional intent?

18    A    Yes.

19    Q    And this report we're discussing, to be clear, is that the

09:28:37   20  102-page report that was filed as part of this case?

21    A    Yes.

22    Q    And have you had a chance to review that report since it

23  was filed?

24    A    Yes.

09:28:46   25    Q    And is everything in that report true and correct, to the

1    best of your knowledge?

2    A    Yes.

3    Q    Thank you, Dr. Kang.

4         THE COURT:  Mr. Goddard?

5         MR. GODDARD:  Yes, Your Honor.

6         THE COURT:  Just for the record, I'd like to refer to

7    the ECF number, which I think is 78-2; is that correct?

8         MR. GODDARD:  Your Honor, one moment.  I don't have any

9    reason to think it's not, but let me just check.

09:29:20    10         Yes, Your Honor, ECF 78-2.

11         THE COURT:  Thank you.

12    Q    (By Mr. Goddard)  Dr. Kang, I'd now like to walk you

13    through the historical events and the evolution of 8 US Code

14    1326, the reentry statute, from Congress's initial

09:29:41    15    criminalization of reentry in 1929 through the recodification in

16    1952 and through the amendments in 1980s and 1990s.

17         I know your report focused on the 1952 act forward, but are

18    you familiar with the Undesirable Aliens Act of 1929?

19    A    Yes.

09:29:58    20    Q    And is there an academic consensus as to Congress's

21    motivation in criminalizing reentry in that act?

22    A    Yes.

23    Q    And what is that academic consensus?

24    A    The academic consensus is that anti-Latino racism motivated

09:30:12    25    the passage of the 1929 Undesirable Aliens Act, and that

1    anti-Latino racism had at least two eugenicist threads.

2         The first thread was this idea that Mexican nationals as a

3    mestizo, or mixed race, were unfit for permanent residence and

4    citizenship in the United States.  As a part of that thought, it

09:30:47  5    was further argued that Mexican nationals would degrade the

6    racial character of the United States.

7         The second thread of this eugenicist thinking was that

8    Mexican nationals were biologically inclined to be a transient

9    population and that Mexican nationals were less inclined to want

09:31:21  10    to settle down in any one place.  And as a part of that

11    eugenicist thread, there is also the belief that Mexican

12    nationals were biologically best suited for manual labor.

13         So farmers in the southwest, in the American southwest,

14    subscribed to these eugenicist views of Mexican immigrants.  And

09:31:55  15    based on those eugenicist views, for much of the twentieth

16    century they lobbied Congress to have easy access to a steady

17    supply of Mexican immigrant labor.  And in the 1920s, Congress

18    acceded to those demands in at least two ways.

19         So in 1924, Congress made the conscious choice to not

09:32:29  20    establish any numerical quotas on Western Hemisphere

21    immigration, and in particular immigration from Mexico, and this

22    was to guarantee that southwestern growers had an easy and

23    regular supply of exploitable Mexican national workers.

24         And then in 1929, Congress passed the Undesirable Aliens

09:32:58  25    Act, and this was one of many tools that southwestern growers

1   and xenophobes had at their disposal to detain, penalize, and

2   remove unwanted Mexican nationals from the United States.

3          And this measure was seen as necessary to preventing the

4   permanent settlement of Mexican nationals in the United States

09:33:26   5   and, from the eugenicist perspective, facilitating a settlement

6   of Mexican nationals in the United States that would degrade the

7   white population in the United States.

8          And from the 1920s onwards, what these laws did is they

9   created this racist cycle whereby in good economic times,

09:33:58   10   Mexican nationals were welcome to come to the United States for

11   temporary periods of time to work on the nation's farms,

12   particularly those farms in the southwest; but then in times of

13   economic distress, they were summarily detained, punished, and

14   removed from the United States.

09:34:26   15   Q    Dr. Kang, as I understand your testimony, the Undesirable

16   Aliens Act was, essentially, a compromise between nativists, who

17   did not want any Latinos in the country, and industry,

18   particularly southwest agribusiness, who wanted continued access

19   to that cheap and exploitable source of labor coming from

09:34:46   20   Mexico.

21   A    Yes.

22   Q    With the compromise being Congress would not stop

23   immigration of Mexicans to the US, but it would allow the

24   nativists tools to drive out Mexicans when they saw fit and that

09:34:58   25   reentry was one of those tools.  Is that a fair summary?

1    A    Yes, that's a fair characterization.

2    Q    Dr. Kang, you said that there's academic consensus that

3    this is -- this was the motivation of the Undesirable Aliens

4    Act?

09:35:11    5    A    Yes.

6    Q    When you say that is the academic consensus, what do you

7    mean by academic consensus?

8    A    So this is the mainstream view, and it's the prevailing

9    view among academics.

09:35:23    10    Q    Are you aware of any historians who believe Congress acted

11    with race-neutral motivation when it criminalized reentry?

12    A    No.

13    Q    And do you know what this academic consensus is based on?

14    A    Yes.  This academic consensus is based on extensive

09:35:42    15    archival research.  Some of this research has been awarded with

16    very prestigious research awards, including an award from the

17    MacArthur Foundation.  One of the authors of this research is a

18    MacArthur genius fellow.  And this extensive archival research

19    clearly demonstrates that eugenicists wrote and sponsored the

09:36:12    20    law that became the Undesirable Aliens Act of 1929.

21    Q    Thank you, Dr. Kang.

22         And that researcher who received the MacArthur genius

23    fellowship, was that Professor Lytle Hernandez who testified in

24    the case of *Carrillo-Lopez* in Nevada?

09:36:31    25    A    Yes, Kelly Lytle Hernandez, who is a faculty member in the

1    history department at UCLA.

2    Q    Thank you, Dr. Kang.

3         Are you aware of any evidence that Congress acted with

4    race-neutral motivation when it criminalized reentry?

09:36:46  5    A    No.

6    Q    Are you aware of evidence that Congress would have

7    criminalized reentry in --

8         INTERPRETER RIVERA:  The interpreter is speaking.

9         Your Honor, the interpreter respectfully requests that

09:36:54  10   Counsel Goddard please speak significantly slower, and please.

11   Thank you very much.

12        THE COURT:  Okay.  Mr. Goddard, you heard that?

13        MR. GODDARD:  Message received.  My apologies.

14        THE COURT:  Okay.  Why don't you repeat your last

09:37:08  15   question.  Okay?

16        MR. GODDARD:  I will.

17   Q    (By Mr. Goddard)  Dr. Kang, are you aware of any evidence

18   that Congress in 1929 would have criminalized reentry were it

19   not for racial animus?

09:37:20  20   A    No.

21   Q    So to summarize, Dr. Kang, the academic consensus is that

22   Congress acted with racial animus when it criminalized reentry

23   in 1929, and there is no reason to believe Congress would have

24   criminalized reentry were it not for that racial animus?

09:37:41  25   A    That's correct.

1    Q    Thank you.

2         The next evolution in the history of the reentry law is the

3    McCarran-Walter Act of 1952 that you have mentioned where

4    Congress recodified the reentry provision at Section 1326.

09:38:02    5    Now, Dr. Kang, you've discussed the importance of

6    historical context.  Were there any developments between 1929

7    and 1952 that inform the passage of the McCarran-Walter Act?

8    A    Yes.  So there were several events, but among the most

9    important were the forced repatriation drives of the 1930s and

09:38:30   10    the Bracero Program that began in 1942.

11    Q    Thank you.

12         Let's start with the forced repatriations.  Could you

13    explain what those were.

14    A    Yes.  In the 1930s, and from approximately 1931 to 1939,

09:38:51   15    Americans chose to scapegoat ethnic Mexicans, and "ethnic

16    Mexicans" refers to both Mexican immigrants and Mexican

17    Americans.

18         So during the Great Depression, America chose to scapegoat

19    ethnic Mexicans for the nation's economic crisis.  In addition,

09:39:15   20    Americans wrongly blamed ethnic Mexicans for taking their unfair

21    share of welfare.

22         Now, in response to this xenophobia and racism, states and

23    localities decided to take matters into their own hands, and the

24    city of Los Angeles began this process by launching its own

09:39:40   25    removal campaign against ethnic Mexicans.

1      And what Los Angeles City officials did was that they

2   worked in cooperation with the INS to conduct these so-called

3   roundups in public places in the city of Los Angeles.  And

4   immediately after these roundups, they placed ethnic Mexicans on

09:40:07   5   the backs of trucks and summarily removed them, often within the

6   space of 24 to 48 hours.

7      As a part of these roundups, Los Angeles City officials

8   also decided to publicize these removals, and so there would

9   have been articles in the *Los Angeles Times* and other city and

09:40:30   10   county papers.  And the goal of this publicity for Los Angeles

11   City officials was to scare the remaining ethnic Mexicans into

12   leaving Los Angeles County.

13      And this scare tactic worked.  As numerous historians have

14   shown, over the course of the 1930s ethnic Mexicans in the city

09:40:56   15   of Los Angeles as well as other localities throughout the nation

16   were scared into leaving the United States.  And there are

17   various estimates, but the most accepted estimate is that

18   approximately a half million ethnic Mexicans -- and, again, this

19   includes Mexican Americans -- were forced to leave the United

09:41:18   20   States.

21      By the early 2000s, the California State assembly decided

22   to revisit the repatriations of the 1930s, and this movement was

23   led by a California State Senator named Joseph Dunn.  And Joseph

24   Dunn began the very thoughtful process of considering whether

09:41:47   25   the state of California owed these ethnic Mexicans reparations,

1    financial reparations, or an apology.

2         And, ultimately, after much debate, Governor Arnold

3    Schwarzenegger in the mid-2000s signed an official apology for

4    the repatriation drives of the 1930s.  And in this revisiting of

09:42:16  5    the repatriations of the 1930s, it was widely understood that

6    these forced removals occurred solely because of racial animus

7    against ethnic Mexicans at the time.

8    Q    Thank you, Dr. Kang.

9         And these forced repatriations, this driving out of half a

09:42:38  10   million ethnic Mexicans based purely on racial animus, what is

11   the relevance of that to Congress's passage of the

12   McCarran-Walter Act and specifically its recodification of the

13   reentry statute?

14   A    So the forced repatriations reflect the enduring and

09:42:57  15   persuasive anti-Latino animus in the United States.  And it's

16   the same form of racial animus that was expressed in the 1920s,

17   this racist idea that Latinos and Mexican nationals did not

18   belong in the United States.  They weren't fit to be permanent

19   residents and citizens.

09:43:23  20   Q    Thank you.

21        The other historical development you had mentioned as

22   relevant is the Bracero Program.  Dr. Kang, could you please

23   speak about that for a minute.

24   A    Yes.  So the Bracero Program was a farm labor importation

09:43:40  25   program that began in 1942.  The United States and Mexico agreed

1    to start this program in 1942 as a temporary measure.  It was

2    originally intended to be an emergency measure that only lasted

3    the duration of World War II, and it was intended to satisfy the

4    demands of southwestern farmers for Mexican agricultural

5    workers.

6         But due to the intense lobbying of southwestern farmers,

7    the Bracero Program lasted 22 years, from 1942 to 1964.  And

8    over the course of those 22 years, approximately 4.5 million

9    Mexican nationals were brought into the United States to work on

10   the nation's farms.

11        Now, because Mexico was deeply reluctant to sign the

12   bracero accords because of the forced expulsions of the 1930s

13   and because Mexico was so worried about the pervasive racial

14   discrimination faced by Mexicans in the United States, it had

15   the United States write into the bracero accords -- and these

16   were the international treaties that launched the Bracero

17   Program.  So Mexico had the United States write into the bracero

18   accords a series of protections for the Mexican braceros, and

19   these protections pertained to wages, working conditions, and

20   living conditions.

21        But as numerous observers at the time discovered, and as

22   historians have since written about, these protections were not

23   observed in practice, so braceros over the course of -- over the

24   22-year course of the program faced widespread humanitarian

25   abuses and racial discrimination.

1    And as a reflection of the pervasive racial discrimination,

2  faced by the braceros, the former Under Secretary of State to

3  President Franklin Delano Roosevelt -- his name was Sumner

4  Welles -- penned an op-ed in the *Washington Post*.  And in this

09:46:17  5  op-ed, Sumner Welles tried to alert the American nation to the

6  pervasive racism faced by the braceros in the United States.  He

7  tried to make Americans aware that Mexican braceros faced the

8  same kinds of racial discrimination as Mexican Americans in the

9  US.  And I quoted extensively from Sumner Welles in my

09:46:44  10  affidavit, and I also included his op-ed as an exhibit to my

11  affidavit.

12    Now, Welles was so distraught by the scope of the racial

13  discrimination experienced by the braceros, and he was so

14  frustrated that the Roosevelt administration wasn't doing more

09:47:05  15  to alleviate it, that he actually resigned.  He resigned from

16  his position as the Under Secretary of State.

17  Q    Thank you.

18    Dr. Kang, you mentioned that the braceros suffered, I

19  believe your term was, widespread humanitarian abuses.

09:47:21  20  A    Uh-huh.

21  Q    Would you explain what you mean by that.

22  A    Yes.  So Sumner Welles actually called -- he characterized

23  those abuses and the discrimination as, quote/unquote,

24  "poisonous."  So the humanitarian abuses range from, you know,

09:47:40  25  poor working and living conditions.  They weren't paid what they

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

30

1    were supposed to be paid.

2         And then perhaps most famously -- and this was captured by

3    photo journalists at the time -- the braceros when they arrived

4    at processing centers on the US side of the US-Mexico border,

09:48:03    5    they were forced to take off all their clothes, and then they

6    were sprayed with chemicals such as DDT and also the kinds of

7    chemicals that were later used by Nazi Germany to euthanize the

8    Jews.

9         And these abuses were so widely known in Mexico that it was

09:48:37    10   one of the reasons that many Mexicans decided to enter the

11   United States without a bracero contract.  Mexicans had heard

12   from newspaper accounts and from word of mouth that these were

13   the kinds of racial discrimination and humanitarian abuses that

14   they would face under the Bracero Program.

09:49:05    15   Q    Dr. Kang, do you know approximately how many Mexicans came

16   to the United States as part of the Bracero Program and

17   separately, outside the Bracero Program, during this time?

18   A    Yes.  Approximately 4.5 million Mexican nationals signed

19   bracero contracts and came into the United States under the

09:49:22    20   auspices of the Bracero Program.  And then in that same 22-year

21   period, approximately 5 million Mexican nationals came to the

22   United States without a bracero contract.

23   Q    So is it fair to say that the Bracero Program, while it was

24   intended or purportedly was intended to bring Mexicans to the

09:49:45    25   United States lawfully, had the consequence of increasing the

1    levels of unlawful migration to the United States?

2    A    Yes.  The Bracero Program is attributed with the increases

3    in undocumented immigration at mid-century.

4    Q    Was there any push in the United States to respond to this

5    unlawful migration?

6    A    Yes.  So the INS -- and included in the INS is the Border

7    Patrol.  So this agency pushed vigorously for greater controls

8    on undocumented migration to the United States.

9    Q    And what controls specifically was INS asking for?

10   A    So among other things, they demanded employer penalties as

11   well as more funding for additional manpower and equipment.

12   Q    Do you know why INS would have been pushing for employer

13   sanctions?

14   A    So they would have been pushing for employer sanctions for

15   multiple reasons, but the INS was -- based on my own review of

16   the archival record, the INS was absolutely infuriated that it

17   didn't have more manpower and more money to control the

18   undocumented population along the US-Mexico border.

19        And much of their fury would have been informed by their

20   own racial biases against Mexican nationals, and this is

21   attested by the fact that INS officials regularly use the racial

22   slur "wetback" in their correspondence with each other and even

23   in their own annual reports.

24   Q    Understood.  Thank you.

25        I could have phrased my question better.  What I was

1  getting at was:  Did INS believe that sanctioning employers

2  would have been an effective way to stem the flow of unlawful

3  migration from Mexico to the United States?

4  A    Yes.

09:52:10   5  Q    And how did Congress respond to INS's demands for increased

6  border enforcement funding and employer sanctions?

7  A    They regularly rejected those requests.

8  Q    Why did they do so?

9  A    Because some of the most powerful members of Congress

09:52:32   10  defended the interests of southwestern agribusiness and

11  specifically their demands for access to an easy and regular

12  supply of exploitable and deportable Mexican farm labor.

13  Q    Thank you.

14      Just getting back to the Bracero Program, could you just

09:52:51   15  explain the relevance of that program to the McCarran-Walter Act

16  and then specifically to the recodification of the reentry

17  provision.

18  A    Uh-huh.  So the Bracero Program, like the forced

19  repatriations of the 1930s, reflects the enduring and pervasive

09:53:13   20  anti-Latino and anti-Mexican animus that existed in the United

21  States.

22      The very existence of the Bracero Program was premised,

23  again, on this longstanding racist view that Mexican nationals

24  were best suited for manual labor and that they were more

09:53:36   25  inclined to be transients rather than permanent residents or

1   citizens.  So the Bracero Program perpetuated these longstanding

2   forms of racial animus against Mexican immigrants.

3   Q   Thank you, Dr. Kang.

4       So in 1952, is it fair to say that the compromise struck in

09:54:01   5   1929 between nativists and industry has continued?

6   A   Yes.

7   Q   And to take a step back to where the country is more

8   broadly in 1952, was the country racially segregated at this

9   time?

09:54:18   10   A   Yes.  In 1952, *Plessy v. Ferguson* was still the law of the

11   land.  *Brown v. Board of Education* wouldn't be handed down by

12   the courts until 1954.  And Washington, DC, itself, while it

13   would begin the process of desegregation slightly earlier than

14   the rest of the country, that process wouldn't begin until 1953.

09:54:44   15       So if you imagine yourself in 1952, Washington, DC, this is

16   a deeply segregated town.  The Capitol itself is segregated.

17   The facilities are segregated.  The lunchrooms are segregated.

18   The bathrooms are segregated.

19       And yes, there were a few African-American members of

09:55:08   20   Congress, but life for them was very, very difficult.  Some of

21   them made the choice to speak out, but historians have shown

22   that there is a price to be paid if they spoke out against the

23   racial discrimination within the Capitol building; but many

24   others chose to remain silent and just tried to go along and

09:55:28   25   effectively accommodate themselves to the segregation that

1    existed in the Capitol.

2    Q    Thank you, Dr. Kang.

3         I think in this country we were taught the history of the

4    Jim Crow laws, the racial segregation of blacks particularly in

09:55:50    5    the American south.  Was there a similar regime for Latinos?

6    A    Yes, and this is something that's now widely written about

7    by historians.  And the phenomenon is referred to as "Juan

8    Crow," and this refers to the de jure and de facto segregation

9    experienced by Latinos and, in particular, Mexican Americans and

09:56:13   10    Mexican immigrants.

11         And, again, going back to Sumner Welles's op-ed, he

12    provides a very eloquent account of what Juan Crow exactly

13    looked like for Mexican Americans and Mexican immigrants in

14    America.

09:56:33   15    Q    Thank you, Dr. Kang.

16    A    Uh-huh.

17    Q    So I think you've been very helpful in providing us the

18    understanding of where we were in 1952 as Congress begins

19    debating the McCarran-Walter Act.  I'd like to talk about that

09:56:44   20    act.  It is named after its two sponsors, Senator McCarran and

21    Representative Walter; is that right?

22    A    Yes.

23    Q    And what can you tell us about Senator McCarran?

24    A    So Senator McCarran was one of the most powerful

09:56:59   25    congresspersons in Congress at the time.  He was the chair of

1    the Senate Judiciary Committee and a member of the

2    Appropriations Committee.  Senator McCarran was also a widely

3    known anti-Semite, xenophobe, and racist.  And we know --

4    Q    Thank you.

09:57:23    5    A    Oh, sorry.

6    Q    No.  Please go ahead.

7    A    So we know this because --

8    Q    What --

9    A    -- Senator McCarran -- yes?

09:57:32    10    Q    I'm sorry.  I'm speaking over you.  I will stop.  Please

11    continue.

12    A    Yeah.  So we know that Senator McCarran was anti-Semitic

13    because he was one of the most powerful proponents of blocking

14    the ability of European Jews to enter the country after World

09:57:55    15    War II.

16         And this is a very striking decision because after World

17    War II, Europe was in shambles.  Cities were reduced to rubble.

18    Millions of people were homeless, hungry, and grieving the loss

19    of family members, their neighborhoods, and their communities.

09:58:12    20         And there were only two nations in the world -- after World

21    War II, there were only two nations in the world that had the

22    resources and the capacity to assist Europe and then also Japan,

23    and those two nations were the United States and the Soviet

24    Union.  So it's quite striking that McCarran, in his role as the

09:58:36    25    chair of the Senate Judiciary Committee, worked vigorously to

1    block and/or restrict the entry of European Jews.

2         In addition to this, it's widely known that Senator

3    McCarran was one of the strongest supporters of the racist

4    national origins quota system, and then Senator McCarran also

09:59:05    5    articulated his racist views toward Mexican nationals by using

6    the racial slur "wetback" to refer to them on the floor of the

7    Senate.

8    Q    Thank you.

9         Dr. Kang, I believe you described Senator McCarran as both

09:59:23    10    a xenophobe and a racist.  Could you explain the difference

11    between those two terms.

12    A    Yes.  So xenophobia is a form of racism, but it's a form of

13    racism that's directed towards foreigners.

14    Q    Understood.

09:59:41    15         So xenophobia is a subset of racism?

16    A    I tell my students that you can see xenophobia as racism

17    plus nativism, and that's -- nativism is fear of the foreigner.

18    Racism is discrimination against an individual on the basis of

19    race.  And so if you put those two things together, racism plus

10:00:08    20    nativism, you get xenophobia.  And xenophobia is considered to

21    be a form of racism.

22    Q    Understood.

23         So would it be fair to say that someone who is expressing

24    xenophobic views is expressing racial animus?

10:00:22    25    A    Yes.

Q    Thank you.

Dr. Kang, I'd like to show you a statement from Senator McCarran and ask my co-counsel -- oh, we apparently lost connection.  I was going to put it up on the screen, but I will just read it into the record -- I'll just read it to you, I should say.  This is a statement from Senator McCarran I believe you included in your report, quote (reading):

Except when you get down to the Mexican boundary.  Of course, you have all kinds of deportations there and removals from the territory of the United States.  But this is a come-and-go proposition.  In other words, there is a flood of people who come across the boundary.  They are called wetbacks, and they come across legally or illegally during the various harvest seasons.  Then they go back, and so you have this come-and-go drifting there.

Dr. Kang, could you give us the context for this statement from Senator McCarran.

A    Yes.  So Senator McCarran made this statement during a 1951 Appropriations Committee hearing, and during this hearing the INS was asking for additional appropriations to respond to undocumented migration along the US-Mexico border.  And McCarran throughout his career routinely defended the interests of southwestern agribusiness in gaining easy access to an exploitable and deportable source of Mexican labor.

And so what he's telling the INS during this hearing is

1    effectively he can't support their call for increased

2    appropriations, and he's telling the INS that they just have to

3    accept the reality of this racist cycle whereby Mexican

4    nationals are welcome to the US in times of economic prosperity

10:02:32    5    but then are summarily removed from the country in times of

6    economic distress.

7    Q    Thank you, Dr. Kang.

8         And this, as Senator McCarran calls it, the come-and-go

9    proposition or the come-and-go drifting, what is the connection

10:02:51    10    between that concept and the compromise we've discussed from

11    1929 between nativists and industry?

12    A    Yes.  So McCarran there is perpetuating that compromise,

13    and, again, he's telling the INS that they have to accept it,

14    that this is just the way things work on the US-Mexico border;

10:03:12    15    and that Mexican nationals are the ideal farm labor workforce,

16    and that they should be welcome to come in times of economic

17    prosperity but that they should be summarily removed when things

18    are no longer good.

19    Q    Thank you, Dr. Kang.

10:03:30    20         I'd like to read you one more statement from Senator

21    McCarran.  This is actually an exchange between Senator McCarran

22    and another senator, Senator Ellender.

23         Senator McCarran (reading):  In that regards, Senator, I

24    think you will agree with me that on this side of the border

10:03:53    25    there is a desire for these wetbacks.  We might as well face

39

1    this thing realistically.  The agricultural people, the farmers

2    on this side of the border want this help.  They want this farm

3    labor.  They just cannot get along without it.  They do not know

4    what they would do if they did not have it.  It would be

10:04:18    5    impossible to harvest certain agricultural commodities unless we

6    have that help.

7        Senator Ellender (reading):  The Mexican government has

8    gone so far as to make us, in a contract, agree to feed these

9    people while en route, take them back, provide minimum wages,

10:04:43    10    and give them health insurance, all that.  It is something they

11    do not get at home.

12        Senator McCarran (reading):  The wetback is little

13    interested in that sort of thing.

14        Dr. Kang, could you give us the context for that exchange.

10:05:03    15    A    Yes.  So during a 1953 appropriations hearing, the INS,

16    once again, requested additional appropriations for immigration

17    law enforcement along the US-Mexico border.  And, once again,

18    Senator McCarran is denying their request by justifying the

19    needs and demands of southwestern farmers by defending, by

10:05:36    20    defending their access to Mexican farm labor.

21        And that statement further reflects his xenophobic

22    sentiment and the xenophobic sentiment of the times by

23    characterizing Mexican immigrants as a population that didn't

24    need to live at the same standard of living as an ordinary

10:06:04    25    American.  It perpetuates this racist stereotype that Mexican

40

1    immigrants could get by with less.

2    Q    Thank you, Dr. Kang.

3         And in both of those statements, Senator McCarran uses the

4    term "wetback."

10:06:20    5    A    Yes.

6    Q    I believe you've testified that he used that term

7    regularly.

8    A    Yes.

9    Q    Could you explain that term.

10:06:27    10    A    Yes.  That term is a racist slur, and it was used to

11    objectify, demean, and degrade persons of Mexican descent, and

12    McCarran used it with respect to both legal and undocumented

13    Mexican immigrants.

14    Q    Are there any other racial slurs that you would consider

10:06:50    15    perhaps the equivalent of this slur?

16    A    Yes.  I see it as equivalent to the N word.

17    Q    And was "wetback" understood as a racial slur equivalent to

18    the N word in the early 1950s?

19    A    Yes.

10:07:07    20    Q    Thank you, Dr. Kang.

21         Despite Senator McCarran's history of racism, it's my

22    understanding the international airport in Las Vegas was named

23    after him; is that right?

24    A    Yes.

10:07:21    25    Q    And is it still?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

41

1    A    No.

2    Q    When was that changed?

3    A    Last month.

4    Q    Do you know why that was changed?

10:07:31    5    A    It was changed because of McCarran's longstanding

6    anti-Semitism, xenophobia, and racism.

7    Q    And who made that change?

8    A    The Clark County Board of Commissioners.

9    Q    And do you know whether the Board of Commissioners

10:07:49    10    explicitly stated its reason for changing the name of the

11    airport?

12    A    Yes, they did.

13    Q    And do you know whether this was a controversial decision

14    among the commissioners?

10:08:00    15    A    No, it was not.  It was a unanimous decision.

16    Q    Thank you, Dr. Kang.  Those are my questions on Senator

17    McCarran.

18         I'd like to move to Representative Walter.  What can you

19    tell us about Representative Walter?

10:08:14    20    A    Representative Walter was the chair of the House

21    subcommittee on immigration.  He shared McCarran's xenophobic

22    views, and he was known as a staunch supporter of the racist

23    national origins quota system.  And until his death in 1963, he

24    did everything in power to ensure that the national origins

10:08:41    25    quota system was not amended nor eliminated by Congress.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

42

1    He was also known to be a member of the Pioneer Fund, which

2    exists to this very day, and is a eugenicist organization that

3    seeks to preserve the American nation as a white, European

4    nation.

10:09:02    5    Q    Thank you, Dr. Kang, for that background on Senator

6    McCarran and Representative Walter.

7    I'd now like to move on to the act that bears their name.

8    Could you give us a brief overview of the McCarran-Walter Act.

9    A    Yes.  The McCarran-Walter Act of 1952 was a consolidation

10:09:24    10    act that brought together all the various laws that had been

11    passed with respect to immigration and consolidated them into

12    one place, into one statute.  In addition to consolidating the

13    nation's immigration laws, it also reorganized them and

14    eliminated various forms of repetition.

10:09:47    15    Q    Thank you.

16    And did that reorganization or consolidation include moving

17    the reentry statute from Title 8 US Code 180 to Title 8 US Code

18    1326?

19    A    Yes.

10:10:06    20    Q    And when Congress moved the reentry statute, did it change

21    that law?

22    A    Yes.  It added a so-called "found in" clause.

23    Q    Do you know who pushed for that change to the law?

24    A    I believe it was the Immigration and Naturalization

10:10:29    25    Service.

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1   Q   And do you know why the INS pushed for that change?

2   A   That change would have -- that change actually did assist

3   the INS insofar as it saved the INS the trouble of having to

4   transport an immigrant from the place in which they were

10:10:50   5   apprehended to the place at which they originally crossed the

6   US-Mexico border.

7   Q   Thank you.

8      Did Congress change any language regarding the lawfulness

9   of the predicate removal order?

10:11:05   10   A   Yes.  It dropped a lawfulness phrase from the 1929 act.

11   Q   So my understanding is the '29 act had required that the

12   predicate removal must have been, quote, "in pursuant to law,"

13   end quote, and the 1952 act dropped that.  Does that line up

14   with your understanding?

10:11:28   15   A   Yes.  That's correct.

16   Q   Thank you.

17      When Congress debated the McCarran-Walter Act, did it spend

18   much time discussing the reentry provision?

19   A   No.

10:11:41   20   Q   In debating the McCarran-Walter Act, did Congress

21   acknowledge or discuss the racial animus that had motivated its

22   initial criminalization of reentry?

23   A   No.

24   Q   Based on your review of the legislative history of the

10:12:01   25   McCarran-Walter Act, are you able to form an opinion as to

1   Congress's intent in recodifying the reentry statute?

2   A    Yes.

3   Q    And what is that opinion?

4   A    Congress is motivated by racial animus.

10:12:19   5   Q    What is that opinion based on?

6   A    So that opinion is based on the historical context; the

7   sweeping racial animus that continued to be expressed against

8   Latinos in this time period; as well as the statements of the

9   drafters and sponsors of the bill; as well as, in this case, the

10:12:46   10   statements of other members of Congress who openly acknowledged

11   the ways in which racism informed the shaping of the

12   McCarran-Walter Act.

13   Q    Thank you.

14       How certain are you of this conclusion, Dr. Kang?

10:13:03   15   A    Very certain.

16   Q    When you say "very certain," would you be able to quantify

17   that perhaps on a scale from 0 to 100?

18   A    So, I would place it somewhere in the 90s.

19   Q    Thank you.

10:13:18   20       And in your review from the legislative history of the

21   McCarran-Walter Act, did you find evidence of Congress acting

22   with any race-neutral motivation when it recodified the reentry

23   provision?

24   A    No.

10:13:34   25   Q    Based on your review of that legislative history, are you

1    able to form an opinion as to whether Congress would have

2    recodified the reentry provision were it not for racial animus?

3    A    Yes.

4    Q    What is your opinion?

10:13:53    5    A    My opinion is that Congress would not have recodified 1326

6    were it not for racial animus.

7    Q    What is that opinion based on?

8    A    So, once again, it's based on the pervasive racial animus

9    of the times, the racial animus that was expressed during the

10:14:17    10    debates over the act.

11    Q    How certain are you of this conclusion?

12    A    Very certain.

13    Q    And, again, if I were to ask you to quantify that

14    numerically on a scale of 0 to 100, what would you say?

10:14:34    15    A    It would be in the high 90s.

16    Q    Thank you, Dr. Kang.  That covers my questions for the

17    McCarran-Walter Act of 1952.

18    The next and final step in the evolution of the reentry

19    statute are the five amendments in the late twentieth century.

10:14:55    20    I want to make sure we cover any important historical

21    developments.  Were there any developments between 1952 and the

22    first amendment in 1988 that informed Congress's passage of

23    those amendments?

24    A    Yes, and those developments included the passage of the

10:15:19    25    Immigration and Nationality Act of 1965 as well as the arrival

1    of Cuban, Haitian, and Central American refugees from the late

2    1970s through the eighties and nineties.

3  Q    Thank you, Dr. Kang.

4      Let's start with the INA, the bill you mentioned from 1965.

10:15:36  5  What did that bill do?

6  A    So the Immigration and Nationality Act of 1965 overhauled

7    the nation's immigration laws.  And at the time, the sponsors,

8    the drafters and sponsors of that act promised that it wouldn't

9    change the racial composition of the nation; but it, in fact,

10:16:01  10  did just that by leading to the unprecedented increase in Asian

11    migration as well as increases in undocumented migration from

12    Mexico.

13      So as a result of these new immigrants there was a backlash

14    among Americans, and we saw in the post-1965 period a rise in

10:16:34  15  xenophobia.  And it was this xenophobia that would go on to

16    inform, inform the immigration policy developments of the

17    eighties and nineties.

18  Q    The INA in 1965 did not amend 1326, did it?

19  A    No.

10:16:53  20  Q    So if this bill did not amend 1326, how is it relevant to

21    the historical context of the later amendments?

22  A    Yeah.  So, again, this act triggered a backlash in America,

23    and it was a measure that, frankly, made xenophobes extremely

24    angry, and this is something that's reflected in the *Law Review*

10:17:20  25  article written by Representative Lamar Smith of Texas.

1    He saw the immigration act of 1965 as transforming

2   immigration into what he saw as a, quote/unquote, "unwarranted

3   civil right."  And, again, he and other xenophobes were

4   absolutely furious about the passage of that act, and they

10:17:44   5   worked vigorously from the seventies and, in particular, the

6   eighties and nineties.  They did everything possible to retrench

7   the gains that were made for immigrants and particularly

8   immigrants from the global south.  So they did everything

9   possible to reverse those perceived gains made by immigrants

10:18:05   10   under that act.

11   Q    Thank you, Dr. Kang.  We will come back to Representative

12   Smith.

13    For now I'd like to ask you about the second historical

14   development you mentioned, the arrival of refugees from Cuba,

10:18:19   15   Haiti, and Central America.  Could you speak a little bit about

16   that.

17   A    Yes.  So the arrival of these refugees in the eighties and

18   nineties added fuel to the fire.  It added fuel to the fire of

19   this backlash to the 1965 act.  And this is particularly the

10:18:39   20   case because these Cuban and Haitian arrivals were perceived to

21   be -- perceived in the most negative of terms.

22    And also because of their skin color -- because many of the

23   Cubans were darker skinned and even black, and because the

24   Haitians were black -- this triggered a new wave of racism and

10:19:09   25   nativism, triggered a new and powerful wave of anti-Black racism

1    in the eighties and nineties.

2    Q    And how was this arrival, the arrival of these refugees,

3    how is that relevant to the later amendments to 1326?

4    A    So it's relevant insofar as the legislators who drafted and

10:19:34   5    sponsored the amendments to 1326 were responding to this

6    backlash.  They were responding to the intense, intense

7    antipathy toward the Cuban and Haitian arrivals of the eighties

8    and nineties.

9    Q    My understanding, Dr. Kang, is that a large number of these

10:19:57   10    refugees were arriving in Florida; is that right?

11    A    Yes.  That's correct.

12    Q    Was there a particular backlash in Florida?

13    A    Yes.  There was a particularly powerful backlash in Florida

14    with respect to these Cuban and Haitian arrivals, and Floridians

10:20:16   15    began characterizing these arrivals -- even though they were

16    humanitarian refugees, they began characterizing them in the

17    most negative of terms.  They were perceived as undocumented

18    immigrants, as lawbreakers, as criminals, as drug traffickers,

19    drug addicts, as diseased peoples, and as, quote/unquote,

10:20:44   20    "social deviants."

21    Q    Dr. Kang, up to this point, the history of anti-Latino

22    racial animus we've been discussing has focused on Mexicans, has

23    focused on the nativists wanting to keep the Mexicans out and

24    southwest agribusiness wanting to bring Mexicans in but in a way

10:21:05   25    that they could control them.

A    Uh-huh.

Q    How did this new form of anti-Latino racism fit in with the racism we've been discussing up to this point?

A    So, first, it's important to note that anti-Mexican and anti-Latin American animus continues in this period.  These longstanding stereotypes with respect to Mexican immigrants don't go away, and the arrival of Central American refugees also triggers waves of xenophobia with respect to those immigrants.

But what's very striking about the xenophobia that emerges in the eighties and nineties are the parallels with the xenophobia of the 1920s.  So as historians have found, xenophobia in the eighties and nineties reached new highs, and historians have shown that the xenophobia of the eighties and nineties was just as widespread as it was in the 1920s.

Another striking parallel is that by the eighties and nineties, xenophobes are using the same adjectives, the same metaphors, the same frameworks to talk about undesirable or unwanted immigrants.  So in the 1920s, xenophobes describe Mexican nationals as criminals, as drug addicts, as, again, quote/unquote, "socially deviant," and you see the application of those very same descriptors to Central Americans, Haitians, Cubans, and Mexicans, once again, in the eighties and nineties.

Another very striking parallel is that by the eighties and nineties, xenophobes are expressing the same concerns that xenophobes of the 1920s expressed, and that is this concern with

1  the impact of these new immigrants upon the composition of the

2  country.

3  　　　　In the 1920s, those xenophobes said outright that their

4  concern was -- their concern pertained to the impact of these

10:23:26  5  new arrivals on the, quote/unquote, "racial" composition of this

6  country; but by the eighties and nineties that word "race" or

7  "racial" drops out of that phrasing, and by the eighties and

8  nineties you hear xenophobes couching their concern as, you

9  know, the impact of these new arrivals on the composition of the

10:23:50  10  country or the culture of the country or the, quote/unquote,

11  "face of the nation."

12  　　　　But despite the dropping of the word "race" or "racial" in

13  the eighties and nineties, the xenophobes are effectively saying

14  the same thing.  They're saying that these new immigrants will

10:24:11  15  have a negative impact on the racial character of the nation.

16  Q　　Thank you.

17  　　　　And these new immigrants that xenophobes are concerned

18  about affecting the racial makeup of the United States, you said

19  they were primarily at this point in time, the 1980s, from

10:24:32  20  Central America, Cuba, and Haiti; is that right?

21  A　　Yes.

22  Q　　Dr. Kang, are Cubans Latinos?

23  A　　Yes.

24  Q　　And are Haitians Latinos?

10:24:44  25  A　　Yes.

Q     Thank you.

      Dr. Kang, we were previously speaking about earlier eras,
the 1920s, the 1950s.  The historical record is full of
congressmen using racial slurs openly on the floors -- on the
floor of the Senate and the floor of the House.  Does that
continue into the 1980s and 1990s?

A     Within Congress, it's rarely seen.  It's not as common.
And what's happened is as a result of the civil rights movement
it becomes, it becomes unacceptable to express, express racism
in overt or explicit terms.

      So what happens by the eighties and nineties is that
xenophobes begin to couch their racist sentiments in coded
terms.  And historians have found that this is the case with
organizations -- which I know we'll talk about it later, but
organizations such as the Federation for American Immigration
Reform use proxies to talk about their racist sentiments.

      Another example would be the language used to talk about
the war on drugs.  Scholars such as Michelle Alexander have
shown that in the eighties and nineties, politicians discovered
that this rhetoric and the politics of the war on drugs often
tracked onto the racist views of their constituents.  So
Michelle Alexander explains that, for example, Reagan used the
word -- used the war on drugs to effectively talk about race and
to elicit the racist sentiments of his supporters.

Q     So the lack of racial slurs in the *Congressional Record*, is

1  that any indication that racial animus has decreased in the

2  country or in Congress?

3  A    Not at all.

4  Q    And, Dr. Kang, you mentioned that rather than using racial

10:27:12  5  slurs, they have been replaced by proxies.  Could you explain

6  what you mean by "proxies."

7  A    So proxies, again, would include things like the discourse

8  and the rhetoric surrounding the war on drugs, and these are

9  ways, these are putatively race-neutral ways to express one's

10:27:34  10  own racist views.

11       Other examples would be the kind of language and frameworks

12  used by the federation for immigration reform.  They often couch

13  their racist and xenophobic views in terms of population control

14  or in terms of environmental preservation, and so on.

10:27:58  15  Q    Thank you.

16       So by the time we get to 1988, the prior forms of

17  anti-Latino racial animus that we've been discussing still exist

18  unchanged?

19  A    Yes.

10:28:10  20  Q    On top of that, there's a new form of anti-Latino racial

21  animus in response to the arrival of refugees?

22  A    Yes.

23  Q    And while language has shifted how the country and Congress

24  speaks about Latinos, the racial animus has not decreased?

10:28:29  25  A    That's correct.

1    Q    Thank you.

2         So that brings us to the first of five amendments to 1326.

3    I'm gonna run through each amendment and ask you a few questions

4    about --

10:28:42    5         THE COURT:  Mr. Goddard, I'm just wondering, is this a

6    good time for a break or are you close to the end of your

7    direct?

8         MR. GODDARD:  I think this would be an appropriate time

9    for a break, Your Honor.  Thank you.

10:28:55    10        THE COURT:  Okay.  We'll take a 15-minute recess.  Court

11   is in recess.

12        (Recess taken:  10:29 am to 10:46 am)

13        THE COURT:  Court is reconvened.

14        Okay.  Mr. Goddard, you were in the middle of your

10:46:28    15   direct.

16        MR. GODDARD:  Thank you, Your Honor.

17   Q    (By Mr. Goddard)  Before I get back to where I was, I'd

18   just like to cover one little bit of housekeeping I'm not sure I

19   remembered to cover at the very beginning.

10:46:38    20        Dr. Kang, as we discussed, you prepared a report in this

21   case, a 102-page report filed at ECF 78-2; correct?

22   A    Yes.

23   Q    And as you testify today under oath, does that (audio

24   connection gap) capture your research and your opinions?

10:47:02    25   A    You know, I -- can I ask you to repeat that?  My connection

1    froze for a little bit.

2         THE COURT:  I'm sure -- Mr. Goddard, I think it was you.

3    You skipped, so I hope that you're not going to have problems.

4         MR. GODDARD:  I hope so too, Your Honor.  Please let me

10:47:21  5    know if that happens again.

6    Q    (By Mr. Goddard)  So, Dr. Kang, as you testify today under

7    oath, does your report fairly and accurately capture your

8    research and your opinions?

9    A    Yes.

10:47:35  10   Q    Thank you.

11        Okay.  Getting back to where we were in the evolution of

12   the reentry statute, we were at the first amendment to 1326

13   which came in 1988.  Dr. Kang, what was the name of the bill

14   that included that amendment?

10:47:54  15   A    The Anti-Drug Abuse Act of 1988.

16   Q    And how did that bill amend 1326?

17   A    It increased the penalties.

18   Q    Was that amendment to 1326 a major focus of the Anti-Drug

19   Abuse Act?

10:48:12  20   A    No.

21   Q    Do you know who drafted that amendment to 1326?

22   A    Senator Lawton Chiles of Florida.

23   Q    What can you tell us about Senator Chiles?

24   A    So Senator Chiles was long concerned about how the new

10:48:32  25   immigration, especially immigration from Cuba and Haiti, was

1    changing the composition of the country.  So in 1985 in a *Time*

2    magazine article, he explained in an alarmist tone that if the

3    United States didn't gain control over its borders, the United

4    States would -- and here I'm paraphrasing -- the United States

5    would cease to look the way that it did in his day.

6        And so in response to that alarm, Senator Chiles over the

7    course of his career proposed numerous anti-immigration

8    measures.  These included measures that would have reduced

9    immigration to the United States over all, also reduced the

10   admission of asylum seekers and refugees, and would have also

11   increased the punitive measures taken against undocumented

12   immigrants as well as asylum seekers and refugees.

13       He also opposed the grant of various kinds of public

14   benefits to undocumented immigrants, and he was also vehemently

15   opposed to the kinds of -- vehemently opposed to the kinds of

16   due process rights that migrants, especially refugees and asylum

17   seekers, were exercising in this time period.  In this time

18   period, as I explain in my affidavit, many were going to court

19   to challenge their detentions and removals.

20   Q    Did Senator Chiles have any connections to the Federation

21   for American Immigration Reform, or FAIR?

22   A    Yes.  So Senator Chiles collaborated with FAIR on various

23   immigration policy proposals, and he also advanced proposals

24   that align with FAIR legislative agenda.

25   Q    And, Dr. Kang, at the beginning of our conversation, you

1    mentioned you had conducted in-person archival research at

2    George Washington University which has a collection of FAIR

3    materials.  Is this the same FAIR?

4    A    Yes.

5    Q    What can you tell us about FAIR?

6    A    So FAIR was founded in the late 1970s, and today it has

7    been designated by the Southern Poverty Law Center as a hate

8    group.  Since its founding, it has subscribed to and articulated

9    eugenicist and white supremacist views, and it has worked

10   assiduously to promote immigration policies that will preserve

11   the white, European character of the American population.

12        It in the late twentieth century became one of the most

13   important forces shaping immigration law and policy, and it did

14   so by meeting regularly with individual members of the House and

15   Senate.  It also routinely held workshops and panels for members

16   of the House and Senate in the offices of the House and the

17   Senate.

18        It routinely published articles and op-eds in the major

19   newspapers.  It appeared on major media outlets to explain its

20   anti-immigration policy proposals.  And in the late eighties and

21   nineties, FAIR made sure that one of its members testified at

22   nearly each and every immigration-related hearing in the House

23   and the Senate.

24        Then when it came to Florida, FAIR had been closely

25   watching developments in Florida.  It had been closely watching

57

1    the arrival of Cuban and Haitian refugees in the eighties and

2    nineties, and it witnessed and observed the rise of intense

3    xenophobia expressed by Floridians towards the Cubans and

4    Haitians.

10:53:20    5        And FAIR realized that it needed to strengthen its outreach

6    among the members of Florida's congressional delegation, and

7    FAIR believed that these federal legislators would be more

8    inclined to embrace and also to introduce FAIR's immigration

9    policy proposals or FAIR's immigration policy ideas on the floor

10:53:51   10   of the House and the Senate.

11       And so that, that explains how FAIR came to cultivate

12   relationships with the congresspeople I talk about in my

13   affidavit, Senator Chiles, Senator Graham, and Representative

14   Bill McCollum.

10:54:13   15   Q    Thank you, Dr. Kang.

16       I'd like to read you a couple of statements from members of

17   FAIR.  The first is the statement from FAIR's founder, John

18   Tanton, and this is from a letter he wrote to eugenicist Garrett

19   Hardin.  The quote is (reading):  I've come to the point of view

10:54:33   20   that for European-American society and culture to persist

21   requires a European-American majority, and a clear one at that.

22       The second statement I'd like to read to you, Dr. Kang, is

23   from FAIR's president, Dan Stein.  This is a statement he made

24   during an interview with Tucker Carlson.  The quote is

10:54:56   25   (reading):  Immigrants don't come all church-loving,

1    freedom-loving, God-fearing.  Many of them hate America, hate

2    everything that the United States stands for.  Talk to some of

3    these Central Americans.

4         Dr. Kang, are those statements representative of FAIR's

10:55:16   5    views?

6    A    Yes.  And it's important to note that FAIR expressed those

7    views in direct response to the arrival of Haitian and Cuban

8    migrants.  And, more broadly, FAIR was an organization that

9    deeply despised the Immigration and Nationality Act of 1965 and

10:55:41  10    its impact on the US population, and it was committed to

11    reversing the gains made by that act for immigrants throughout

12    the world.

13    Q    And what were Senator Chiles's connections to FAIR?

14    A    So Senator Chiles collaborated with FAIR.  It also held a

10:56:04  15    workshop on behalf of FAIR on some of its anti-immigration

16    policy proposals.  And then Chiles's own legislative agenda,

17    immigration agenda, reflects a clear alignment with FAIR's own

18    immigration policy proposals.

19    Q    Thank you.

10:56:23  20         I'd also like to read you a statement this time from

21    Senator Chiles himself, a statement he made on the Senate floor

22    (reading):  There's a new bumper sticker that you will see on

23    more and more cars in the Miami area.  It says, quote, "Will the

24    last person to leave please bring the flag," end quote.  That

10:56:48  25    sums up a lot of the feeling of frustration that is down there

1   presently, and I would say with the tremendous movement that we

2   have in Florida and people buying new homes -- I now find that

3   people in the central part of the state, the real estate agents

4   are telling me, it is not the people that are coming from out of

5   state that they are selling homes to, it is the migration from

6   south Florida that they are selling homes to, people that are

7   leaving the county.  This is bad.  It is a situation that we

8   have to reverse.

9       Dr. Kang, could you give us some context for that statement

10  from Senator Chiles.

11  A    Yes.  Senator Chiles made this statement in the early

12  eighties during a Senate Judiciary Committee hearing on

13  immigration and refugees, and he was speaking about Haitian

14  refugees.  And his statements reflect his own xenophobic

15  sentiments as well as the xenophobic sentiments of his fellow

16  Floridians, which perceived Cuban and Haitian refugees in the

17  most negative of terms; and Floridians perceived these

18  individuals to be, once again, criminals, disease ridden,

19  socially deviant.  And more broadly, they were cast again in

20  these xenophobic terms as a kind of invasion.

21      So what Chiles is saying in this statement is that these

22  Haitian migrants were moving into Floridians' neighborhoods and

23  ruining the character of those neighborhoods and likely the

24  property values which then compelled these Floridians to move

25  away.

1    So in that statement, Chiles again is expressing his own

2    xenophobic views towards refugees in Florida, and then he

3    concludes by saying that something needs to be done about it.

4    The trend needs to be reversed.  And he worked assiduously as a

10:59:17    5    member of Congress to pass the kinds of laws that would prevent

6    the entry of these refugees.

7    Q    Is this statement representative of Senator Chiles's views

8    on race?

9    A    Yes.

10:59:32    10    Q    So to recap, the first amendment to 1326 was authored by a

11    Senator from Florida who expressed xenophobic views and had

12    connections to an anti-immigrant hate group?

13    A    Yes.

14    Q    Thank you.

10:59:49    15    It takes us to the second amendment to 1326.  What was the

16    name of the bill that included that second amendment?

17    A    The Immigration Act of 1990.

18    Q    And how did that bill amend 1326?

19    A    It increased the penalties.

11:00:09    20    Q    And was this amendment to 1326 a major focus of the

21    Immigration Act of 1990?

22    A    No.

23    Q    Do you know who drafted this amendment to 1326?

24    A    Senator Bob Graham of Florida.

11:00:25    25    Q    What can you tell us about Senator Graham?

1    A    So, like Senator Lawton Chiles, Senator Graham was under

2    intense pressure from his Florida constituents to articulate

3    xenophobic views and to pass anti-immigration policies.

4         Senator Graham himself characterized Haitian and Cuban

11:00:50    5    refugees as criminals even though the data at the time and

6    subsequent studies conducted by historians have shown that the

7    vast majority of the Cuban refugees were not criminals, did not

8    have a criminal background.

9         And he made these characterizations of the Cuban and

11:01:13    10    Haitian refugees even though studies at the time and then

11    subsequent studies have either shown that immigrants -- the

12    presence of immigrants in a community actually lowers crime or

13    have been inconclusive with respect to the degree of crime

14    committed by these Cuban and Haitian immigrants.

11:01:42    15    Q    Dr. Kang, was this -- the idea of referencing Cuban and

16    Haitian arrivals as criminals, was this one of the proxies you

17    mentioned earlier that had replaced the use of racial slurs?

18    A    Yes.

19    Q    So to summarize, the first two amendments to 1326 were

11:02:01    20    authored by senators from Florida who spoke of immigrants in

21    xenophobic terms at a time when the electorate in Florida was

22    demanding anti-immigrant legislation?

23    A    Yes.

24    Q    Thank you.

11:02:18    25         That takes us to the third amendment to 1326.  What bill

1    was that amendment a part of?

2    A    The Violent Crime Control and Law Enforcement Act of 1994.

3    Q    Is that act better known as the Clinton crime bill?

4    A    Yes.

11:02:37  5    Q    (Audio connection gap) Clinton crime bill amend 1326?

6         THE COURT:  Mr. Goddard, I think you broke up a little

7    bit again.

8         MR. GODDARD:  I apologize.

9         THE COURT:  We heard the first time of the Clinton crime

11:03:02  10    bill, and then you were going to ask a second question.

11         MR. GODDARD:  Yes.  My apologies, Your Honor.

12    Q    (By Mr. Goddard)  Dr. Kang, how did the Clinton crime bill

13    amend 1326?

14    A    It increased the penalties.

11:03:16  15    Q    And was this amendment to 1326 a major focus of the Clinton

16    crime bill?

17    A    No.

18    Q    Who drafted this amendment to 1326?

19    A    Representative Bill McCollum of Florida.

11:03:31  20    Q    What can you tell us about Representative McCollum?

21    A    Representative Bill McCollum long expressed anti-immigrant,

22    xenophobic views, and he dedicated much of his career to

23    drafting, cosponsoring -- drafting and cosponsoring

24    anti-immigrant legislation.  By 1994, he was a senior and

11:03:59  25    influential member of the House.

1    Q    Did Representative McCollum have ties to FAIR?

2    A    Yes.

3    Q    What were those ties?

4    A    So early in his career, the early 1980s he worked with FAIR

5    to pass legislation that would have restricted the issuance of

6    public benefits to undocumented immigrants.

7         By the mid-1980s, he worked with FAIR in hosting a workshop

8    for members of Congress in the offices of the House on the

9    so-called problems surrounding legalization and what was then

10   called amnesty, and his proposals received the regular

11   endorsement of FAIR.

12   Q    Thank you, Dr. Kang.

13        Your report included a quote from Representative McCollum

14   where he said that President Reagan should, quote, "find a hole

15   in our fence at Guantanamo and push these aliens through it,"

16   end quote.  Could you let us know the context of that statement.

17   A    Yes.  So this statement reflects McCollum's longstanding

18   xenophobic views with respect to Haitian and Cuban refugees in

19   Florida.  It also reflects the fact that McCollum's views

20   towards immigrants and vulnerable populations in general were

21   deeply punitive.  It wasn't good enough for McCollum to remove

22   refugees from the United States.  It was also necessary, in his

23   mind, to detain them at a place like Guantanamo.  So just more

24   broadly, the statement is reflective and characteristic of

25   McCollum's deep-seated, anti-immigrant hostilities.

1  Q    Understood.

2       Mr. McCollum, Representative McCollum drafted an amendment

3  to 1326.  Were there changes from his initial language to what

4  Congress initially passed in the Clinton crime bill?

5  A    Yes.  When the Clinton crime bill passed, it excised what

6  had been a Clause C in McCollum's original bill, and that

7  Clause C would have limited collateral attacks on removal orders.

8  Q    So in addition to the enhanced penalties that were passed,

9  Representative McCollum had also wanted to limit 1326

10  defendants' ability to collaterally attack their prior removal

11  orders?

12  A    Yes.

13  Q    Did Representative McCollum eventually vote for the Clinton

14  crime bill?

15  A    No.

16  Q    Why not?

17  A    McCollum, like many other Republicans, was absolutely

18  enraged by the Clinton crime bill.  McCollum saw it as being too

19  soft on crime, and he and other Republicans characterized it as

20  a welfare bill because it allocated billions of dollars to crime

21  prevention programs and also to community support programs.

22  Q    So Representative McCollum, who made xenophobic comments

23  and was associated with an anti-immigrant hate group, drafted an

24  amendment to 1326, and voted against the larger bill for reasons

25  unrelated to 1326?

11:06:31
11:06:56
11:07:09
11:07:29
11:07:55

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

65

1    A    Yes.

2    Q    Thank you.

3        That takes us to the fourth amendment to 1326.  What bill

4  included this amendment?

11:08:09  5    A    The Antiterrorism and Effective Death Penalty Act of 1996.

6    Q    Is that act sometimes known as AEDPA?  And for the court

7  reporter, that is A-E-D-P-A.

8    A    Yes.

9    Q    How did AEDPA amend 1326?

11:08:33  10    A    It increased the penalties.

11    Q    Did AEDPA limit collateral attacks on predicate removal

12  orders?

13    A    Yes.

14    Q    And was this amendment to 1326 a focus of AEDPA?

11:08:51  15    A    No.

16    Q    Who drafted this amendment to 1326?

17    A    Representative Bill McCollum.

18    Q    The same Representative McCollum who drafted the prior

19  amendment to 1326?

11:09:02  20    A    Yes.

21    Q    Had there been any relevant changes in Congress in the time

22  between these two amendments?

23    A    Yes.  The Republicans took control of the House and the

24  Senate for the first time in 40 years.

11:09:21  25    Q    And what is the relevance of that change in leadership?

1    A    So it meant that Republicans like Senator -- like

2    Representative Bill McCollum had much more power to enact their

3    legislative agenda.

4    Q    So Representative McCollum, following a Republican

11:09:40    5    takeover, drafted an amendment to change 1326 in the way he had

6    previously tried to change it?

7    A    Yes.

8    Q    And did Representative McCollum vote for AEDPA?

9    A    Yes.

11:09:54    10    Q    So Representative McCollum, who had made xenophobic

11    comments and had ties to an anti-immigrant hate group, tried to

12    amend 1326 to limit collateral attacks.  That amendment was

13    watered down, and two years later he reintroduced that same

14    amendment?

11:10:14    15    A    Yes.

16    Q    Thank you.

17         That takes us to the fifth, and final, amendment to 1326.

18    What bill included this amendment?

19    A    The Illegal Immigration Reform and Immigrant Responsibility

11:10:32    20    Act of 1996.

21    Q    And is that better known as IIRIRA?

22    A    Yes.

23    Q    For the court reporter, that is I-I-R-A-I-R-A.

24         Dr. Kang, how did IIRIRA amend 1326?

11:10:51    25    A    It increased the penalties.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*                                                67

1   Q   And was this amendment to 1326 a focus of IIRIRA?

2   A   No.

3   Q   And who drafted this amendment to 1326?

4   A   Representative Lamar Smith of Texas.

11:11:08   5   Q   What can you tell us about Representative Smith?

6   A   Representative Smith was a longstanding xenophobe and the

7   author of anti-immigration measures in Congress.  He was a

8   longstanding member of FAIR, and to this day he serves on its

9   national board of advisors.

11:11:33   10       Shortly after the passage of IIRIRA, he penned a *Law Review*

11   article explaining his rationale for proposing the bill.  And in

12   it he made clear his xenophobic views, his intense anger about

13   the passage of the Immigration Act of 1965, its -- the putative

14   harms that it caused to the composition and culture of the

11:12:03   15   nation, and so on.

16       And Representative Smith is said to have drafted and

17   sponsored IIRIRA, although contemporary observers have

18   subsequently attested that an attorney named Cordelia Strom

19   authored IIRIRA.

11:12:34   20   Q   What can you tell us about Ms. Strom?

21   A   So Cordelia Strom, at the time in which IIRIRA was being

22   authored and debated in Congress, served as the counsel to

23   Representative Smith, who at the time was the chair of the House

24   subcommittee on immigration.  And prior to that, Cordelia Smith

11:13:08   25   [*sic*] had served as an immigration expert to Senator Alan

1    Simpson of Wyoming, who served as the chair of the Senate

2    immigration subcommittee and who is, to this day, a member of

3    the national board of advisors for FAIR.

4         Prior to serving as an immigration expert for Senator

11:13:31  5    Simpson, Cordelia Strom was a long-standing member of FAIR and

6    served as a staff attorney to Dan Stein, who was one of the

7    leaders of FAIR.  And during her tenure on the Senate

8    subcommittee on immigration as well as the House subcommittee on

9    immigration, she continued to have an affiliation with FAIR.

11:13:59  10   Q    So to summarize, the most recent amendment to 1326 was

11   introduced by a congressman who has explicitly stated his

12   xenophobic views and was, in fact, drafted by a lawyer who works

13   for an anti-immigrant hate group?

14   A    Yes.

11:14:17  15   Q    Thank you, Dr. Kang.

16        That takes us through the five amendments to 1326.  I'd

17   like to ask you a few questions about those amendments

18   generally.  For each of the five bills we've discussed, the

19   particular amendment to 1326 was not a major focus of the bill;

11:14:38  20   is that right?

21   A    Yes.  That's correct.

22   Q    Did Congress spend much time debating the provisions of

23   these bills that amended 1326?

24   A    No.

11:14:48  25   Q    Were these amendments to 1326 controversial?

USA v. Munoz-De La O/2:20-CR-00134-RMP-1                    69
Motion to Dismiss Hearing - January 28, 2022
Kang/D/Goddard

1    A    No.

2    Q    Why not?

3    A    They weren't controversial because of the xenophobia, the

4    widespread and pervasive xenophobia at the time.  And

11:15:08    5    congresspersons in the late eighties and nineties knew that it

6    would be political suicide for them to try to revoke 1326 or

7    water it down, and this was because members of the House and the

8    Senate in the eighties and nineties faced intense pressure from

9    their constituents across the country to do something about

11:15:34    10    immigration.

11    Q    Thank you.

12        In debating the five amendments to 1326, did Congress ever

13    acknowledge or discuss the racial animus that had motivated the

14    criminalization of reentry?

11:15:52    15    A    No.

16    Q    Dr. Kang, based on your review of the legislative history

17    of these five amendments, are you able to form an opinion as to

18    Congress's intent in amending 1326?

19    A    Yes.

11:16:10    20    Q    What is that opinion?

21    A    Congress was motivated by racial animus.

22    Q    What is that opinion based on?

23    A    That's based on my exploration of the legislative history,

24    a broader social context, and the motivations of the law's

11:16:29    25    drafters and sponsors.

USA v. Munoz-De La O/2:20-CR-00134-RMP-1
Motion to Dismiss Hearing - January 28, 2022
Kang/D/Goddard

70

1    Q    How certain are you of this conclusion?

2    A    Very certain.

3    Q    If I were to ask you to quantify your level of certainty

4    numerically on a scale from 0 to 100, what would you say?

11:16:48  5    A    It would be in the high nineties.

6    Q    Thank you.

7         In your review of the legislative history of the amendments

8    to 1326, did you find any evidence that Congress acted with any

9    race-neutral motivation when it passed those amendments?

11:17:05  10    A    No.

11    Q    Based on your review of the legislative history of the

12    amendments to 1326, were you able to form an opinion as to

13    whether Congress would have passed those amendments were it not

14    for racial animus?

11:17:24  15    A    Yes.

16    Q    And what is that opinion?

17    A    Congress would not have passed those amendments were it not

18    for racial animus.

19    Q    What is that opinion based on?

11:17:35  20    A    It's, again, based on my research of the historical context

21    and the motives of the drafters and sponsors and the

22    pervasiveness of the racial animus and the xenophobia at the

23    time.  And it was a xenophobia that infected not only the

24    population at large but also members of Congress on both sides

11:18:00  25    of the aisle, both Democrats and Republicans.

1    Q    Dr. Kang, how certain are you of this conclusion?

2    A    Very, very certain.

3    Q    And once again, if I were to ask you to quantify that

4    numerically on a scale from 0 to 100, what would you say?

11:18:20    5    A    High nineties.

6    Q    Thank you.

7        Dr. Kang, that covers the history of the reentry statute

8    for its entire 90 years.  I'd like to ask you a few questions to

9    get your response to some of the government's concerns with your

11:18:38    10    report.  I believe there are five.

11        The government points to the fact that the amendments to

12    1326 were often passed by large majorities in Congress, and the

13    government argues the amendments, quote, "appear to have been

14    relatively uncontroversial," end quote.  Is this a valid

11:19:01    15    concern?

16    A    No.  And, in fact, the support for 1326 reflects the

17    widespread xenophobia of the times and within Congress.

18    Q    So did a large -- if an amendment passes by a large

19    majority, does that suggest in any way that Congress was acting

11:19:28    20    without racial animus?

21    A    No, not -- no, not necessarily.

22    Q    Thank you.

23    A    And, again, in this case, the votes for the amendments to

24    1326 are an indicator of the widespread xenophobia in this time

11:19:43    25    period.

1  Q   Thank you.

2      Government's second concern has to do with Representative

3  McCollum.  The government argues Representative McCollum's views

4  with respect to the Clinton crime bill's amendment to 1326 are

5  quote, "meaningless," end quote, because Representative McCollum

6  voted against that bill.  Is this a valid concern?

7  A   No, and it's -- because it's critical to look at Bill

8  McCollum, because he drafted the amendment to 1326 that ends up

9  in the Clinton crime bill.  It's also critical because, as Bill

10  McCollum and others explained in the debates regarding the

11  Clinton crime bill, McCollum authored that clause, so he's

12  credited with authoring that clause.

13      And even though he didn't vote for the Clinton crime bill,

14  he then quickly went on to try to get the version of the

15  amendment to 1326 that he wanted.  He worked very hard to

16  quickly get that passed by 1996.

17  Q   Thank you, Dr. Kang.

18      The government's third concern is that you offer, quote,

19  "scant legislative history," end quote, concerning 1326 and its

20  amendments.  You instead, according to the government, focus on

21  other aspects of immigration law -- asylum, refugee policy,

22  admission quotas, and removal proceedings -- and, quote,

23  "attempt to paint unlawful reentry with the same brush," end

24  quote.  Is this a valid concern?

25  A   No, because it's important to understand the legislative

1    intent surrounding the amendments to 1326 are related to these

2    other issues insofar as the drafters of 1326 took these other

3    issues into account and began the work of reframing these

4    issues.  Particularly with respect to asylum and refugee law,

11:22:04   5    they began reframing them not as admissions policies but as

6    enforcement issues, as enforcement questions.

7        And hence you see in this period the transformation of the

8    thinking about refugees and asylum seekers.  That thinking

9    begins to change, and you see these conservative legislators

11:22:25   10   beginning to argue that these individuals were undocumented

11   immigrants and criminals.

12   Q    Thank you.

13       The government's fourth concern is that you, quote,

14   "attempt to ascribe the supposed motives of single legislators

11:22:42   15   to all those who ultimately voted to enact," end quote, the

16   amendments of 1326.  Is this a valid concern?

17   A    No, and it's because -- there are several reasons.  One is

18   that when Congress asks individuals to draft a bill or a portion

19   of a bill, Congress in many ways delegates their authority to

11:23:14   20   that individual to draft these measures and to speak for the

21   body or large subsets of the body as a whole.  And, again, this

22   is something that Victoria Nourse explains in her book

23   *Misreading Law, Misreading Democracy*.

24       Another reason, as I've explained before, in doing a

11:23:37   25   legislative history, historians focus on telling the story of

1    the winners rather than the losers.  So we really focus on the

2    question what were the specific elements; who were the specific

3    individuals involved in getting the law to pass.

4           And then, you know, another reason is that in this time

11:24:05    5    period, even though one might not have divined the intention of

6    every single member of Congress -- I believe it's 535

7    individuals -- it's important to note that when you do peruse

8    the legislative history, the numbers of congresspeople -- and,

9    again, on both sides of the aisle -- who are expressing

11:24:40    10    xenophobic sentiments is widespread, and it's striking.

11           And as other historians have written, Democrats and

12    Republicans in this period, the late eighties and nineties, are

13    quote/unquote, "falling all over themselves to propose

14    anti-immigration bills," and I list several of those in my own

11:25:08    15    affidavit.

16           So even though I might not have, have an account of the

17    views of all 535 members of Congress, I believe I've captured a

18    representative sample of the views of the members at large.

19    Q    Thank you, Dr. Kang.

11:25:37    20           The government's last concern is that without knowing the

21    views of the individual legislators who voted for the amendments

22    to 1326, you were, quote, "incorrect," end quote, to claim the

23    five amendments to 1326 were passed in a, quote, "xenophobic

24    context," end quote.  Is that a valid concern?

11:26:04    25    A    No.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

75

1    And can I add to sort of my last answer?  Is that --

2  Q    Certainly.

3  A    So even though, again, I might not have specific

4  statements, sentences, paragraphs, writings from the 535

11:26:23  5  members, again, we do have their votes.  As I just explained, we

6  also have the bills that other members of the House and Senate

7  propose in this time period.

8    And we also know, when you look at the broader context,

9  that all members of the House and the Senate were under intense

11:26:52  10  electoral pressure, again, from their constituents to pass these

11  deeply xenophobic, anti-immigrant measures.

12    And I think that the timing of these bills is an important

13  piece of this larger historical context insofar as many of these

14  bills were passed on the cusp or the eve of the midterm or

11:27:17  15  presidential election; right.

16    And that just speaks to the importance of xenophobia in

17  this period, the importance for congresspeople in the House and

18  the Senate in this period -- and, again, no matter what side of

19  the aisle you're on -- the importance for them of taking a

11:27:37  20  xenophobic stand on immigration.

21  Q    Thank you very much, Dr. Kang.

22    We are coming to the end now.  I believe you've made five

23  conclusions that are very important here, and I just wanted to

24  recap those quickly.

11:27:53  25    First, you testified there's an academic consensus that

1    Congress was motivated by anti-Latino racial animus when it

2    first criminalized reentry in 1929; is that right?

3    A    Yes.

4    Q    Second is your opinion -- second is you saying with more

11:28:17  5    than 90 percent certainty that Congress was motivated by

6    anti-Latino racial animus when it recodified the reentry statute

7    in 1952; is that right?

8    A    Yes.

9    Q    Three, you can say with more than 90 percent certainty that

11:28:36  10    Congress was motivated by anti-Latino racial animus when it

11    amended 1326 in the 1980s and 1990s; is that right?

12    A    Yes.

13    Q    Four, you are aware of no evidence that Congress acted with

14    any race-neutral motivation when it criminalized reentry, when

11:29:01  15    it recodified the reentry statute at 1326, or when it amended

16    1326; is that right?

17    A    Yes.

18    Q    And, finally, you can say with more than 90 percent

19    certainty that absent anti-Latino racial animus, Congress would

11:29:19  20    not have criminalized reentry the way it did in 1929, Congress

21    would not have recodified the reentry statute the way it did in

22    1952, and Congress would not have amended 1326 the way it did in

23    the 1980s and 1990s; is that correct?

24    A    Yes.

11:29:40  25    Q    Thank you, Dr. Kang.

1    I have one final question for you.  You mentioned at the

2    outset that when you began your research into the

3    McCarran-Walter Act of 1952 and subsequent amendments to 1326,

4    you didn't expect to find much.  Could you describe your

11:30:01    5    surprise at what your research did uncover.

6  A    Yes.  So by the time I finished my first affidavit, I was

7    stunned to find the extent of xenophobia that inform the

8    amendments to 1326 in the late twentieth century, and that

9    feeling only continued to grow as I continued my research for

11:30:30   10    other FDs and then most recently for this last affidavit that

11    got filed with your office.

12    And it's why I conclude the affidavit by saying that the

13    racial animus that informed 1326 and its amendments is profound,

14    because it is profound.  The racial animus that was initially

11:30:52   15    directed against Mexican migrants in 1929 only expanded and

16    proliferated.

17    It continued to be applied to Mexican nationals in the

18    1950s and the eighties and nineties and then was propagated and

19    applied to different immigrant groups and, again, on the basis

11:31:17   20    of racial animus.

21    So the scope, the scope of the racial animus that informed

22    the amendments to 1326 as well as the passage of these broader

23    immigration measures in the 1980s and 1990s is profound.

24    MR. GODDARD:  Thank you very much, Dr. Kang.

11:31:42   25    Your Honor, I have no more questions.

1    THE COURT:  All right.  Mr. Ellis, are you ready to

2    begin your cross or do you need a break?

3    MR. ELLIS:  I'm ready to start.  If anyone wants a

4    break, I don't mind either way.

11:31:59  5    THE COURT:  No.  Let's go ahead, and then we'll see in

6    another hour or so, if you're still going, we might take a break

7    then.  Okay?

8    MR. ELLIS:  All right.  Thank you, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. ELLIS:

11   Q    Good morning, Dr. Kang.  So first I'd like to just ask you

12   a couple of questions about how bills become laws in general.

13   And so you write in your affidavit that it was in the xenophobic

14   context -- after describing the xenophobic context -- the

11:32:32  15   members of Florida's congressional delegation amended 8 United

16   States Code Section 1326 in 1988, 1990, 1994, and 1996; right?

17   A    Yes.

18   Q    But those congressmen, those Floridian congressmen, they

19   only, as you discussed with Mr. Goddard, perhaps authored and

11:32:54  20   advocated for those bills; right?

21   A    Yes.

22   Q    And as with any bill it takes a majority, or in the case

23   of, say, overturning a presidential veto, a substantial majority

24   of Congress to actually enact a specific provision into law;

11:33:14  25   right?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

79

1   A    Yes.

2   Q    Okay.  So lots of bills get written, right, all the time?

3   A    Yes.

4   Q    And as you mentioned, you profiled a lot of bills in your

11:33:27  5   affidavit that never went anywhere, never became law; right?

6   A    Yes.

7   Q    So I'd also like to ask, you mentioned to Mr. Goddard this

8   idea that Congress asks -- and I think that may have been your

9   word -- asks legislators to draft bills; right?  I think -- was

11:33:50  10  "ask" the word that you used?

11  A    So . . .  Yes, I believe so.

12  Q    And so how does -- who does, who does that asking?

13  A    So it would typically be the head of a congressional

14  committee through which the bill would then be -- would then

11:34:16  15  flow after its drafting.

16  Q    Okay.  So, for instance, who asked Senator Chiles to draft

17  the amendment that was ultimately included in the Anti-Drug

18  Abuse Act of 1988?

19  A    So I would not be able to answer at this time, but I'd be

11:34:37  20  happy to supply you with the answer.

21  Q    Okay.  And the same question, really, for who asked Senator

22  Graham, who asked Representative McCollum, who asked

23  Representative Smith about their amendments?  Are you aware of

24  who asked them to draft them?

11:34:52  25  A    So for McCollum, it's -- the picture is much clearer,

1    especially by '96.  It would have been House Speaker Newt

2    Gingrich.

3    Q    I thought you said his was -- really is building off of his

4    1994 version; right?

11:35:12    5    A    Yes.

6    Q    So is it possible that these senators and representatives

7    just wrote these bills themselves without having -- being asked

8    by anyone to do so?

9    A    In some cases that can occur, yes.

11:35:24    10    Q    And how about all of the other bills that were profiled?

11    Harry Reid, Senator Harry Reid's bill, many other

12    representatives and senators, are you aware of who asked them to

13    draft those provisions?

14    A    No.  But, you know, in the immigration context, if a

11:35:49    15    congressperson is asked to write an immigration bill, it would

16    typically be the chair of the House or Senate immigration

17    subcommittees.  So prior nineteen ninety -- prior to the

18    November -- well, let's say prior to January 1995, in the House,

19    that would have been Representative Mazzoli; in the Senate, that

11:36:15    20    would have been Kennedy.  By January 1995, the heads of the

21    immigration subcommittees were Senator Alan Simpson in the

22    Senate and then Representative Smith in the House.

23         So those individuals, they would have, you know, asked --

24    if it's the case that they wanted a certain kind of immigration

11:36:41    25    bill to be drafted, those would have been the individuals

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

81

1    principally responsible for asking.

2    Q    But sitting here today, based on -- and I acknowledge that

3    there may be way more research out there that could potentially

4    shed some light on this.  But sitting here today, you don't know

11:37:00    5    who, if anyone, asked -- with the exception of McCollum in

6    '96 -- these representatives and senators to write their

7    respective provisions amending Section 1326?

8    A    So I can speculate as to who might have asked these

9    individuals to have written these bills, but, again, I can

11:37:27    10    provide you with a more definitive answer after this hearing.

11    Q    All right.  Thank you.

12        And just generally, if one writes a provision, they don't

13    have to vote for it; right?

14    A    That's correct.  Yes.

11:37:49    15    Q    That's the case with Representative McCollum in 1994;

16    right?

17    A    Yes.  That's correct.

18    Q    Okay.  Now, lobbyists -- so is it fair to say that, well,

19    there are a lot of lobbyists in Washington, DC?

11:38:09    20    A    Yes.

21    Q    And those lobbyists represent interests, a large variety of

22    interest groups spanning the entire political spectrum?

23    A    Yes.

24    Q    And industries and, really, probably everything else on the

11:38:28    25    planet?

1    A    Yes.

2    Q    They don't vote, right, the lobbyists?

3    A    No, they don't vote.

4    Q    You talked about this with Mr. Goddard quite a bit.  And so

11:38:43    5    these bills, the 1952 INA, the AEDPA -- all of them -- they were

6    really quite enormous packages of legislation; right?

7    A    Yes.

8    Q    Of which Section 1326 or subsequently the amendments to

9    Section 1326 were relatively small parts?

11:39:10    10    A    Yes.

11    Q    And in some of them, is it fair to say, let alone focusing

12    on 1326, didn't even focus on immigration?

13    A    I -- that would be a slight mischaracterization.  I think

14    each one of the bills that I examined deals with immigration to

11:39:36    15    a greater or lesser extent.  Immigration is certainly not absent

16    from any of these bills.

17    Q    Oh, no.  Certainly not absent but -- I know 1326 is in each

18    of them so --

19    A    Yes.

11:39:48    20    Q    -- certainly not absent.  But -- and is it fair to say that

21    the focus of some, if not many of them, was on other aspects of

22    law, such as crime?

23    A    Yes.

24    Q    And even when focused on immigration, is it fair to say

11:40:11    25    that the bills touched on a variety of subtopics within

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*                                                           83

1  immigration policy?

2  A    Yes.

3  Q    Such as, as Mr. Goddard mentioned, refugee policy, asylum

4  policy, how removal proceedings operate, and that kind of thing?

11:40:28  5  A    Yes.

6  Q    And so I think, as you testified to, 1326 and any

7  amendments thereto were relatively minor parts of these greater

8  wholes?

9  A    Yes.

11:40:43  10  Q    Okay.  Before we kind of dive into, you know, some specific

11  questions about each of these bills, I'd like to talk to you

12  just a little bit about bias.  Now, is it fair to say that to a

13  greater or lesser degree, bias really affects everyone and every

14  profession?

11:41:04  15  A    Yes.

16  Q    Does it include academia?

17  A    Yes.

18  Q    And historians?

19  A    Yes.

11:41:17  20  Q    All right.  So how -- so the Federal Defenders of Eastern

21  Washington were not the first Federal Defenders' office that

22  you've worked on this issue with; is that right?

23  A    That's correct.

24  Q    And I think is it -- the exact one's gonna escape me, but

11:41:40  25  is it one of the districts in Texas that --

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

84

1    A    Yes.

2    Q    -- was the very first you worked with?

3    A    Yes, west Texas.

4    Q    Western Texas.  Thank you.

11:41:48    5    So how were you initially contacted by, I'm assuming, the

6    Federal Defenders' office of the Western District of Texas?

7    A    I cannot remember the exact details, but I believe I was

8    contacted by Molly Roth in an email message, and I cannot

9    remember the exact date.

11:42:10    10    Q    Okay.  And that's fine.  I'm more wondering if you ever

11    became aware of how Ms. -- was it Roth? -- found you and decided

12    to contact you.

13    A    My understanding from Molly Roth -- and, again, I would

14    have to review my email to recollect more clearly.  But based on

11:42:48    15    my recollection now, without having looked back at my email from

16    Molly Roth, is that she got my name from a local professor.

17    Q    Okay.  Because perhaps she was interested in someone with

18    insight into immigration history or something?

19    A    I . . .  I'm trying to recollect, and I think that she

11:43:20    20    wanted someone -- I think that -- let's say this.  I think that

21    is the general idea.  I think Molly Roth had been looking for a

22    professor who had expertise on immigration, and she got my name

23    from another professor.

24    Q    Okay.  And do you consider yourself and kind of your

11:43:48    25    conclusions on these issues part of what you discussed as kind

1    of the academic consensus on, really, this interplay between

2    immigration law and immigration history?

3    A    Yes.

4    Q    And are you familiar -- I know Professor, I think, Lytle

11:44:06    5    Hernandez --

6    A    Lytle, Kelly Lytle Hernandez.

7    Q    Lytle Hernandez, thank you.

8         -- came up during your direct.  Is Professor Lytle

9    Hernandez also part of what you would consider to be the

11:44:19    10    academic consensus on this issue?

11    A    Yes.

12    Q    And you're also familiar with another professor who's done

13    some work and testimony, I believe Professor, is it, Gonzalez

14    O'Brien?

11:44:29    15    A    Yes.

16    Q    And would you consider Professor Gonzalez O'Brien to also

17    be part of this academic consensus?

18    A    So to the best of my knowledge, his work is considered to

19    be a part of the academic consensus.

11:44:50    20    Q    And so were you aware or have you had contact with, say,

21    Professor Lytle Hernandez prior to beginning your work on this

22    historical background information concerning Section 1326?

23    A    No.  And I actually did not know that she had filed an

24    affidavit and had been participating in this endeavor.

11:45:17    25    Q    And are you aware that Professor Lytle Hernandez and

1    perhaps other relevant members of the academic consensus, in

2    addition to filing these affidavits in these kinds of cases,

3    have also been filing amicus briefs and that sort of thing in a

4    variety of other immigration-related cases?

11:45:36  5    A    Yes.

6    Q    And have you been, have you been a part of any sort of

7    amicus brief or signed on to anyone's amicus brief or anything

8    like that?

9    A    No.

11:45:48  10    Q    So is this some -- is this an activity that historians have

11    regularly engaged in, being in this sort of advocate, advocacy

12    role, in filing amicus briefs and that kind of thing as part of

13    legal cases?

14    A    In order to answer that question, I would actually need to

11:46:14  15    do some historical research.  I'm reluctant to answer that

16    question without knowing more historical context.

17    Q    Okay.  Fair enough.

18         Do you have personal views on the merits, or lack thereof,

19    of the United States immigration system?

11:46:30  20    A    I think, like anyone --

21         MR. GODDARD:  Your Honor, Your Honor, I would object to

22    that question.  Dr. Kang is here testifying as to the history.

23    She's not here to offer any personal opinions.  She was not

24    asked any personal opinions on direct.

11:46:44  25         THE COURT:  Mr. Goddard, for whatever reason, your video

1    dropped, at least on my screen.  There you are.

2            MR. GODDARD:  My apologies.  Here I am.

3            THE COURT:  Okay.  So your objection is that this is

4    outside the scope?  Is that how you're framing this objection,

5    Mr. Goddard?

6            MR. GODDARD:  Yes, Your Honor.  It's outside the scope,

7    and it's also not relevant to what -- why Dr. Kang's here.

8    She's here to talk about the history of the illegal reentry

9    statute.  She's not here to offer personal opinions.

10            THE COURT:  But she was asked by you about what she

11    expected to find.

12            MR. GODDARD:  Certainly, Your Honor, as a historian,

13    knowing the history that she did before she started, what she

14    expected to find in the history; not what she wanted to find or

15    what she thought the history should have been.

16            THE COURT:  Mr. Ellis, your response to this?

17            MR. ELLIS:  Your Honor, the only purpose of this line of

18    questioning -- which won't be very long -- is simply that

19    Professor Kang has acknowledged that bias permeates many persons

20    in professions, to include academia and historians.  And a

21    question like this just simply probes any bias that might have

22    been present while researching and drafting the affidavit.

23            THE COURT:  I'm going to overrule the objection.  If you

24    want to ask the question again, Mr. Ellis, so the professor

25    knows what question it is, then she may answer.

1          MR. ELLIS:  Thank you, Your Honor.

2     Q    (By Mr. Ellis)  So, Professor Kang, the question was,

3     essentially:  Do you have any personal views on the merits, or

4     lack thereof, concerning the United States immigration system?

11:48:24  5     A    Yes, I have personal opinions on the nation's immigration

6     system, but I think in that regard I'm no different from anyone

7     else in this courtroom or in society at large.

8          And in preparing the affidavit, I did not prepare it on the

9     basis of my personal opinion but upon the highest standards of

11:48:46  10    academic research that I was taught at Cornell and at the

11    University of California at Berkeley.

12         And because this is a public document that's read by

13    attorneys and judges as well as my own peers in the academic

14    community, I hold myself and that document to the highest

11:49:06  15    academic standards.

16    Q    All fair enough.  But do you personally have a positive

17    view of the United States immigration system?

18    A    I'm not . . .

19         So as I've just said, my own personal views on immigration

11:49:40  20    don't shape my scholarship, and so I'm not, I'm not certain of

21    the salience of the question.

22         THE COURT:  So for the court to examine your credibility

23    and to analyze your reports and your statements, please answer

24    the question.

11:50:15  25         THE WITNESS:  Okay.  Thank you.

1    So my own views of the nation's immigration system are

2    mixed.  I think there have been some positive things about the

3    nation's immigration system, and I have to say that because I'm

4    a second-generation immigrant.

11:50:36    5    Without certain features of the nation's immigration

6    system, my own parents would not have been able to come here,

7    and I would not have been able to have been a native-born

8    citizen and benefited from many of the positive things there are

9    about living in this country.

11:50:52    10    But at the same time, my own value system that I learned

11    from my parents and going to church with my parents, the value

12    system that I learned from my parents and from church often make

13    me on a personal level feel uncomfortable with some of the ways

14    that our nation's immigration system treats immigrants.

11:51:25    15    So it does pain me to see refugees put in detention for

16    extended periods of time, often in terrible conditions, and it

17    is actually very difficult for me to talk about the racism faced

18    by the immigrants over the course of the twentieth century

19    because it's very painful on just a fundamental, fundamental

11:52:00    20    level.

21    Q    (By Mr. Ellis)  Thank you, Dr. Kang.

22    A    So my views on immigration are mixed.

23    Q    Thank you.

24    So moving on, my plan is just to kind of walk through some

11:52:09    25    questions on each of the various acts that you talked about with

1    Mr. Goddard, but before we get there, I'd like to follow up on a

2    question that Mr. Goddard asked you.

3        So on direct you discussed both -- as kind of predecessors

4    to the 1952 INA, you discussed both the repatriation drives and

11:52:31  5    the Bracero Program.  Do you recall that, generally discussing

6    those two --

7    A    Yes.

8    Q    -- historical events?

9        All right.  And Mr. Goddard asked you concerning both of

11:52:43  10    those what the relevance of those was specifically to unlawful

11    reentry criminalization and Section 1326.  Do you recall being

12    asked that question?

13    A    Yes.

14    Q    And so your answer, which I would summarize as,

11:52:57  15    essentially, they were evidence of continuing animus, didn't

16    mention reentry or criminalization of reentry or Section 1326.

17        So I'm just gonna ask you Mr. Goddard's question again,

18    which is:  Specifically what relevance did these programs have

19    to the codification of Section 1326 in 1952?

11:53:25  20    A    So they reflected the ongoing racial animus towards Mexican

21    immigrants in this time period.

22    Q    Okay.  But, again, with the -- I guess the question being

23    narrowed by the word "specifically," do you have any historical

24    insights or statements from persons that connect attitudes

11:53:51  25    towards the Bracero Program and the repatriation drives directly

1  to the codification of Section 1326 in 1952?  Because I think

2  that was Mr. Goddard's question, and that's the question I don't

3  think was answered.

4  A    So could I ask you to repeat that question?

11:54:13  5  Q    Sure.  So Mr. Goddard's question was something along the

6  lines of what relevance did these two historical events

7  specifically have to Section 1326 and its codification in 1952.

8  And I'm just wondering if there's an answer as to -- that is

9  more specifically related to Section 1326 because -- yeah.

11:54:37  10  That's, that's the question.

11  A    So I think those two events reflect the longstanding racist

12  view that it was acceptable to expeditiously remove and punish

13  Mexican nationals when they were no longer wanted in the United

14  States.

11:55:02  15  Q    This leads to another kind of thing I'm sort of struggling

16  with as part of your testimony.  And so how does it benefit --

17  how did it benefit southwestern agribusiness or farming

18  businesses to imprison and lock up their laborers when they were

19  done with them?

11:55:27  20  A    It was a deterrent.  That's what it was.  So in times of

21  economic distress, when southwestern farmers felt that:  Okay.

22  It's now time to shut off the valve.  It's time to close the

23  valve and stop Mexican migrants from coming into the country.

24    I mean, if it's the case that we begin prosecuting and

11:55:48  25  detaining Mexican migrants, we will then send the message to

1    prospective Mexican migrants that they should not enter the

2    country.

3    Q    And is it kind of fair to sum up that that sort of comes

4    about at the end of harvesttime; that they no longer need the

11:56:04  5    laborers because the harvest is over, so they want them to go

6    home?

7    A    Yes, and there are multiple scenarios:  end of harvesttime;

8    an economic crisis; if a farm employer feels that a worker is

9    being intransigent; if workers try to initiate a labor action,

11:56:25 10    you know, form some kind of union, decide to go on some kind of

11    strike; or, frankly, if the farmer decided they just didn't like

12    the worker or workers, they would pick up the phone and call the

13    INS.

14    Q    Okay.  So there may be an aspect of specific deterrence,

11:56:43 15    that perhaps a farmer wanted to specifically deter a given

16    worker from returning.  Is that kind of a fair sum-up of those

17    last couple of comments?

18    A    Yes.

19    Q    So going back to the harvest, I mean, there's a harvest

11:56:59 20    every year, right, hopefully?

21    A    You know, I don't know enough about farming.  I think there

22    can actually be multiple harvests in a single year, and it

23    actually depends on the crop and . . .   But you know what?  I

24    should stop myself, because I really -- I don't know enough

11:57:22 25    about agriculture.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

93

1    Q    Fair enough.  I don't either.

2         But a farmer would anticipate having a future harvest or

3    harvests, right, down the road?

4    A    Yes.

11:57:39   5    Q    And then would need that laborer to come back for such

6    future harvests or harvest; right?

7    A    Yes.

8    Q    So that's what I'm struggling with, because I don't see --

9    from taking, you know, what you've testified to, I understand

11:57:57   10   how they may have a motive to have folks removed at the end of

11   harvest, but I struggle to see how it benefits the farmers to

12   then deter workers from coming back when they're gonna have a

13   harvest next year and the year after that.  And so, I guess, is

14   there any more insight you can provide as to how -- why farmers

11:58:16   15   benefited and supported deterrent measures from returning?

16   A    So farmers would support deterrent measures, again, in

17   economic downturns when they actually might have to cease having

18   a harvest with respect to their crop or crops.

19   Q    So perhaps -- okay.  I'll move on.

11:58:45   20        I'll move on directly to the 1952 McCarran-Walter Act.  So

21   you wrote about this a little bit.  Is it fair to say that this

22   act is being motivated by a number of political concerns?

23   A    Yes.

24   Q    And with one being maybe the foreign policy, circumstances

11:59:07   25   of the Cold War?

1    A    Yes.

2    Q    And another being perhaps labor pressures from labor unions

3    and that kind of thing?

4    A    Yes.

11:59:23    5    Q    So, again, a number of, a number of motivating or

6    influencing factors behind the 1952 INA?

7    A    Yes, and I think -- yes.

8    Q    Okay.  So as we discussed, is it fair to say the 1952 INA

9    has a substantially large number of provisions of which Section

11:59:50    10    1326 is only one; right?

11    A    Yes.  That's correct.

12    Q    I want to talk a little bit about how the newly codified

13    Section 1326 differs from its predecessors.  So you testified,

14    you discussed with Mr. Goddard that a new, quote/unquote, "found

12:00:09    15    in" clause was added; is that right?

16    A    Yes.

17    Q    And so this made it, essentially, a crime to be -- where a

18    crime to have reentered the United States, it was prosecutable

19    wherever that individual was found within the United States;

12:00:27    20    right?

21    A    Yes.

22    Q    As opposed to before, where the government would have to

23    ascertain the exact district or state where that individual had

24    reentered the United States?

12:00:38    25    A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

95

1   Q    And so is it not fair to say that this is a quite expansive

2   broadening of the criminal prohibition that was previously

3   enacted in the 1929 act?

4   A    So I'm not a legal -- I'm not -- without knowing the exact

12:01:14   5   numbers of persons who were prosecuted under 1326 pre- and

6   post-1952, I can't answer definitively.

7   Q    But it certainly adds an entire new charging mechanism to

8   the criminalization of unlawful reentry; right?

9   A    Yes.  In theory, you would think that it would broaden the

12:01:44   10   ability of the INS to apprehend undocumented immigrants.

11   Q    Well, let's take, for example, a pretty immediate example.

12   Mr. Munoz-De La O's case is charged as a "found in" case.  Is it

13   not true that his case would not exist in this district under

14   the 1929 act?

12:02:08   15   A    Yes.

16   Q    In fact, is it not true that except for perhaps rare

17   circumstances where people enter across the Canadian border

18   between the Cascades and North Idaho, this district would see

19   almost no 1326 cases, almost no unlawful reentry cases under the

12:02:31   20   1929 act?

21   A    Yes.

22   Q    And so it's really only following the 1952 act and the

23   creation of Section 1326 that this prosecution even became

24   possible?

12:02:51   25   A    Yes.

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1  Q    You also mentioned that the change or the language adopted

2  in 1952 dropped a lawfulness requirement from the burden of

3  proof on the government?

4  A    Yes.

12:03:09  5  Q    Okay.  So another change from what had previously existed

6  under the 1929 act; right?

7  A    Yes.

8  Q    And is it not also true that Section 1326 kind of melds

9  together a number of other prohibitions, such as statutes that

12:03:27  10  had specifically criminalized the reentry of folks removed as

11  anarchists or prostitutes?

12  A    Yes.

13  Q    So it's sort of a melding, a combining what had previously

14  been disparate statutes into one?

12:03:43  15  A    Yes.

16  Q    You talked about some of the government's motives in 1952

17  for creating, say, the "found in" clause.  Is it not a valid

18  government interest to preserve public moneys?

19  A    Yes.

12:04:06  20  Q    And so the motive, as I think you testified to, of the INS

21  to preserve money that was unnecessarily being spent

22  transporting people back to the districts that they reentered

23  in, is that not a valid governmental concern?

24  A    Yes.

12:04:27  25  Q    And is it not also a governmental concern to simply make

1  criminal laws practically enforceable?

2  A    Yes, so long as they don't perpetuate forms of racial

3  discrimination or serve as a pretext for racial discrimination.

4  And the "found in" clause was very much a function of this

12:05:03  5  widespread anti-Latino animus.

6  Q    Well, is it not fair that -- I think you wrote -- that the

7  INS was concerned because under the 1929 act, the government

8  somehow had to prove where the exact district that a person had

9  reentered the United States in with regards to --

12:05:29  10  A    Yes.

11  Q    And is it fair to say they thought that was pretty hard to

12  do?

13  A    Yes.

14  Q    And, in fact, would it be fair to say that, in your

12:05:45  15  opinion, that might be a little difficult to prove given that

16  there won't be any documentation or anything like that?

17  A    It would be fair to say that it was difficult to prove, but

18  it would also be fair to say that the INS and the Border Patrol

19  in this period had a reputation for being racially

12:06:14  20  discriminatory and for inflicting various forms of racial

21  violence against the Latino population in the southwest.  And

22  this is something that's been written about by Kelly Lytle

23  Hernandez and then also another MacArthur genius fellow named

24  Monica Munoz Martinez.

12:06:36  25         And so what happens in the twenties, thirties, forties, and

1    beyond is that the Border Patrol and the INS are populated by

2    former members of the Clan and also former members of the Texas

3    Rangers who had participated in the lynching of Mexican

4    Americans and Mexican immigrants in Texas.

12:06:56    5         And so the Border Patrol and the INS in the southwest at

6    this time was infected with pervasive anti-Latino animus.  And

7    oftentimes that animus, if it wasn't articulated in actual

8    physical violence and egregious forms of physical violence

9    inflicted upon Mexican immigrants, it was also articulated in

12:07:22    10   the efforts, and the very aggressive efforts, of the Border

11   Patrol and the INS to rewrite this nation's immigration laws,

12   whether it be through the creation of a 100-mile zone or through

13   the addition of a "found in" clause.

14        The reason that the Border Patrol and the INS tried as much

12:07:44    15   as possible and as aggressively as possible to expand their

16   legal powers is because of the widespread anti-Mexican animus

17   within that institution.

18   Q    But could it not also be said that the government simply

19   has an interest in taking laws that don't work in practice and

12:08:07    20   making them functional --

21   A    But that has to be balanced against the government's

22   interests in not drafting statutes and writing laws that

23   perpetuate racial discrimination and racial violence, and that

24   balancing, that balancing did not occur in this period.

12:08:28    25        THE COURT:  And you just need to let Mr. Ellis finish

1    the question before you answer.

2           THE WITNESS:  Okay.  I'm sorry.  I'm very sorry.

3           THE COURT:  Go ahead.

4           MR. ELLIS:  No.  That's okay.  I'll just ask the same

5    question again.

6    Q    (By Mr. Ellis)  Is it a legitimate government interest to,

7    when you have a statute that doesn't work in practice, change it

8    so that it can function as it's supposed to?

9    A    So here, I think that this whole idea of having a statute

10   work in practice, this is also something that really needs to be

11   contextualized, and, again, contextualized in light of events in

12   the 1920s, thirties, forties, and beyond; and contextualized

13   with respect to the ways in which the Border Patrol and the INS

14   operated in the southwestern borderlands, because this is an

15   agency that had a very different view of what it meant for a

16   statute to work or not work.

17          It's right -- this agency's metrics for deciding whether or

18   not a statute worked or didn't work would have been different

19   from the metrics that might have been implemented by the -- that

20   might have been applied by the US Forest Service, so that it

21   really -- that's a claim that really has to be put in context.

22          And based on my own research into the INS and the Border

23   Patrol, they were largely unsatisfied with most of the statutes

24   that they were given, because most of the statutes that governed

25   them and that were drafted by Congress never gave them enough

1    power.  The history of the Border Patrol and the INS is the

2    history of an agency that is constantly seeking more power, more

3    statutory authority, right, more funds, more manpower.

4        And what's important and interesting -- interesting and

12:10:44    5    stunning about the history of the INS and the Border Patrol with

6    respect to the immigration statutes is they've pushed for

7    expansions of their statutory authority even when that authority

8    in other contexts would be violative of the Constitution.

9        THE COURT:  Dr. Kang, would you mind answering the

12:11:06    10    question Mr. Ellis asked as to whether it would be a legitimate

11    government interest to, in fact, alter a statute so it could be

12    enforced.  I believe that was the question, Mr. Ellis, if I've

13    got that right.  Go ahead.

14        MR. ELLIS:  Yes, Your Honor.  And I think I can actually

12:11:25    15    get there through a hypothetical outside the immigration context

16    which might get us to where we need to go.

17    Q    (By Mr. Ellis)  And so, Professor Kang, just -- Congress

18    wants to pass a statute prohibiting convicted felons from

19    possessing guns.  Someone messes up at the computer, and they

12:11:40    20    pass a statute saying convicted felons cannot possess gum, with

21    an "m."  That statute does not serve the purpose Congress

22    intended.  That statute is not useful.  Is it a legitimate

23    purpose for Congress to go back and fix that statute so that it

24    can do what it was intended to do?

12:11:59    25    A    In that specific example, yes.

1    Q    Okay.  I'll move on.

2         So you wrote in your affidavit -- and you discussed this

3    with Mr. Goddard as well -- that Congress remained largely

4    silent with respect to the recodification of the criminal entry

12:12:22    5    and reentry provisions of the immigration laws in the 1952 act;

6    right?

7    A    Yes.

8    Q    And based on your review of the legislative history, the

9    hearings, the debates, all that, do you agree that that is an --

12:12:37    10    what you wrote is an accurate reflection of the congressional

11    debates concerning Section 1326 in 1952?

12    A    Yes.

13    Q    Okay.  And then you concluded that Congress -- that in your

14    opinion, based on your research and all that, that Congress was

12:12:56    15    motivated by racial animus largely based on the historical

16    context when enacting Section 1326 in 1952?

17    A    Yes.

18    Q    And you were able to reach that conclusion despite the lack

19    of direct statements from congressmen when debating the 1952 INA

12:13:20    20    concerning the codification of Section 1326; right?

21    A    Yes.

22    Q    Okay.  And then you were able to quantify your level of

23    certainty; is that right?

24    A    Yes.

12:13:33    25    Q    And I think you went for high 90s?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

102

1    A    Yes.

2    Q    Is that scientific?

3    A    Yes.

4    Q    How?

12:13:56  5    A    It's scientific in the sense that I feel that the evidence

6    is overwhelming that Congress is motivated by anti-Latino racial

7    animus in passing this iteration of 1326.

8    Q    Okay.  So more of a -- so less scientific, more of a

9    feeling?

12:14:22  10    A    I wouldn't say -- it's not a feeling.  It's based on

11    evidence.

12    Q    Okay.  So what would get you to 100 on this scale?

13    A    You know, I'm not, I'm not certain.  And, again, it's --

14    yeah, I'm not certain what it, what it would be.  It's hard to

12:15:19  15    envision what exactly it would be, what specific piece of

16    evidence or pieces of evidence.

17    Q    Okay.  And is this -- is that kind of, the idea of

18    quantifying the level of certainty, is that a common practice

19    among academic historians?

12:15:40  20    A    You know, it's not a common practice among academic

21    historians.  But, again, when we prepare our journal articles,

22    our monographs, and our books, we hold ourselves to the highest

23    standards of evidence.

24    Q    Okay.  So just to take another historical example down this

12:16:07  25    vein, I assume just as part of, you know, your general history,

1    education, that you had to take classes and courses, do

2    coursework that concerned areas of history outside United States

3    immigration policy; right?

4    A    Yes.

12:16:25    5    Q    So to the extent you know, what is a historian's general

6    feeling for the idea that the Roman Emperor Nero played the

7    fiddle while Rome burned?

8    A    I do not know.

9    Q    Well, is it fair to say that such things like that might be

12:16:46    10    tainted by bias or limited evidence that survives over the 2,000

11    years since that supposed event?

12    A    Yes.

13    Q    So things like limited evidence might color how historians

14    view what certain folks say happened in the past?

12:17:04    15    A    Yes.  That's correct.

16    Q    And bias such as -- I mean, that story comes from the Roman

17    writer Suetonius, who may well have been biased, may well also

18    taint whether or not what's been reported as happening actually

19    happened; right?

12:17:24    20    A    Yes, but bias doesn't mean that an account is patently

21    wrong and that it ought to be discarded altogether.

22    Q    Oh, true, but I think the gist of that one is that I don't

23    think -- not many people contest that Rome burned down.  I think

24    it's just to do with Emperor Nero's attitude and his demeanor

12:17:47    25    while that event occurred, right, and that's what's in question.

1    A    Yes, but even that account provides some form of evidence.

2    Q    And so -- I'd just like to sum up.  So you describe your

3    certainty as overwhelming that --

4    A    Yeah.

12:18:06    5    Q    -- in 1952, Section 1326 was motivated by racial bias?

6    A    Yes.

7    Q    And that's in spite of the lack of statements --

8    A    Yeah.

9    Q    -- and the lack of debate?

12:18:16    10    A    Because what I do is -- again, when you consider the larger

11    historical context, the statements of these legislators on the

12    Florida House and the Senate; when you consider that the

13    opponents to the McCarran-Walter Act even admitted that the

14    racism was so pervasive that they weren't gonna challenge the

12:18:45    15    national origins quota system; and, you know, when you consider

16    that -- when you envision the counterfactual, which is, you

17    know, what if somebody had proposed dismantling 1326, it's just

18    not conceivable in that time period, and that's because of the

19    racism.  There would have been an absolute uproar if someone had

12:19:14    20    proposed dismantling or revising 1326.  It just would not have

21    been feasible.

22    Q    Well, I get that, but isn't it also true there's no

23    statements in support either?  There's nothing.

24    A    So the lack of controversy, again, indicates this general

12:19:32    25    consensus for 1326.

Q    Okay.  So finishing up on 1952, you also write that

(reading):  In 1952, Washington lawmakers consciously chose not

to erase the animus -- or the racial animus -- sorry -- from the

nation's immigration laws, including 1326.

12:19:55     Right?

A    Yes.

Q    So to your knowledge, how many lawmakers remained in

Congress in 1952 who were present as elected representatives in

1929?

12:20:10    A    That I am not certain of, but one thing that historians do

know is that one of the reasons that the national origins quota

system -- which originated in 1924 -- had such longevity is that

nativists and xenophobic members of Congress, who had been in

the House in 1924, often were in Congress for many, many years.

12:20:39    And then, again, those members of Congress who had supported the

national origins quota system in '52 remained in Congress well

into the sixties and played a role in sharply opposing the

dismantling of the quota system in '65.

So that the longevity of xenophobia in American immigration

12:21:05    law is very much a function of the structural features of

Congress and that you have, you continue to have these

legislators in Congress over the long durée, and sometimes in

these very powerful positions such as the chair of the House and

Senate judiciary committees as well as the House and Senate

12:21:25    immigration subcommittees.

1    Q    Is there any -- in reviewing the records, in reviewing the

2    hearings, the debates, all that, did you find any evidence that

3    lawmakers in 1952 reviewed the *Congressional Record* from 1929?

4    A    No.

12:21:44    5    Q    Or any hearings, any eugenicists who were invited to

6    Congress, any of that?

7    A    So with respect to 1952 . . .

8         Well, I can't answer definitively as to whether or not

9    eugenicists were invited.  The best places --

12:22:20    10    Q    I'll --

11    A    Yeah.

12    Q    Sorry.  I'll rephrase it.

13         The question is:  Generally, are you aware of any evidence

14    that legislators in 1952 reviewed anything -- from the testimony

12:22:30    15    to the debates to statements from other legislators -- anything

16    from 1929 when the 1929 act was passed?

17    A    To the best of my knowledge, no.

18    Q    Okay.  And so just circling back just a little bit, so is

19    it fair to say that a large part of the 1952 INA, a topic you've

12:23:02    20    discussed a couple of times, was revising the entry quota

21    system?

22    A    Yes.

23    Q    So aside from just both being parts of immigration law, how

24    is the entry quota system related to the criminalization of

12:23:18    25    reentry into the United States after you've been deported?

1   A    So are you referring to the national origins quota system?

2   Q    Yes.

3   A    So the national origins quota system is related to 1326

4   insofar as it left -- insofar as it did not place a numerical

12:23:45   5   quota on Western Hemisphere immigration and, in turn,

6   facilitated the easy entry of Mexican workers at the behest of

7   southwestern agricultural labor.

8   Q    But in general, is it fair to say that the quota system --

9   so say there's -- say the quota system allows for 2,000 English

12:24:09   10   people to come into the United States a year.  Those would be

11   legal entries, right, those 2,000?  They'd give them visas;

12   right?

13   A    Yes.

14   Q    And so the quota system deals with legal entries while

12:24:24   15   Section 1326 deals with unlawful entries; right?

16   A    Yes.

17   Q    And undocumented entries as opposed to entries with visas

18   and other documentation; right?

19   A    Yes.

12:24:38   20   Q    Okay.  So I'll move on.

21        And, Your Honor, it's been about 55 minutes.  I'm jumping

22   now into the eighties and nineties.  I don't know if this might

23   be a good time for a break?

24        THE COURT:  Okay.  I think that makes some sense.  So

12:25:03   25   does everyone -- and I'm just going to ask the interpreters

1    first.  I'm gonna ask Ms. Rivera.  Can you manage with a

2    15-minute break or do you need a half-hour break?

3            INTERPRETER RIVERA:  The interpreter is speaking.  The

4    interpreter asks for a brief moment to consult with her

12:25:26   5    colleague.  One moment, please, Your Honor.

6            THE COURT:  Okay.

7        (Pause in proceedings)

8            INTERPRETER RIVERA:  Interpreter Rivera speaking.  Thank

9    you, Your Honor.

12:26:00   10           Interpreter Rivera has consulted with her colleague, and

11   a 15-minute break would be sufficient for both interpreters.

12   Thank you.

13           THE COURT:  Okay.  And I just need to check with the

14   court reporter too.  Does the court reporter think 15 minutes

12:26:14   15   will work or do you need longer?

16       (Court reporter replied)

17           THE COURT:  Okay.  So since I've taken so long to ask

18   these questions, we'll resume at 12:45.

19           Court is in recess.

12:26:46   20   (Recess taken:  12:26 pm to 12:44)

21           THE COURT:  I think we have everyone.  So, Mr. Ellis,

22   please continue.

23           MR. ELLIS:  Thank you, Your Honor.

24   Q   (By Mr. Ellis)  Dr. Kang, as I mentioned before the break,

12:45:03   25   I'm going to jump to the later amendments in the eighties and

1    nineties, and I just have a couple of questions about, really

2    about each amendment and the process that went behind it.

3         So starting with the Anti-Drug Abuse Act of 1988, if I

4    remember your affidavit correctly, is it fair to say that then

12:45:22    5    Senator Chiles wrote, I think, five different kind of major

6    bills that were ultimately folded into the Anti-Drug Abuse Act

7    of '88?  Is that fair to say?

8    A    Yes.

9    Q    Of which one was the amendment to Section 1326 increasing

12:45:39    10   the penalties?

11   A    Yes.

12   Q    Okay.  I want to ask you about a couple of the other ones.

13   So I believe one such change, though, is made in the Anti-Drug

14   Abuse Act of '88, was a mandatory detention in immigration

12:45:58    15   proceedings for aggravated felons; is that right?

16   A    Yes.

17   Q    Okay.  So --

18        INTERPRETER RIVERA:  And the interpreter is speaking.

19        Mr. Ellis, would you please repeat that question a

12:46:10    20   little bit more slowly, please.  Thank you.

21        MR. ELLIS:  Sure.  And my apologies.

22   Q    (By Mr. Ellis)  So the question was:  Was one of those

23   provisions mandating detention in immigration proceedings for

24   aggravated felons?

12:46:26    25   A    Yes.

1  Q    Okay.  So persons are not born with aggravated felony

2  convictions; right?

3  A    That's correct.

4  Q    You know, having -- you have to do something when you're

12:46:43  5  here.  You know, you have to be convicted of murder or drug

6  trafficking or child abuse or something, right, to merit being

7  an aggravated felon; right?

8  A    Yes.

9  Q    So I guess I'm wondering, how -- so if you have the overall

12:47:01  10  subset of aliens, and then you assume that a smaller, much

11  smaller subset of that overall group are aliens with aggravated

12  felonies, I guess, how is it racist to enact a policy that is

13  more punitive, or whatever word you want to use, against folks

14  who do have those aggravated felony convictions?

12:47:27  15  A    So, again, based on the research that I conducted into

16  Senator Chiles and his own motivations for trying to amend the

17  nation's immigration laws and Section 1326, he was motivated by

18  his own racial antipathies toward Cuban and Haitian refugees,

19  and he was also responding to the deeply xenophobic sentiments

12:48:02  20  of his Florida constituents.

21  Q    And I get that, and you talk in your affidavit about, you

22  know, the terms like criminal aliens that were being thrown

23  around at the time, but this provision literally deals with

24  aliens who are criminals.  And so I just struggle to see how,

12:48:19  25  when you're literally dealing with aliens who are criminals, you

1    drift into the potentially not great language of criminal

2    aliens?

3    A    Yes.  So I think that when it comes to this measure, it's

4    very important to take into account the many critiques that were

12:48:40  5    issued at the time.  And one such powerful critique was issued

6    by Wade Henderson, an attorney for the ACLU, and he really asked

7    many probing questions of Senator Chiles's amendment and really

8    questioned whether there was anything there to Chiles's attempts

9    to characterize immigrants as felons, right, as criminals.

12:49:15  10    And, you know, Henderson also finds that the data that had

11    been used to bolster such claims and to fashion such legislation

12    really didn't bear out the idea that immigrants and refugees

13    were criminals and merited the kinds of punishments that Chiles

14    was proposing in these bills.

12:49:42  15    Q    And I get that, but, again, this provision isn't dealing

16    with some hypothetical persona of the criminal alien in the

17    community.  It is literally dealing with an alien who is a

18    criminal.  It does not impact in any way an alien who does not

19    have an aggravated felony conviction.

12:50:03  20    And so I struggle to see how this provision is influenced

21    by a negative and perhaps false persona of a criminal alien when

22    it targets, literally, aliens who are criminals and no one else.

23    So I guess -- I don't know if you have anything else to add, but

24    I just am -- I just don't really see the link.

12:50:26  25    A    I think we really need to bring a healthy skepticism to

1  measures that Chiles was proposing in this period.  So, you

2  know, first, I referenced Wade Henderson's critique; but I think

3  we also have to keep in mind that, you know, Chiles wasn't -- we

4  have to ask ourselves, you know, Chiles wasn't necessarily

12:50:48  5  thinking about actual crime.  He was also thinking about his own

6  reelection, and he knew that in order to get reelected, he had

7  to pander to the xenophobic sentiments of his Florida

8  constituents, right, and hence draft these kinds of measures.

9  Q    But, again, I mean, can't this kind of provision be easily

12:51:13  10  justified as a public safety analysis?  I mean, again, you're

11  not -- a person isn't born an aggravated felon.  You have to do

12  something first to get there.  Is it not -- is public safety not

13  a potentially valid reason justifying this kind of provision?

14  A    Yeah, public, public safety is a valid concern, but it also

12:51:35  15  has to be balanced against the concerns of the community to not

16  be racially discriminated against, and also balanced against the

17  concerns of the community to have laws that are proposed on the

18  basis of solid empirical evidence.  And that's -- it's not clear

19  to me that those two, those two sort of balancing tests were met

12:52:03  20  in this case.

21  Q    And so I think if the provision Chiles had proposed had

22  been mandatory detention for all aliens, then I think I could

23  follow your reasoning, but I guess I just don't because it's

24  mandatory detention for aggravated felons.  It's a subset.

12:52:25  25       And so I'll move on to another provision of Chiles's, the

1  criminal penalties for persons who assist aliens with drug

2  trafficking convictions from reentering the United States.  So,

3  again, is it not fair to say that we're not dealing with all

4  aliens here?  We're dealing with a specific subset --

12:52:46  5  A    Yeah.

6  Q    -- who have done something that, essentially, moves them

7  into another class, here, those with drug trafficking

8  convictions?

9  A    Yeah.  So the broader legislative history of that provision

12:53:02  10  is that Chiles, as well as other legislators, were extremely

11  upset about the way in which the so-called Mariel Cuban refugees

12  arrived in the United States, and oftentimes they were able to

13  make it to America's shores with the assistance of relatives.

14  Some of them chartered boats and sailed them to Cuba to pick up

12:53:29  15  their relatives in Cuba.  Some of them may have been in Cuba and

16  had sailing vessels there and sailed them to the United States.

17      So that provision was directed to those family members who

18  were trying to offer humanitarian assistance to their relatives.

19  And the interpretation, the standard interpretation is that

12:53:51  20  these efforts to penalize these humanitarian family members was

21  a function of racial animus.

22  Q    But, again, I mean, this provision would only impact

23  someone who -- and I haven't read the exact language, but I

24  would assume knowingly, they would probably have to know that

12:54:12  25  the person they were helping had a drug trafficking conviction,

1    and it only impacts that very small group.  Is it not fair to

2    say that it only impacts a very small subset of folks who may

3    have been coming from Cuba or Haiti or other places?

4    A    And, again, I think that, yes, it might be fair to say that

12:54:43   5    it impacts a small group of people, but then you would also have

6    to take into account, in assessing the value or worth of this

7    legislation, is that impact disparate in any way; right?  Is it

8    targeting certain individuals of a particular race or

9    nationality to a greater extent than others?

12:55:07   10    Q    Well, isn't it fair to say it's targeting folks with drug

11    trafficking convictions?  I mean, that's what it does; right?

12    That's the only people it impacts?

13    A    So yes, it's fair to say that.

14    Q    Okay.  So, again, as with many of these other statutes, you

12:55:30   15    know, this Anti-Drug Abuse Act was passed overwhelmingly.  I

16    think you wrote and testified that it was 346 to 11, I'm

17    assuming in the House?

18    A    Uh-huh.

19    Q    So we heard, obviously, about Senator Chiles.  We heard

12:55:45   20    about -- can you tell us about any other, any other statements,

21    debates, hearings, anything where a congressman or woman who

22    subsequently voted for this bill gave an opinion on increasing

23    the penalties for Section 1326?

24    A    Not at this time, no.

12:56:08   25    Q    Thank you.

1    So I'm gonna move now to the Immigration Act of 1990, the

2    next one in our series of amendments.  And so, again, similar,

3    you wrote here that -- and correct me if I'm wrong -- but the

4    legislative history of the 1990 amendment of Section 1326 was

12:56:29  5    very thin; right?

6    A    Yes.

7    Q    And because -- and then the section in the affidavit kind

8    of then veered off, talking about Senator Graham.  I'm assuming

9    "very thin" means not really anything; again, no debates, no

12:56:44  10   hearings, no nothing?

11   A    That's correct.

12   Q    Okay.  And then moving to the Violent Crime Control and Law

13   Enforcement Act of 1994, again, in a similar vein, I think you

14   wrote that during the floor debates, Congress said very little

12:57:04  15   regarding the proposed changes to Section 1326; right?

16   A    Yes.

17   Q    And, again, in a similar vein, I'm assuming "very little"

18   means nothing, because nothing was --

19   A    No.

12:57:13  20   Q    -- mentioned as to quotes or anything like that?

21   A    So we're talking about the Clinton crime bill?

22   Q    Yes.

23   A    So it's definitely not nothing.  There are discussions of

24   1326 in those debates.

12:57:35  25   Q    Okay.  And is that from Representative McCollum or others

1  or who?  Who was a proponent -- who was expressing views in a

2  positive manner towards these changes to Section 1326?

3  A    So what happens in '94 is McCollum proposes his version of

4  1326 that ultimately gets folded into the Clinton crime bill.

12:58:04  5      But at the same time, you have Senator Harry Reid proposing

6  his own version of 1326 and making that now widely publicized

7  speech about how he believed that -- and here I'm paraphrasing --

8  that no sane country would grant birthright citizenship to

9  children born in the United States to undocumented parents.

12:58:36  10     And then at the same time, during a congressional committee

11  hearing, Chris Sale, who I believe was the head of the INS at

12  the time, endorsed 1326.

13  Q    I think I do remember that.  I think you wrote that the INS

14  director was perhaps the sole witness to discuss 1326.

12:59:03  15     But, again, relatively uncontroversial, and the bills

16  passed with relatively broad support.  Is that fair to say?

17  A    Yes.

18  Q    So, again, the AEDPA, the Antiterrorism and Effective Death

19  Penalty Act of '96, again, similarly you wrote that no

12:59:26  20  congressmen challenged the additions to Section 1326; right?

21  A    That's correct.

22  Q    And, again, the overall statute passed with broad

23  bipartisan support?

24  A    Yeah.  And I should go back to the Clinton crime bill.

12:59:39  25  That bill didn't pass with bipartisan support.  That was really

1  heavy -- it was principally the Democrats who voted for that

2  crime bill.

3  Q    Thank you for clarifying.

4        And then finally, the last one, the Illegal Immigration

12:59:58  5  Reform and Immigrant Responsibility Act of '96, IIRIRA, and,

6  again, similarly, is it fair that you wrote that the change to

7  Section 1326 stirred no debate in Congress?

8  A    That's correct.

9  Q    And, again, you know, relatively strong support for the

01:00:19  10  bill overall?

11  A    Yes.

12  Q    So you sum up after the discussion of IIRIRA by writing

13  that between 1996 and 2013, immigration prosecutions primarily

14  under Sections 1325 and 1326 increased by a factor of 10; is

01:00:39  15  that right?

16  A    I believe so.

17  Q    And then I think you also wrote that this increase was a

18  result of IIRIRA as well as Operation Streamline?

19  A    Yes.  That's based on a study that I was -- I believe was

01:00:59  20  produced by TRAC, but I would have to double-check that.

21  Q    Okay.  I'm just wondering about the causation.

22  A    Okay.

23  Q    Is it fair -- like, my understanding of the changes to 1326

24  in IIRIRA is that they added 1326(b)(4); right?

01:01:23  25  A    Yes, and I would need to look at the code to refresh my

118

1    memory on (b)(4).

2    Q    I think long story short, it increases the statutory

3    maximum penalty to 10 years for persons convicted of nonviolent

4    offenses while on probation, supervised release, or parole with

01:01:46  5    reentry of the United States.  Is that a fair summation of that

6    legislative change?

7    A    Okay.  Yes.

8    Q    How did that spur a tenfold increase in prosecutions?

9    A    So while I can't speak to that specific provision, there's

01:02:09  10    a consensus among immigration scholars that immigration

11    legislation from nineteen -- at least 1988 onwards, 1988, 1990,

12    1994, the measure's passed in '96, and then '96/'97.  The

13    enforcement provisions of these immigration laws all contributed

14    to a situation that we have now in which we have an

01:02:39  15    unprecedented number of detentions and deportations.

16    Q    Okay.  But, I mean, it isn't -- this is a criminal statute;

17    right?  It doesn't directly have anything to do with folks then

18    being removed from the United States; right?

19    A    Yes.  Yes, and so it's also argued, again -- and this is

01:03:02  20    the prevailing view among immigration scholars -- that the

21    criminalization of immigration under these laws, again '88, '90,

22    '94, '96, and IIRIRA of '96, contributed to the situation where

23    1325 and 1326 cases constitute the bulk of the workloads in the

24    offices of Federal Defenders around the country.

01:03:36  25    Q    Okay.  And I guess I just wonder, because increasing the

1   statutory maximum penalty for something doesn't on its face

2   directly correlate with increased prosecutions; right?  There's

3   no direct spatial link between those two concepts; right?

4   A    So I can only make an assumption that that's correct, but

01:04:05   5   my world is not the world of the court, so I don't claim to be

6   an expert on the number of actual prosecutions that have

7   occurred as a result of the various provisions of 1326.  But, if

8   necessary, I would be happy to provide those to you afterwards.

9   Q    I think that's okay.  I'll move on.

01:04:34   10       So generally, you know, these amendments in the eighties

11   and nineties -- with some exceptions, but is it fair to say they

12   generally increase the maximum penalties for certain persons

13   convicted under Section 1326?

14   A    Yes.

01:04:50   15   Q    For example, the VCCLEA increased the maximum statutory

16   penalty for persons with aggravated felony convictions; right?

17   A    Yes.

18   Q    And so, again, going back to what we were talking about

19   before, I mean, that is targeting persons with certain

01:05:12   20   convictions; right?  It's not targeting everyone?

21   A    Yes.

22   Q    And, you know, if there's a big circle of everyone who is

23   an alien, there's gonna be a smaller circle of those persons who

24   qualify for that increased maximum penalty; right?

01:05:30   25   A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

120

1   Q    Okay.  So Congress has generally -- and also it increased

2   the penalty for persons with non-aggravated felony convictions;

3   right?  That's another one?

4   A    Yes.

01:05:47   5   Q    So these provisions, is it not fair to say, are just

6   increasing the penalties for persons who have done, say, either

7   serious or very serious criminal acts while present in the

8   United States?

9   A    Yes, it is fair to say that.

01:06:10   10   Q    And could that not be a public safety concern that persons

11   should be treated perhaps more punitively if they have done more

12   serious things while present in the United States?

13   A    Yes.  It is -- you know, public safety is a legitimate

14   concern, but I think that, you know, one of the questions at

01:06:40   15   issue here is that these punishments, which may be legitimate,

16   deserve a heightened level of what lawyers call scrutiny.  And

17   this is because these are penalties under the criminal law, and

18   that's made explicit in 1326.

19   Q    But being an alien when you're charged under Section 1326,

01:07:17   20   the fact that if the person is an alien has nothing to do with

21   whether their maximum penalty is 2 years or 20 years; right?

22   It's solely a function of their criminal history; right?

23   A    I would think so, but I am not certain.

24   Q    Okay.  So moving on, so as part of, kind of, a wrap-up,

01:07:47   25   conclusion -- and you talked about this with Mr. Goddard as

1  well -- you wrote that during the 1988, 1990, 1994, and 1996

2  legislative debates, lawmakers made no effort to acknowledge

3  and/or amend the racial animus that informed earlier iterations

4  of this provision in Title 8; right?

01:08:09  5  A    Yes.

6  Q    And I think you testified to something very similar with

7  Mr. Goddard.

8        So I'm gonna ask you some questions that are similar to

9  some I asked about 1952.  I'm assuming the answer to this one is

01:08:22  10  "No," but are you aware of any members of Congress who were

11  still in Congress in the eighties and nineties who were in

12  Congress in 1929?

13  A    No.

14  Q    And the same question for 1952.  Are you aware of any

01:08:36  15  members of Congress who were in Congress in 1952 who were still

16  in Congress in the eighties and nineties?

17  A    No.

18  Q    And have you in your review of the legislative history of

19  those various bills from the eighties and nineties, do you see

01:08:54  20  any evidence that congressmen or women in the eighties and

21  nineties reviewed the hearings, the records, anything, the

22  debates, from either 1929 or 1952?

23  A    No.

24  Q    So just to summarize it a little bit, is it fair to say

01:09:15  25  that with these bills 1952 through the eighties and nineties,

1    Section 1326 and then its subsequent amendments spurred little

2    to zero debate as part of the overall debates concerning those

3    measures?

4    A    I would say yes, little debate.

01:09:38    5    Q    And you discussed when going through your background that,

6    you know, part of determining legislative history is you

7    extensively review and read, you know, records, reports,

8    hearings transcripts, you know, everything -- anything and

9    everything that went into the *Congressional Record*, and debates,

01:09:56    10    when they were considering these statutes; right?

11    A    Yes.

12    Q    And, in fact, here you physically went to the *Congressional*

13    *Record* to review such items?

14    A    Yes.

01:10:08    15    Q    And when you started out, I think you testified that you

16    really weren't thinking you were gonna find very much?

17    A    That's correct.

18    Q    Isn't that true concerning Section 1326 specifically?  If

19    there was little to no debate, if there was not much said about

01:10:27    20    it, is it not true that you didn't find very much?

21    A    No, because the *Congressional Record*, the legislative

22    history, and the broader historical context make it very clear

23    that racial animus was pervasive in the recodification and the

24    amendments to 1326.

01:10:57    25         And what's even more striking is that there is no way that

1    anyone could have or would have dared to have raised a challenge

2    to 1326 in these periods of US history, because it would have

3    been political suicide.  In the 1980s and '90s these

4    congresspersons would have lost reelection if they made any

01:11:26    5    attempt to expunge the racial animus from 1326 or dilute it in

6    any way.  It was in their best political interest, to put it

7    colloquially, to get on the xenophobia bandwagon and propose and

8    support anti-immigration measures in this period.

9    Q    So is it not fair to say that your opinions are really more

01:11:51    10   about the overall bills than Section 1326?  Like, take the 1952

11   INA.  You have nothing specific about 1326, but you say it's

12   overwhelmingly animated by racial animosity.  Isn't that

13   conclusion really about the entire 1952 INA?

14   A    But those conclusions about the larger bill form an

01:12:18    15   essential part of the historical context that are important to

16   understanding the legislative intent underlying 1326, especially

17   since so many components of those bills pertain to the issue of

18   immigration law enforcement, and that, and that is related to

19   1326.

01:12:41    20   Q    And so is the same true for -- you know, 1326 is not

21   specifically discussed in the variety of bills in the eighties

22   and nineties.  So is it not fair to say that your opinion that

23   it was motivated by racial animosity is really an opinion that

24   the immigration provisions in, say, the AEDPA were motivated by

01:13:01    25   racial animosity?  Is that not a fair, kind of, jump to make

1    given your testimony?

2    A    You know, I'm sorry.  I missed some of that.  Could you

3    repeat that?  I'm sorry.

4    Q    So -- right.  So take AEDPA; right?

01:13:14    5    A    Yes.

6    Q    AEDPA makes a change to Section 1326 of which there are no

7    statements, there are no anything from legislators specific to

8    that, but you have statements that you've talked about

9    concerning general immigration policy in the AEDPA.

01:13:29    10    So is not your opinion that 1326, as amended in AEDPA, was

11    motivated by racial animus, really an opinion that the entire

12    immigration structure from AEDPA was motivated by racial animus

13    because there's nothing specific about 1326?

14    A    No.  I would have to disagree because, again, in trying to

01:13:52    15    understand the legislative intent of any particular clause in a

16    piece of legislation, it's legitimate to look at the larger

17    history of the bill itself.

18    Q    Exactly, though the larger history is the same for every

19    immigration provision in that bill.  And if all you're looking

01:14:12    20    at is the larger history, shouldn't the conclusion trickle down

21    to every individual immigration provision?

22    A    In the late -- for the late twentieth century, that

23    actually would not be an unwarranted conclusion.

24    Q    Okay.  So based on --

01:14:32    25    A    But especially when you consider the electoral pressures

1    that these congresspersons were under.  The American public was

2    very angry, extremely xenophobic.  They would have been

3    satisfied with nothing less than xenophobic immigration bills.

4    Q    So is it fair to say that IIRIRA in '96 was kind of the

01:14:59   5    last big overhaul of immigration law?

6    A    Yes.  And what's fascinating about the debates about

7    IIRIRA, when you read the congressional debates, the early floor

8    statements begin with legislators saying, you know, this is a

9    racist bill.  The same goes for AEDPA.  There is a large outcry

01:15:21   10    about the racism in that bill.

11    Q    So if the immigration system has not really been changed

12    since IIRIRA in '96, and IIRIRA and the precursor statutes that

13    crafted that immigration system were racially motivated, is it

14    your opinion that the entirety of the United States immigration

01:15:41   15    system is racist?

16    A    I think I -- and I recognize that, you know, that might be

17    one conclusion that you could draw; but, first, without having

18    looked at every single immigration statute that was ever

19    written, it's very difficult to come to that conclusion.  But I

01:16:21   20    would state --

21    Q    How about --

22    A    Yeah.

23    Q    No.  Go ahead.  Please finish your thought.

24    A    Yeah.  But I would say that I am convinced that racial

01:16:28   25    animus informed the passage of the 1952 McCarran-Walter Act, the

1    1988, the 1990, the 1994, and the 1996 laws.

2    Q    And as those laws, in combination or separately, created

3    the immigration system that we have today, then it follows,

4    right, that your opinion is that racial animosity taints the

01:16:52    5    entire immigration system?

6    A    So I -- again, I don't think that those laws constitute the

7    entirety of our nation's immigration system, and especially when

8    you look at it from a historical perspective; so . . .

9    Q    How about, so you've testified and you wrote that a variety

01:17:20    10    of congressmen, senators -- Senator Chiles, Representative

11    McCollum, and others -- were motivated by racial animosity;

12    right?

13    A    Yes.

14    Q    Is it your opinion that any congressman or senator who

01:17:33    15    voted for these bills was motivated by racial animosity?

16    A    I'm sorry.  I missed that again.  Could you repeat?

17    Q    I'll repeat.  That's fine.

18    A    Yeah.

19    Q    So is it your opinion that any representative or senator

01:17:49    20    who voted for these bills was motivated by racial animosity and

21    a discriminatory purpose?

22    A    I think many of them were.  I cannot account for all of

23    them.  But, again, when you read the congressional debates

24    pertaining to this bill, one of the -- all of these bills, there

01:18:11    25    are several striking things.

1    And it goes back to this point that historians have made

2    that both Democrats and Republicans were, quote/unquote, falling

3    all over themselves to propose anti-immigrant bills, to

4    rearticulate the xenophobic rhetoric of the times.

01:18:36    5    And Harry Reid here is the classic example, and Harry Reid

6    has now apologized twice for that speech he gave on the floor of

7    the House and his statements about the native-born children of

8    undocumented immigrants.

9    So one of the striking things when you do this legislative

01:18:58    10    history is just the pervasiveness of the xenophobia on both

11    sides, both sides of the aisle, and just the overwhelming

12    concern on the part of senators and members of the House, you

13    know, that they have to adopt this rhetoric and propose these

14    kinds of bills and then vote for these xenophobic bills so that

01:19:25    15    they can get reelected.  Right?

16    You know, one of the shocking things I found, Dianne

17    Feinstein -- I spent many years in California, you know, and got

18    to know a bit more about Dianne Feinstein.  Always assumed that

19    she was something of a liberal lion, so it was a shock for me to

01:19:46    20    learn that she early in her career was a staunch supporter of

21    increased appropriations for the Border Patrol and the

22    construction of a border wall.  And soon after she made those

23    recommendations, her poll numbers shot up.  So that's one of the

24    big takeaways of my research.

01:20:12    25    MR. ELLIS:  All right.  Thank you, Dr. Kang.  I don't

1    have any other questions, so I'll pass you back to Mr. Goddard.

2              THE WITNESS:  Thank you.

3              THE COURT:  Redirect, Mr. Goddard?

4              MR. GODDARD:  Thank you, Your Honor.

01:20:27  5              Dr. Kang, I know you've been testifying for quite some

6    time.  I appreciate it.  I'll try --

7              THE COURT:  And we shouldn't speed up at this time

8    because the interpreters and the court reporter are tired, so

9    time to slow down.  Okay?

01:20:40  10             MR. GODDARD:  Yes, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MR. GODDARD:

13   Q    Dr. Kang, Mr. Ellis asked you some questions about whether

14   you knew who had asked --

01:20:52  15             MR. ELLIS:  Your Honor, I'm sorry to jump in.  I'm

16   having a really hard time hearing Mr. Goddard.  He's very, very

17   quiet.

18             THE COURT:  So, Mr. Goddard, you seemed a little fast to

19   me.  Maybe just a little louder, a little slower.

01:21:07  20             MR. GODDARD:  Certainly.  Is this better?  Can you hear

21   me, Mr. Ellis?

22             MR. ELLIS:  (Moves head up and down)

23   Q    (By Mr. Goddard)  Okay.  So, Dr. Kang, Mr. Ellis asked you

24   a series of questions about whether you had knowledge of who had

01:21:22  25   asked certain legislators to draft certain bills.  Do you

1    remember that line of questioning?

2    A    Yes.

3    Q    And you did not have exact knowledge of who asked whom to

4    draft each bill.  Does that lack of knowledge alter any of your

01:21:40    5    conclusions in any way?

6    A    No.

7    Q    Why not?

8    A    Because the statements of the legislators themselves and

9    their legislative record speak for themselves and attest to the

01:21:57    10    xenophobia that motivated their amendments to 1326.

11    Q    Thank you.

12        Mr. Ellis also asked you a series of questions suggesting

13    that Congress could have multiple motivations for passing a

14    bill.  Do you recall that?

01:22:18    15    A    Yes.

16    Q    And as I recall from your testimony when you and I spoke

17    earlier, you said that legislative intent is the history of

18    winners and losers; is that right?

19    A    Yes.

01:22:31    20    Q    And you look to the winners to get insight on legislative

21    intent; right?

22    A    Yes.

23    Q    Who were the winners of the 1952 act?

24    A    So the winners were Senator McCarran and Representative

01:22:51    25    Walter.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*

130

Q    And who were the winners of the bills that amended 1326 in the 1980s and the 1990s?

A    Senator Lawton Chiles, Senator Bob Graham, Representative Bill McCollum, and Representative Smith.

01:23:09   Q    Thank you.

Dr. Kang, Mr. Ellis also asked you a series of questions about bias.  Do you recall that?

A    Yes.

Q    And you acknowledged that bias can impact historians just

01:23:28   as it can impact anyone; correct?

A    Yes.

Q    Do you have any concerns that your conclusions in your report or in your testimony here today were impacted or shaped by your personal biases?

01:23:42   A    No.

Q    Is it fair to say that the opinions you've shared with the court are grounded in evidence and your professional opinion rather than your personal biases?

A    Yes.

01:23:58   Q    Thank you.

Dr. Kang, Mr. Ellis asked you a series of questions about the Bracero Program.  Do you recall that?

A    Yes.

Q    And you've previously testified that the Bracero Program is

01:24:14   an important historical context for understanding the

1    legislative intent behind the 1952 act; correct?

2    A    Yes.

3    Q    And you've testified the bills and legislative intent

4    cannot be understood in a vacuum --

5    A    Yes.

6    Q    -- is that right?

7    A    Yes.  That's correct.

8    Q    And is it fair to say that Bracero Program is crucial to

9    understanding Congress's motivation --

01:24:43    10    A    Yes.

11    Q    -- in clarifying the reentry statute in the 1952 act?

12    A    Yes.

13    Q    Thank you.

14          Dr. Kang, Mr. Ellis asked you a series of questions about

01:24:55    15    whether members of Congress and certain congresses had read

16    testimony from prior congresses.  Do you recall that?

17    A    Yes.

18    Q    And you stated that you did not whether members of the 1952

19    Congress had read transcripts from 1929.  You did not know

01:25:15    20    whether members of Congress in the eighties and nineties had

21    read transcripts from decades prior; is that correct?

22    A    That's correct.

23    Q    Does that fact alter any of your conclusions in any way?

24    A    No.

01:25:28    25    Q    Why not?

1    A    Because, once again, the statements of the drafters of the

2    amendments to 1326 speak for themselves and attest to the racial

3    animus that motivated the recodification and the amendments.

4    Q    Thank you.

01:25:54    5        Dr. Kang, Mr. Ellis suggested that there were certain

6    potentially valid governmental interests that may have or could

7    have, hypothetically, motivated Congress to pass the 1952 act or

8    to amend 1326, such as public safety or saving the government

9    money by making it easier to prosecute 1326.  Do you recall that

01:26:23    10    line of questioning?

11    A    Yes.

12    Q    And these purported or hypothetical reasons Congress might

13    have been justified in passing these laws, do they impact in any

14    way your conclusion that Congress was, in fact, motivated by

01:26:42    15    racial animus?

16    A    No.

17    Q    Why not?

18    A    Because, once again, the legislative history and the

19    broader historical record demonstrate that racial animus was a

01:26:59    20    principal motivation of the drafters of 1326.

21    Q    Thank you.

22        Dr. Kang, Mr. Ellis towards the end of his questioning

23    asked you a series of questions about aggravated felonies.  Do

24    you recall that?

01:27:18    25    A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
Kang/ReD/Goddard

133

1    Q    And I believe Mr. Ellis gave the examples of murder, child

2    abuse.  And there was a third crime I'm forgetting, but it was a

3    particularly heinous crime.  Do you recall that?

4    A    Yes.

01:27:26    5    Q    Over the course of the amendments to 1326 we have

6    discussed, are you aware of the definition of aggravated felony

7    changing in any ways?

8    A    Yes.

9    Q    And how did that definition change?

01:27:42    10    A    So over the course of the eighties and nineties it changed

11    by broadening quite substantially.

12    Q    And am I correct to understand that currently an aggravated

13    felony could include a misdemeanor conviction?

14    A    Yes.

01:28:00    15    Q    Thank you.

16        Mr. Ellis also discussed how -- his line of questioning, as

17    I recall it, was that it made sense to target certain aliens

18    convicted of these types of crimes.  Do you recall that line of

19    questioning?

01:28:20    20    A    Yes.

21    Q    And, again, Dr. Kang, you've testified that we cannot

22    understand legislative intent in a vacuum; correct?

23    A    That's correct.

24    Q    In your opinion, do you think it's a coincidence that

01:28:34    25    Congress enhanced penalties for aliens with aggravated felony

1  convictions in the 1980s and 1990s, a time you have described as

2  a peak in this country's history of xenophobia?

3  A    No.

4  Q    And, Dr. Kang, do you believe it's coincidence that

01:28:53  5  Congress enhanced the penalties for aliens with aggravated

6  felony convictions, that those amendments were drafted by

7  legislators from Florida at the time when this sentiment was at

8  its peak in that state?

9  A    No.  And can I add to that a little bit?

01:29:11  10  Q    Certainly.

11  A    So here again, I would refer to the work of Michelle

12  Alexander, who talks about how the characterization and the

13  imposition of penalties against undocumented immigrants for

14  these other kinds of crimes often won conservative legislators

01:29:34  15  the votes of racist constituents, particularly white,

16  working-class Americans.  And, again, Michelle Alexander has

17  empirical research, and she cites to empirical research for this

18  claim.

19        So that was the value of these kinds of penalties and for

01:29:54  20  the expansion of this definition of an aggravated felony.  It

21  had real, sort of, on-the-ground electoral value for these

22  politicians who were trying to curry the xenophobic vote.

23  Q    Thank you.

24        Dr. Kang, this Michelle Alexander you mentioned, am I

01:30:15  25  correct, she authored a book, I believe, called *The New Jim*

1    *Crow*; is that right?

2    A    Yes, uh-huh.

3        MR. GODDARD:  Thank you, Dr. Kang.  I have no further

4    questions.

01:30:24  5        THE COURT:  Mr. Ellis, recross?

6        MR. ELLIS:  And, Your Honor, I have no recross; so I'd

7    like to thank Dr. Kang for her time.

8        THE COURT:  Okay.  May Dr. Kang be excused then,

9    Mr. Goddard?

01:30:36 10        MR. GODDARD:  Yes.  Thank you very much, Dr. Kang.

11        THE COURT:  Thank you.  And you are free to leave, or

12    you can turn off your camera and mute your microphone and stay

13    if you would like.

14        THE WITNESS:  Okay.  Thank you.

01:30:51 15        THE COURT:  Goodbye.

16        THE WITNESS:  Bye.

17      (Witness excused)

18        THE COURT:  Mr. Goddard, any other witnesses?

19        MR. GODDARD:  No, Your Honor.

01:30:57 20        THE COURT:  Okay.  And, Mr. Ellis, any witnesses?

21        MR. ELLIS:  No, Your Honor.  Thank you.

22        THE COURT:  Okay.  So, Mr. Goddard, your argument first,

23    please.

24        MR. GODDARD:  Thank you, Your Honor.

01:31:13 25        Marciano Munoz-De La O is the latest in a long, long,

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

136

1  long parade of Latinos to appear in federal court charged with

2  illegal reentry, accused of coming back to this country after

3  being removed.  Mr. Munoz came to this country as a minor; has

4  been a member of our community for 35 years.  He has four adult

01:31:41   5  children who know no home but this country.

6          All of us have been a part of so many cases like this,

7  and none of us have known the shameful history behind this law.

8  Not even Dr. Kang, a professional historian specializing in

9  immigration law, knew the full extent of this law before she

01:32:00  10  began to research it.

11          Only recently, through the work of Dr. Kang and other

12  historians, has that history come to light, and that history is

13  continuing to develop case by case as historians delve deeper

14  and deeper into this record.  And no court has had nearly as

01:32:19  15  extensive a record as this court does in this case.

16          And the question for the court is what do we do with

17  this shameful history, and the Supreme Court has given us an

18  answer in *Arlington Heights*.  That's where the court set out the

19  standard for determining what to do with a law that targets a

01:32:36  20  racial group.

21          It's a simple test.  Was Congress motivated by racial

22  animus in part when it enacted the law, and does the law

23  disparately impact the targeted racial group?  Effectively, did

24  Congress intend to target a race, and did it succeed?

01:32:56  25          The answer is "Yes."  It's up to the government to show

1  that Congress would have passed that law without any racial

2  animus.  And the application of *Arlington Heights* in this case

3  is straightforward.  The law does bear more heavily on Latinos.

4  We've all seen that with our own eyes.  And Dr. Kang has

01:33:17  5  comprehensively established that racial animus motivated the

6  enactment of that law.

7       That shifts the burden to the government, and the

8  government has put on no evidence to meet that burden.  The

9  government has not called a historian to counter anything

01:33:34  10  Dr. Kang has said or -- is aware that we pushed this hearing out

11  several months to allow Dr. Kang time to go to archives to

12  conduct research to prepare a 102-page report.  And the

13  government had all the time in the world to find an expert, to

14  find any historian to come and say that Congress acted with

01:33:55  15  race-neutral motivation enacting this law.  The government found

16  no one.  The silence here speaks volumes.

17       So what the government does, instead of putting on its

18  own historian, is to argue that the court should ignore the

19  history altogether.  It's not possible under *Arlington Heights,*

01:34:15  20  so the government argues for an entirely different standard of

21  review, a rational basis review -- which, not coincidentally,

22  would prevent the court from looking behind the curtain and

23  assessing Congress's intent in criminalizing reentry.

24       The government's argument for rational basis review is

01:34:35  25  incorrect on the law and would lead to absurd and untenable

1    results.  The government's argument is, essentially, that any

2    immigration-related law gets the highest possible level of

3    deference.  *Arlington Heights* doesn't apply, rational basis

4    does, says the government.

01:34:52    5         But the Supreme Court and the Ninth Circuit have

6    recently applied *Arlington Heights* in immigration-related cases

7    in the civil context.  If *Arlington Heights* applies in civil

8    immigration cases, surely it applies in criminal cases when

9    folks like Mr. Munoz have their liberty on the line.  So the

01:35:12    10   government is wrong on the law, and it's worth taking a minute

11   to consider the consequences of the government's position.

12        The government would give Congress free rein to pass

13   laws targeting disfavored racial groups.  Just say the word

14   "immigration," and the courts have to look the other way.  It's

01:35:31    15   not difficult to think of quite troubling hypotheticals if that

16   were the law.

17        Imagine the exact same statute, 1326, existing.  There's

18   explicit, explicit evidence from -- statements from Congress, a

19   statement of purpose from Congress amended to the bill saying

01:35:51    20   that the purpose of the law is to keep Latinos out of the United

21   States.  Under rational basis review, the court couldn't look to

22   that.  It would just have to say:  It's immigration related;

23   it's fine.

24        It cannot possibly be our Constitution prevents [*sic*]

01:36:10    25   this end run around equal protection and shields laws from any

1    judicial scrutiny.  *Arlington Heights* is the standard for

2    race-based equal protection claims for a reason, and there is no

3    reason we should look away from the shameful history of the

4    reentry law just because it touches on immigration.

01:36:27    5    And that takes us to the test under *Arlington Heights*.

6    It's a two-prong test, disparate impact and racial animus, and

7    I'll start with disparate impact.  Does the law bear more

8    heavily on one race than another?  That's the question.  It's a

9    matter of numbers.

01:36:45    10    The government does not dispute the numbers.  How could

11    they?  Almost every single 1326 prosecution is against a Latino.

12    That should be the end of the inquiry.  The government instead

13    tries to explain away these numbers.  It says the numbers aren't

14    like that because of immigration animus.  It's just because we

01:37:06    15    have this long border with Mexico and remind that most folks in

16    this country unlawfully are here because they overstayed their

17    visas, not because they crossed the southern border.

18    But putting that aside, the government's argument misses

19    the point.  Disparate impact inquiry is not about why the law

01:37:23    20    bears more heavily on one race.  It's just whether the law bears

21    more heavily on one race.  It's undisputed that 1326 bears more

22    heavily on Latinos.  The law clearly bears more heavily on one

23    race.  Mr. Munoz has made a showing of disparate impact.  So

24    that's the first prong.

01:37:43    25    The second prong is racial animus.  The question is:

1    Was Congress motivated in part by racial animus when it enacted

2    the reentry law?  And there's no dispute that Congress was

3    motivated by racial animus when it criminalized reentry as part

4    of the Undesirable Aliens Act of 1929.

01:38:03    5         The government conceded this point in proceedings in

6    Nevada with good reason.  It bears an incredibly fulsome record.

7    Dr. Kang testified today that the academic consensus is that the

8    government -- that Congress's motivation was racial animus.  She

9    said she's not aware of any historian who holds a contrary view.

01:38:25    10         As she explained it, it was a deal struck between two

11    different forms of anti-Latino racial animus:  the nativists,

12    who wanted to keep all Latinos out of the country; and industry,

13    who wanted access to cheap and exploitable Latino labor.

14         The deal was Congress would not prevent Mexicans from

01:38:48    15    coming to the United States but would give the nativists tools

16    to drive out those Mexicans when the nativists saw fit, and one

17    of those tools was the reentry law.

18         And this law also helped industry in that it allowed

19    industry to ensure that this source of labor, the Mexican labor,

01:39:10    20    remained exploitable; that it was never comfortable; it never

21    knew that it could stay in this country.

22         So the government does not dispute the shameful history.

23    It has offered no evidence of a race-neutral motive for Congress

24    criminalizing reentry in 1929, so that should be the end of the

01:39:29    25    inquiry on racial animus.

1 But the government argues that instead of looking to

2 1929, we should instead look to the McCarran-Walter Act of 1952.

3 This is despite the government describing the Undesirable Aliens

4 Act of 1929 as the, quote, "first version," unquote, of 1326.

01:39:52 5 As Dr. Kang testified, McCarran-Walter Act was a

6 reorganization of the nation's immigration laws.  It moved the

7 reentry provision from Section 180 to Section 1326.  The

8 government's position is that moving this provision wipes the

9 racist history away.

01:40:11 10 It's not surprising the government wants the court to

11 look away from 1929 and to focus just on 1952 because in 1952,

12 Congress did not have much discussion of this provision.  The

13 law doesn't allow us to ignore 1929, and doing so would, again,

14 have absurd and untenable results.

01:40:33 15 Now, the government's argument as to why we should look

16 to 1952 hangs on its interpretation of the Supreme Court's

17 decision in *Abbott v. Perez*.  The facts in that case are a

18 little bit confusing, so I think it merits taking a minute to

19 understand what was going on in that case.

01:40:52 20 In 2011, the Texas legislature drew up a redistricting

21 plan.  That plan was challenged on equal protection grounds for

22 racial gerrymandering.  The law never went into effect.  Before

23 it could go into effect, the district court proposed an

24 alternative plan that acknowledged and addressed the racial

01:41:15 25 animus of the gerrymandering and fixed it.

1    In 2013, the Texas legislature then enacted that plan,

2    the plan that had acknowledged and addressed the racial animus

3    of the 2011 plan.  The 2013 plan is then challenged, makes its

4    way to the Supreme Court, and what the Supreme Court holds is

01:41:35    5    that the racial animus from 2011 did not automatically condemn

6    any future plan.

7    That holding does not help the government.  It supports

8    Mr. Munoz's position, because Mr. Munoz is not arguing that the

9    racial animus of 1929 automatically condemns all future reentry

01:41:55    10    statutes.  Congress is free to criminalize reentry whenever it

11    likes.  It just has to do so with a race-neutral motivation.

12    The Supreme Court in *Abbott* recognized and stressed the

13    differences between that case and cases like Mr. Munoz's.  In

14    *Abbott* the Supreme Court said -- the Supreme Court stressed that

01:42:17    15    it was not addressing a case where, quote, "a law originally

16    enacted with discriminatory intent is later reenacted by a

17    different legislature," end quote.

18    That perfectly describes where we are, Your Honor.  The

19    1929 law was originally enacted with discriminatory intent and

01:42:40    20    later reenacted by the 1952 legislature.  In *Abbott*, the Supreme

21    Court took pains to distinguish its holding and the Supreme

22    Court's earlier holding at *Hunter* where changes that failed to

23    remove racial animus from a law did not, quote, "legitimate,"

24    end quote, that law.  Again, that is where we are today.

01:42:57    25    Changes in 1952 did not remove the racial animus and legitimate

1    the 1929 law.

2         And, finally, in *Abbott* the Supreme Court stressed that

3    the 2013 legislature had, quote, "fixed the problems

4    identified," end quote, in the 2011 plan.  Here, the 1952

01:43:18  5    Congress did not take any actions that could be described as

6    fixing racial animus that infected the 1929 law.  The government

7    wants this court to read *Abbott* to say that recodification of a

8    racist law automatically wipes the slate clean of that racial

9    animus, and that's simply not what *Abbott* says.

01:43:40  10         Again, it's worth taking a minute to consider the

11    consequences of the government's position, what messages it

12    would send to Congress and also to state legislatures.  The

13    government would have the court tell those legislatures:  It's

14    fine to pass laws for any racist reason.  Use any racial slurs

01:44:00  15    you want in your debate on those bills.  Just make sure you move

16    the statute within the code book before it's challenged.  That

17    will scrub all the racism from the bill.  The law will be

18    forever insulated from equal protection challenges, and no court

19    will ever be able to look at your racial animus.

01:44:18  20         And, again, this just cannot be that our Constitution

21    permits such an end run around equal protection and shields

22    legislation from judicial scrutiny.

23         So Mr. Munoz's position is that the court need not look

24    to 1952 at all.  The proper *Arlington Heights* analysis is in

01:44:39  25    1929.  But if the court were to assess the 1952 recodification,

1  there's no question that racial animus motivated that

2  recodification as well.  That was what Dr. Kang testified to.

3  She said she had certainty in the above 90 percent that that was

4  the case.  She's a professional historian.

01:44:57  5      There is no evidence from any historian to the contrary.

6  The government has offered no evidence of any race-neutral

7  motivation.  It has hypothesized certain motivations that could

8  potentially have been this or could potentially have been that

9  but no evidence that Congress was acting with a race-neutral

01:45:16  10  motivation.  It just says there was a lack of discussion.

11  Therefore, there's a lack of racial animus.  Therefore, the law

12  is fine.

13      That is not how legislative history works.  Dr. Kang has

14  testified at length that a lack of discussion is not a lack of

01:45:30  15  racial animus.  *Abbott* tells us that a lack of discussion is not

16  a lack of racial animus.

17      In *Abbott,* the Supreme Court said you look to the prior

18  legislature's intent, the extent it naturally gives rise to

19  inferences regarding the later legislature's intent.  When the

01:45:50  20  later legislature, as in 1952, offers no new motivation for a

21  law, the natural inference is that there is no new motivation.

22  The prior motivation continues from the 1929 act.  That was

23  racial animus.

24      And, finally, *Arlington Heights* itself tells us that a

01:46:08  25  lack of discussion is not a lack of racial animus.  In *Arlington*

1    *Heights*, the court directed courts to conduct a, quote,

2    "sensitive inquiry into such circumstantial and direct evidence

3    of intent as may be available," end quote.

4          What the Supreme Court is saying here, what the Supreme

01:46:31  5    Court is recognizing, is that there is not always going to be a

6    statement from each legislator explaining precisely why he or

7    she voted for a bill.  There are other tools that courts can use

8    to assess legislative intent.  Dr. Kang has explained the tools

9    she uses as a professional historian.

01:46:52  10          In *Arlington Heights*, the court set out what tools

11    courts can use, including historical context.  And Dr. Kang has

12    testified extensively about:  the historical context of the 1952

13    McCarran-Walter Act, the historical context of the repatriation

14    drives, of the Bracero Program, the fact that Senator McCarran

01:47:17  15    is a known racist, the fact that Representative Walter was a

16    known eugenicist.

17          This whole context shows that Congress was continuing

18    the 1929 compromise between nativists and industry and using --

19    continuing the use of the reentry statute as a tool in that

01:47:37  20    compromise.  It can't be that we simply ignore that historical

21    context.  It can't be; that doing so would just entirely gut

22    *Arlington Heights*.  *Arlington Heights* directs courts to look to

23    this context.  The courts must look to that context.

24          This lack of discussion in 1952 in no way suggests a

01:47:58  25    lack of racial animus; quite the opposite.  As Dr. Kang has

1    testified, there's overwhelming evidence that the 1952 Congress

2    acted with anti-Latino racial animus when it recodified the

3    reentry statute.

4         So as Mr. Munoz has shown both disparate impact and

5    racial animus, he has carried his burden.  That shifts the

6    burden to the government to show that the same decision would

7    have resulted.

8         The government has not presented any evidence of

9    Congress acting with race-neutral motivation.  The government

10   simply points to the amendments from the 1980s and the 1990s

11   that were passed with little discussion.

12        Those amendments are not enough for two reasons.  The

13   first is that the question is whether the enacting Congress

14   would have passed a bill absent racial animus, not what a later

15   amending Congress would have done.

16        And even if the focus were on the later amending

17   Congress, here what those congresses did was to raise the

18   penalties for a certain subset of potential defendants without

19   any discussion.  That is not evidence that Congress -- those

20   congresses would have passed the exact same law.

21        There is a categorical difference between enacting a law

22   out of nothing versus increasing the fines and penalties for

23   that crime once it's been on the books for nearly 70 years.

24   Increasing fines does not prove that the amending Congress would

25   have made the same decision that Congress made in 1929.

1      The second reason these amendments are not enough to

2   carry the government's burden are that the congresses that

3   passed those amendments were themselves acting with racial

4   animus, as Dr. Kang has established.

01:49:55  5      Those amendments were drafted by xenophobes working with

6   anti-immigrant hate groups at a peak time of anti-Latino racial

7   animus.  By this time, it was obvious to everyone that 1326 was

8   being used almost exclusively against Latinos, and Congress

9   chose repeatedly to ratchet up the penalties and to limit

01:50:19  10  collateral attacks, assuring more Latinos spent more time in

11  jail.  A Congress motivated by racial animus cannot save a

12  racist law.

13      And the government's response to this is, essentially:

14  Well, the drafters were xenophobes working with an

01:50:38  15  anti-immigrant hate group, but what about everybody else?  We

16  don't know about them.

17      That's, again, not how legislative history works, as

18  Dr. Kang has testified.  And, importantly, it ignores the fact

19  that at this point the burden is on the government.  The

01:50:52  20  government has to show evidence of race-neutral motivation.

21      Instead of putting on any evidence, instead of calling a

22  historian, instead of pointing to anything in the historical

23  record, that's not what the government does here.  It just says

24  there is no discussion, and therefore there's no animus.

01:51:12  25      This is not the showing -- the government, it's -- I

1    apologize, Your Honor.  The point I'm making is:  The burden

2    here is on the government.  The government has not cured that

3    burden by simply saying there is no discussion.

4            So the amendments do not prove that Congress would have

01:51:26  5    made the same decision absent racial animus.  The government has

6    not met its burden, and that is the end of the *Arlington Heights*

7    inquiry.

8            Mr. Munoz has shown that Congress acted with anti-Latino

9    racial animus when it criminalized reentry.  Mr. Munoz has shown

01:51:43  10   that the reentry law bears more heavily on Latinos, and the

11   government has not offered any evidence to carry its burden.

12   Having satisfied *Arlington Heights*, Mr. Munoz has shown that

13   1326 violates equal protection.

14           And, Your Honor, I'd just like to wrap up by responding

01:51:59  15   to the government's argument that a decision in Mr. Munoz's

16   favor would be the death knell for this country's immigration

17   laws and policies.  The government says Mr. Munoz is asking this

18   court to, quote, "embrace the theory that any racism of the

19   1920s poisons United States immigration law no matter the

01:52:21  20   motives of a given Congress," and then Mr. Munoz's -- that's the

21   end of that quote, and then Mr. Munoz's argument, quote, "would

22   invalidate essentially every immigration-related statute," end

23   quote.

24           This is not the case.  First, a decision in Mr. Munoz's

01:52:38  25   favor would have no effect on civil immigration proceedings.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

149

1    The government could continue to remove noncitizens not

2    involving the judiciary at all.

3           More importantly, Mr. Munoz is not suggesting that

4    Congress cannot criminalize reentry.  He is just arguing that

01:52:58  5    Congress must have race-neutral reasons to do so.  Congress

6    might have race-neutral reasons to criminalize reentry today.

7           The government has suggested, quote, "deterrence of

8    repeat violators," end quote, and, quote, "protection of the

9    public from unlawful aliens," end quote.  Are those race-neutral

01:53:19  10   reasons?  They might be; they might not be.

11          The point is that the government has the burden of

12   showing Congress did, in fact, act; did, in fact, have

13   race-neutral motivation when it criminalized reentry.

14   Hypothesizing that such reasons might exist today simply doesn't

01:53:37  15   cut it.

16          The government fails to meet its burden because it can't

17   meet its burden because, as Dr. Kang testified, there is no

18   evidence that Congress acted with race-neutral motivation, not

19   in 1929, not in 1952, not in the 1980s or the 1990s.  No

01:53:56  20   historian has said anything different.  No historian would say

21   anything different.

22          If Congress now has race-neutral reasons to criminalize

23   reentry, it could fix this tomorrow.  All it has to do is pass a

24   law motivated by those race-neutral reasons.  But until that

01:54:12  25   happens, we can only assess the law that is on the books, and

1    the law on the books was motivated by anti-Latino racial animus.

2    It violates the Constitution's guarantee of equal protection,

3    and it cannot stand.

4          Thank you.

01:54:29    5          THE COURT:  Thank you.

6          Mr. Ellis.

7          MR. ELLIS:  Thank you, Your Honor.

8          This court should decline to accept the defendant's

9    invitation to follow *Carrillo-Lopez* and instead look at what

01:54:45   10    every single other district court who's addressed this question

11    has done when asked to determine whether or not Section 1326

12    violates the Equal Protection Clause of the Fifth Amendment.

13          So initially it is the government's position that the

14    court doesn't need to get any more close to *Arlington Heights* in

01:55:05   15    that analysis.  That's because, ultimately, this is, Section

16    1326 is a congressional immigration-related statute.  And that

17    means under a long line of caselaw that deference is

18    appropriate; that Congress has wide latitude in how to govern

19    and adjudicate and run the United States immigration system.

01:55:29   20          And that -- and the Supreme Court and the Ninth Circuit

21    have held that that stretches into equal protection claims.  You

22    have *Fiallo v. Bell*, which is an equal protection claim where,

23    you know, the plaintiff says:  Oh, I'm being discriminated

24    against based on my gender.

01:55:50   25          And the Supreme Court says:  Well, we're gonna look at

1 this under rational basis review. We're not gonna apply what

2 might otherwise be applied in a gender-based equal protection

3 claim, because this is related to an immigration statute.

4 And, you know, to the extent that the defense says,

01:56:06 5 "Well, this is criminal so this is different," it doesn't change

6 the analysis. You have at least two Ninth Circuit cases,

7 *Ruiz-Chairez* and *Lopez-Flores*, which deal with equal protection

8 challenges in criminal contexts.

9 And, again, the Ninth Circuit says: Well, these are

01:56:24 10 immigration related. Therefore, we're going to apply rational

11 basis review, again, as they are immigration-related

12 congressional statutes. Section 1326 is no different.

13 Now, you know, it came up in the reply brief. It's come

14 up here as well. You know, Mr. Goddard seems to take rational

01:56:46 15 basis review as though there is no review, and you don't get

16 anything. That's not the case.

17 The government still needs a reason to do what it's

18 doing. There can't just be no reason. There can't be an

19 irrational reason. There has to be a rational, articulable

01:57:04 20 reason as to why the statute needs to exist.

21 And here the Ninth Circuit has already said that this

22 statute has a rational basis, it is rationally related to

23 deterrence, and that's *Hernandez-Guerrero*. They said that was

24 the exact point of the whole decision is as an equal protection

01:57:24 25 challenge to -- as a challenge to 1326.

1    And the court said:  Well, there's an obvious rational

2  basis.  It's a necessary part of the immigration structure.

3  Without it, the immigration system is all bark and no bite, and

4  there's no deterrent measure.  There's no consequence for not

01:57:42   5  following along with what you're told to do by immigration

6  judges.

7    So there is a rational basis.  The Ninth Circuit has

8  already determined there is a rational basis.  And just because

9  Mr. Munoz's claim here has basically already been adjudicated

01:57:58   10  doesn't mean he somehow has been stripped of his claim.  It just

11  simply has a rational basis behind it, and that's the end of the

12  story, really, with evaluating the statute.

13    So, again, right off the bat, the government would just

14  urge the court to do what courts have done repeatedly and apply

01:58:17   15  rational basis review to this equal protection challenge to a

16  congressional immigration statute.

17    If the court does want to move into *Arlington Heights*, I

18  would note right off the bat that what *Arlington Heights* looks

19  at is it looks at the challenged action, looks at the challenged

01:58:36   20  piece of legislation that allegedly is discriminating based on a

21  protected clause, in violation of the Equal Protection Clause.

22    I think that's relevant for two reasons.  First, it's

23  relevant because the challenge is to Section 1326.  The

24  challenge is not and cannot be to all immigration policy, to

01:58:55   25  general immigration policy.

1       And that is largely what the defense has presented.

2   That's largely what Dr. Kang testified about.  It is a series of

3   statements and actions from legislatures addressing other things

4   in immigration policy; addressing asylum policy, addressing

01:59:14   5   refugee policy, addressing the standards that someone could be

6   removed from the United States initially.

7       That's not what is being challenged here.  What is being

8   challenged is Section 1326, and the court has to determine

9   whether the defense has presented sufficient evidence that

01:59:28   10   Section 1326, and not any or all other immigration-related

11   statutes, has been tainted by racial animus.

12       And the second reason that 1326 being the focus is

13   important, because it focuses the court on which legislative

14   enactions are important, and that means this story starts,

01:59:53   15   really, in 1952.

16       1929 did have a version of the criminal unlawful

17   reentry.  However, as Dr. Kang confirmed during her testimony,

18   there are more changes that happened in 1952 than simply moving

19   the provision from one place in the US Code to another.

02:00:12   20       An entirely new way of proving the charge of committing

21   the crime was added, the "found in" clause.  Without that clause

22   this case, this motion, this wouldn't exist, because Mr. Munoz

23   would not have been chargeable in this district.  His case -- if

24   1929 was all we had, this case would not be here.  This case

02:00:33   25   would not exist.

 1    1952 and Section 1326 is what makes this case even

 2  possible.  It's a massive, substantive change to how this crime

 3  can be committed and how the government can prove that it has

 4  been committed.

 5    That's not the only difference.  Dr. Kang testified that

 6  1952 dropped out a requirement that the government prove that

 7  the prior removal was lawful.  Dr. Kang confirmed that Section

 8  1326 is, in fact, a merger, a combination of a variety of other

 9  prior reentry-esque criminalization statutes, ones affecting

10  folks removed as anarchists, people removed as prostitutes.

11    This is a combination.  So what we have here in Section

12  1326, as created in 1952, is a new statute that combines older

13  statutes together; that creates a brand new way of committing

14  and proving the crime, and changes the elements.  It's far, far

15  more than what the defense says, which is a copy-and-pasted from

16  one section to another.  It's simply not the case.  It's quite a

17  few changes.

18    And that's, again, important because Mr. Munoz is

19  charged with violating Section 1326.  He's not charged with

20  violating a nonexistent or repealed statute that was created in

21  1929.

22    And so there are quite a few reasons to reject the idea

23  that this story begins and the analysis begins in 1929.  And I

24  understand why the defense is so committed to making 1929 the

25  start point, because from 1952 onwards, there is very little to

1    no evidence concerning Section 1326 specifically.

2         Mr. Goddard describes it as comprehensively established.

3    Professor Kang described it as overwhelming the amount of

4    evidence that 1326 was motivated by racial animus.  For the most

02:02:40    5    part, that just cannot be the case because nothing has been

6    presented.  There are no, no statements.  These were not

7    debated.  Section 1326 was not debated in '52.  The amendments

8    were not debated in '88, in '90, '94, '96.

9         How no evidence can somehow shift into overwhelming

02:03:05   10    evidence, into a somehow quantifiable 90-plus percent certainty,

11    it's a little bit mind-boggling.  The lack of evidence is not

12    evidence.

13         And, ultimately, when you're looking at Section 1326,

14    Dr. Kang confirmed that she searched the records, she searched

02:03:30   15    the *Congressional Record,* she read the transcripts, and there

16    simply is nothing to base it on, that Section 1326 in

17    particular -- not immigration policy in general, not the larger

18    bill Section 1326 was part of, but Section 1326 was motivated by

19    racial animus.

02:03:50   20         And the Supreme Court has confirmed how difficult --

21    actually, an uphill battle the defendant's task is here.  I'm

22    looking at the *O'Brien* case which has as a quote about how

23    difficult this -- an *Arlington Heights* analysis would be, and it

24    went into the congressional action (reading):

02:04:05   25         It is entirely a different matter when we are asked to void

156

1   a statute that is, under well-settled criteria, constitutional

2   on its face, on the basis of what fewer than a handful of

3   congressmen said about it.  What motivates one legislator to

4   make a speech about a statute is not necessarily what motivates

02:04:23   5   scores of others to enact it, and the stakes are sufficiently

6   high for us to eschew guesswork.

7        What the defendant has presented are the statements of a

8   few congressmen.  The defendant has then asked to attribute

9   those statements to these scores and hundreds of representatives

02:04:40   10   and senators who subsequently voted for these bills and say,

11   "Well, they must also have been similarly racially motivated."

12   That's exactly what the Supreme Court has told this court not to

13   do.  That's the wrong approach for dealing with this issue.

14        Now, in 1952 the defendant really has four, they call it

02:05:03   15   four pieces of evidence; putting aside the general historical

16   context as testified to by Dr. Kang, four pieces of evidence.

17        You have the letter from Deputy Attorney General Peyton

18   Ford, who is not a member of Congress; who didn't vote for

19   anything; who was just putting forth what the Department of

02:05:21   20   Justice's recommendations were for the 1952 INA.

21        You have President Truman's letter explaining his veto

22   of the originally passed 1952 INA which, by reading through it,

23   is largely about his objections to continuing the quota-based

24   admission system.  He never once mentions the unlawful reentry,

02:05:43   25   the criminalization of the unlawful reentry or Section 1326.

1    You have the fact that Congress had earlier debated and

2    passed the so-called wetback bill which, again, had nothing to

3    do -- was not the 1952 INA.  The bill had nothing to do with

4    unlawful reentry, had nothing to do with Section 1326.

02:06:02    5    And then per Dr. Kang, you have statements from Senator

6    McCarran which also do not mention Section 1326, have nothing to

7    do with criminalization of unlawful reentry.

8    So what you really have is you get back to Dr. Kang's

9    statement that during the 1952 debates over the INA Section,

02:06:24    10    1326 was not debated.  It was not controversial.  No one really

11    said anything about it, and that is not somehow evidence that it

12    was motivated by racial bias.

13    And the same is true for the subsequent reenactments.

14    The lack of debate cannot be transformed into an assumption that

02:06:44    15    all of these representatives and senators are acting out of

16    racial animus.  It just -- the dearth of evidence just goes to

17    show how lacking the defendant's support is for both 1952 and

18    every subsequent amendment.

19    Just pointing to the statements of a few, pointing to

02:07:09    20    kind of general ideas of public opinion at the time does not get

21    you to inside the head of the congressmen who voted to pass

22    these various bills.

23    So then you get to the forever tainted argument, that

24    once tainted it is forever tainted until Congress issues some

02:07:29    25    kind of *mea culpa* and repasses the legislation based on another

1  reason.  So this not only is not very practical, it's also just

2  not supported by the law.  As noted by the Supreme Court in *City*

3  *of Mobile* (reading):  Past discrimination cannot, in the manner

4  of original sin, condemn governmental action that is not itself

02:07:52  5  unlawful.

6        So whatever happened in 1929, it doesn't carry forward

7  to -- automatically to 1952 and '88 and all of the other

8  reenactments.  And as I noted, the defendant hasn't presented,

9  really, anything to show that 1326 in particular was motivated

02:08:09  10  by racial bias in '52 or in any of the other subsequent bills.

11        So, ultimately, getting to *Abbott*, and *Abbott* is -- you

12  know, Mr. Goddard wants to kind of similarly ignore the focus

13  on -- ignore, I guess, what the Supreme Court was saying.  The

14  Supreme Court pretty clearly in *Abbott* says:  We don't, we don't

02:08:35  15  make a subsequent legislature have a true change of heart.  We

16  don't make them put on the record that, oh, we're changing

17  our -- we're doing the exact same thing, but we're charging

18  our -- you know, publicly changing our reasoning behind it.

19  *Abbott* says that you don't do that.

02:08:52  20        And, of course, there are so many differences between

21  the redistricting plans in *Abbott* from 1326.  *Abbott* is from

22  2011 to 2013.  Presumably, a lot of the same people are

23  involved.  Here we're dealing with 70 years where, you know,

24  no -- as far as Dr. Kang knows, no member of Congress in '29 is

02:09:14  25  still in Congress in '52.  No member of Congress from '52 is

1    still in Congress in the eighties and nineties.

2            To say that there is a natural inference that a

3    completely different group of people -- that Dr. Kang has no

4    evidence -- reviewed the record that was in front of the prior

02:09:30    5    people can be assumed to be acting out of the same motive just

6    cannot be the case.

7            It may have been more appropriate in the Texas case

8    where we're talking about a two-year difference with presumably

9    the same people.  But when you're dealing with such a timespan

02:09:46    10    and different people, for that to be a natural inference

11    somewhat seems to undermine what that term actually means.

12            So, ultimately, you know, if the court does reach

13    *Arlington Heights*, it's the defendant's burden to show racial

14    animus arising from Section 1326, and the defendant hasn't

02:10:07    15    really presented much evidence at all concerning Section 1326 in

16    particular in '52 or onwards.

17            The idea that these subsequent congresses are just

18    tainted by whatever happened in '29 is not borne out either

19    practically or by the Supreme Court's statements on the issue,

02:10:26    20    and so the defendant's claim fails there.

21            And as for disparate impact, I would just -- I think

22    this has been briefed pretty heavily.  I would just point the

23    court to *Regents* where the Supreme Court makes some statements

24    about the percentage of Latino individuals in the DACA program

02:10:46    25    and how that by itself or in concert with the other proposed

1    evidence of animus doesn't get you there.  For preliminary

2    injunction, that alone actually substantiated the challenge.  As

3    a number of other courts have held, it's a high percentage

4    number.  It's a matter of geography and socioeconomic conditions

02:11:04    5    as compared between the United States and Mexico.

6        So, ultimately, even if the court engages in *Arlington*

7    *Heights*, the defendant just hasn't met his burden.  If the court

8    finds the defendant has, it's the government's position that not

9    only is -- Section 1326 had a number of very valid bases

02:11:28    10    supporting why it exists, as the Ninth Circuit has held in the

11    case of deterrence.

12        But the fact that Congress repeatedly went to the

13    trouble of increasing the penalties for violating the statute

14    for certain groups of people, it seems somewhat far-fetched to

02:11:39    15    conclude that if they went to the trouble of increasing the

16    penalties, they would not have criminalized the conduct in the

17    first place if it was not -- if the statute wasn't already on

18    the books.

19        So to sum up, you know, rational basis review should

02:11:59    20    apply.  If the court finds that it doesn't, the defendant hasn't

21    met his burden, because we're talking about 1326 and not all

22    other immigration policy lumped together in a big group.  And,

23    ultimately, the defendant just hasn't really presented anything

24    about Section 1326 from 1952 on.

02:12:19    25        Thank you.

1    THE COURT:  Thank you, Mr. Ellis.

2    Mr. Goddard, your rebuttal?

3    MR. GODDARD:  Thank you, Your Honor.

4    Mr. Ellis began by noting that several courts have sided

02:12:31    5    with the government on this issue.  What's different here is the

6    amount of evidence before this court.  This court has heard

7    testimony and evidence that no other court has.  This court has,

8    by far, the most well-developed record on this issue.

9    Dr. Kang's evidence was comprehensive and clear.  Mr. Ellis

02:12:52    10   repeatedly said that Mr. Munoz has not put on much evidence.

11   We've been here for hours listening to Dr. Kang.  We've heard

12   nothing from the government.

13   Turning to the rational basis deference the government

14   would have this court adopt, the government, Mr. Ellis, points

02:13:14    15   the court to two cases where courts applied rational basis in

16   the criminal context in equal protection.

17   One had to do with alienage, race, which is entirely

18   different.  The other, as I recall -- this is *Ruiz-Chairez* -- it

19   was the difference between someone convicted of a certain type

02:13:36    20   of felony versus someone convicted of a different type of

21   felony.  That's clearly, drastically, a different question than

22   someone of one race than another race.

23   I just want to take a minute to respond to Mr. Ellis's

24   insistence that Mr. Munoz has to find direct statements from

02:13:56    25   legislators on exactly, precisely, why they passed this

1    provision of this bill.  It's just not supported in the caselaw.

2    It's not what *Arlington Heights* says.

3              And Dr. Kang, a professional historian, has said over

4    and over and over again that that is not required.  That is not

02:14:15   5    what professional historians need.  There are so many other

6    tools that they can use and do use regularly.  There's no

7    dispute on that.

8              The government has not suggested that historians

9    shouldn't use those tools or put on a historian to say, "No.

02:14:34  10    Actually, we don't use those tools," or put on a historian to

11    say anything contradicting Dr. Kang.

12              Dr. Kang is a professional.  She has dedicated her

13    career to this.  And she has come here today and informed the

14    court that she has taken the tools she has learned, and she has

02:14:51  15    applied them to the question before this court, and she has no

16    doubt that racial animus was a motivating factor in 1952, in the

17    1980s, and the 1990s.

18              And I also want to respond briefly to these changes in

19    1952.  I agree Mr. Munoz is not suggesting that the language was

02:15:10  20    word for word the same, but let's look at what the changes were

21    between 1929 and 1952.

22              One was the addition of "found in," which changes how

23    the government can prosecute this crime.  It doesn't change what

24    is being criminalized, which is being deported and coming back

02:15:27  25    to the country.  Congress in 1929 criminalized reentry.

1    Congress in 1952 just made it easier to prosecute that crime.

2           The other change Mr. Ellis points to is that Congress in

3    1952 dropped the requirement that the prior removal be lawful.

4    The Supreme Court in *Mendoza-Lopez* a few decades later said that

02:15:51    5    the Constitution actually requires that and wrote it back into

6    the statute.

7           So what Congress did in 1952 was, essentially, try to --

8    or make a change that the Supreme Court later said was basically

9    unconstitutional and had to read it back into the law.  So I

02:16:07    10    don't think that Congress in 1952 making that change suggests

11    any lack of racial animus.

12           And what I think is really important here is that the

13    standard for a showing of racial animus under *Arlington Heights*

14    is that that racial animus be a motivating factor -- not the

02:16:29    15    only factor, not the controlling factor, not the predominant

16    factor -- a motivating factor.

17           Mr. Ellis has suggested there may have been all other --

18    all kinds of other factors.  He hasn't shown evidence of that.

19    He suggested it may have been.  But putting that aside, all

02:16:47    20    Mr. Munoz has to do to meet his burden is show that racial

21    animus was a motivating factor.

22           And it's clear from Dr. Kang's testimony we have known

23    racists, known eugenicists, we have recodifying laws to make it

24    easier to lock up Latinos at a time when Latinos were despised

02:17:10    25    in this country.  It is not a huge leap, as Mr. Ellis suggests

1  it is, to find that Congress in 1952 and in the 1980s and in the
2  1990s was acting with racial animus.

3      And what Mr. Ellis . . .

4      I think that, Your Honor, really is the point that I
02:17:43  5  want the court -- to leave the court with, is that it is a
6  motivating factor of racial animus.

7      Dr. Kang came here today, testified for hours on her
8  professional opinion that it was an overwhelming factor, and
9  that clearly meets the bar of a factor which shifts the burden
02:18:01  10  over to the government.

11      And I believe I heard Mr. Ellis say that a lack of
12  evidence is not evidence.  And the amendments in the 1980s and
13  the 1990s, we all agree that Congress didn't really discuss
14  reentry.  So if a lack of evidence is not evidence, then the
02:18:20  15  government cannot meet its burden of showing that Congress would
16  have enacted the reentry statute absent racial animus.

17      I'd be happy to answer questions from the court on any
18  of this.

19      THE COURT:  I don't have any questions.

02:18:34  20      I want to thank both counsel for an interesting day and
21  have quite a bit of work ahead of me.  What I would like to do
22  is end the record unless there's anything else the government
23  wants to add?

24      MR. ELLIS:  No, Your Honor.  Thank you.

02:18:52  25      THE COURT:  Okay.  Mr. Goddard, anything else from you?

1          MR. GODDARD:  No, Your Honor.  Thank you very much.

2          THE COURT:  Okay.  And I just -- I'd like counsel to

3     stay on just for a minute.  I'm going to excuse the court

4     reporter and the interpreters.  Court is in recess.  I will

02:19:11  5     issue an opinion later.

6          So court's in recess.

7          (Hearing concluded at 2:19 pm)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3        I, MARILYNN S. McMARTIN, Registered Diplomate Reporter and

4    Certified Realtime Reporter, do hereby certify:

5        That I am an Official Court Reporter for the United States

6    District Court for the Eastern District of Washington in Yakima,

7    Washington;

8        That the foregoing proceedings were taken on the date and

9    at the time and place as shown on the first page hereto; and

10       That the foregoing proceedings are a full, true and

11   accurate transcription of the requested proceedings, duly

12   transcribed by me or under my direction, to the best of my

13   ability.

14       I do further certify that I am not a relative of, employee

15   of, or counsel for any of said parties, or otherwise interested

16   in the event of said proceedings.

17       DATED this 21st day of February, 2022.

18

19

20

21       Marilynn S. McMartin, RDR, CRR

22       Washington CCR #2515

23       Official Court Reporter

24       Yakima, Washington

25